From: Lisa Scibilia <LScibilia@UROMED.com>
To: "'gcapianco@prowess.com'" <gcapianco@prowess.com>
Subject: benefit info
Date: Thu, 12 Apr 2001 15:35:44 -0400
X-Mailer: Internet Mail Service (5.5.2650.21)

Hi Gil,

I called the Hartrford and Blue Cross and they had said that since your
group is being considered a transfer and not as newhires and you are coming
directly from another plan, than both for medical and all disabilitites that
the pre-existing conditions are waived.

Hope this answers your question.

Take care

Lisa



EXHIBIT

1



Hartford Life

May 3, 2002

Gil Capianco
4274 Mt Hukee Ave
San Diego, CA  92117-4734

Policy Holder:    Alliant Medical Technologies
Claimant:         Gil Capianco
SSN:              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
Policy Number:    GLT219661

Dear Mr. Capianco:

We are writing to you about your claim for Long Term Disability (LTD) benefits.  These benefits are under the group insurance policy number GLT219661 for Alliant Medical Technologies.

We have completed our review of your claim for benefits and have determined that the Pre-Existing Conditions Limitations Provision contained in the Policy applies to this Disability.  Accordingly, LTD benefits are not payable to you under the terms of the Policy, and your claim must be denied.

Your policy states: "No benefit will be payable under the plan for any Disability that is due to, contributed to by, or results from a Pre-existing Condition, unless such Disability begins:
1.  after the last day of 90 consecutive day(s) while insured during which you received no medical care for Pre-existing Condition; or
2.  after the last day of 365 consecutive day(s) which you have been continuously insured under this plan.

Pre-existing Condition means:
1.  any accidental bodily injury, sickness, Mental Illness, pregnancy, or episode of Substance Abuse; or
2.  any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, Mental Illness, pregnancy, or Substance Abuse;

for which you received Medical Care during the 90 days period that ends the day before:
1.  your effective date of coverage; or
2.  the effective date of a Change in Coverage.

Medical Care is received when:
1.  a Physician is consulted or medical advice is given; or
2.  treatment is recommended, prescribed by, or received from a Physician.

**AR293**



EXHIBIT

2

Benefit Management Services
Syracuse Disability Claim Office
P.O. Box 4907
Syracuse, NY 13221-4907
Fax (315) 385-5014

Treatment includes but is not limited to:
1. medical examinations, tests, attendance or observation; and
2. use of drugs, medicines, medical services, supplies or equipment."

We based our decision to deny your claim on policy language. All the papers contained in your file were viewed as a whole. This included:

- The Employer and Employee sections of the Application for Long Term Disability Income Benefits.
- Attending Physician Statement completed by Dr. Nelson dated January 30, 2002.
- Medical records obtained from the office of Dr. Nelson.
- Pharmacy records from Express Scripts.

Alliant Medical Technologies reports that your Long Term Disability (LTD) Insurance coverage under Policy GLT219661 became effective on March 27, 2001 and that your last date worked was October 31, 2001.

The Attending Physician's Statement dated January 30, 2002 completed by Dr. Nelson reports a diagnosis of multiple sclerosis.

The medical records received from the office of James R. Nelson, M.D. report that you received Medical Care as defined in the Policy for multiple sclerosis on the following dates:

12-11-00: Office visit: Reference to the medication: Avonex noted.
04-16-01: Office visit: Reference to the medication: Avonex noted.
09-17-01: Office visit: Reference to your taking the medication: Avonex for 1 ½ years.
03-11-02: Office visit: medication : minimal reaction to Avonex (since April 2000).

The pharmacy records received from Express Scripts report that you received medical care as defined in the Policy for multiple sclerosis on the following dates:

06-20-01: medication: Avonex
07-05-01: medication: Avonex

Based on the above information, we have determined that:
(1) Your LTD insurance coverage had been in force for less that 365 consecutive days at the time of your last date worked on October 31, 2001.
(2) Your received Medical Care for your multiple sclerosis during the 90 day period prior to your effective date of LTD insurance on March 27, 2001.
(3) You did not experience a 90 consecutive days while insured during which you received no medical care for the Pre-Existing Condition of multiple sclerosis.

Therefore, it is our determination that your disability is due to, contributed to by, and results from the Pre-Existing Condition of multiple sclerosis; that the Pre-Existing Condition Limitations Provision applies to your disability due to multiple sclerosis; and that your claim for Long Term

**AR294**

Disability Benefits must be denied. Accordingly, LTD Benefits are not payable to you for this claim.

We reserve all rights and defenses available to us in making our determination.

The Employee Retirement Income Security Act of 1974 (ERISA) gives you with the right to appeal our decision and receive a full and fair review. You may appeal our decision even if you do not have new information to send us. You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. If you do not agree with our denial, in whole or in part, and you wish to appeal our decision, you or your authorized representative must write to us within one hundred eighty (180) days from your receipt of this letter. Your appeal letter should be signed, dated and clearly state your position. Along with your appeal letter, you may submit written comments, documents, records and other information related to your claim.

Once we receive your appeal, we will again review your entire claim, including any information previously submitted and any additional information received with your appeal. Upon completion of this review, we will advise you of our determination. After your appeal, and if we again deny your claim, you then have the right to bring a civil action under Section 502(a) of ERISA.

Please send your appeal letter to:

Disability Claim Appeal Unit
Benefit Management Services - Floor B2-E
P.O. Box 2999
Hartford, CT 06104-2999

You may also have this matter reviewed by the California Department of Insurance by writing directly to them at the following address:

California Department of Insurance
Consumer Service Division
300 South Spring Street, 11th Floor
Los Angeles, CA 90013
Telephone: (213) 897-8921 or (800) 927-HELP

If you have any questions, please feel free to contact our office at (888) 875-4727, x5952. Our office hours are 8:00 AM to 6:00 PM EST, Monday through Friday.

Sincerely,

Sabrina P. Coleman, Examiner
Hartford Life and Accident Insurance Co.

CC:    File Copy

AR295

# LAW OFFICES OF HOWARD BENNETT HELLEN

MELROSE LAW CENTER
380 SOUTH MELROSE DRIVE, SUITE 345
VISTA, CA 92083
(760) 643-4115
(760) 643-4116 FAX
HHELLEN@AOL.COM

**MISSION VALLEY OFFICE:**
3111 CAMINO DEL RIO NORTH
SUITE 400
SAN DIEGO, CA 92108
(619) 284-9375

**RANCHO BERNARDO OFFICE:**
11440 W. BERNARDO COURT
SUITE 300 PMB 300
SAN DIEGO, CA 92127
(858) 485-8830

October 28, 2002

Ms. Sabrina P. Coleman, Examiner
HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Disability Benefit Management Services
Syracuse Disability Claim Office
P.O. Box 4907
Syracuse, NY 13221-5014

-AND-

Manager or other applicable person,
Disability Claim Appeal Unit
HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Benefit Management Services – Floor B2-E
P.O. Box 2999
Hartford, CT 06104-2999

VIA FEDERAL EXPRESS OVERNIGHT DELIVERY

Re:    Claimant:          Gil Capianco
        Policy Holder:     Alliant Medical Technologies (now UroMed Corp.)
        Policy #:          GLT219661
        Soc. Sec. #:       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

## ADMINISTRATIVE APPEAL OF DENIAL OF LTD BENEFITS

Dear Ms. Coleman or successor and Sir or Madam in Appeals Unit:

As you are aware, this office has been retained by Mr. Gil Capainco for the purpose of representing him in the above-captioned matter. I am addressing this formal letter of appeal to both persons listed above, since despite the instructions in Ms. Coleman's denial letter of May 3, 2002 to forward the appeal letter to the second address listed above, when my

continued....

**AR276**



MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE TWO

paralegal Stephanie called there today she was told that "no appeals ever come to our Hartford Office." Therefore I am relying on you to ensure that this letter arrives where it is supposed to be received on or before the deadline of November 3, 2002.

At the outset, please be advised that in the event of an upholding of the denial of Long-Term Disability ("LTD") benefits upon this appeal, Mr. Capainco will have exhausted his administrative remedies, and his right to file suit under ERISA in a United States District Court will accrue. We are of course confident that you will determine that between the administrative record already in your files, augmented by the additional reports and facts set forth in the instant appeal, more than sufficient evidence exists to overturn your initial decision to deny LTD benefits.

## I.  **PROCEDURAL SUMMARY**:

Gil Capianco, a former employee of UroMed Corporation (hereinafter "UroMed"), formerly Prowess/SSGI (hereinafter "Prowess"), applied for short-term disability in approximately October of 2001, and for long-term disability on January 8, 2002. After a delay of several months, Mr. Capianco's LTD benefits claim was denied by The Hartford by way of letter dated May 3, 2002 from a Ms. Sabrina P. Coleman (see Exhibit "A").

Mr. Capianco's occupation was that of technical computer support and "troubleshooting" for clients and customers. He had worked in the general area of computer support and software engineering for a period of nearly twenty (20) continuous years, prior to his ceasing work due to his disability. This is essentially the *only* type of work Mr. Capianco has done for the past 20 years.

Mr. Capianco's occupation involved the ability to work under constant pressure, with a need to instantly keep track of detailed technical information, deal with large numbers of clients, and customers, and sit and use a computer and word processor for many hours of each working

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE THREE

day. He also had to frequently "multi-task" his work due to constantly changing requirements and had to pay very strict attention to even the smallest detail. A copy of Mr. Capianco's job description, in full detail, is attached hereto as Exhibit "B".

As demonstrated in The Hartford's own administrative record, Mr. Capianco suffers from numerous health problems, including but not necessarily limited to Multiple Sclerosis ("MS"), Optical Neuritis, bilateral partial blindness, severe fatigue, and related severe difficulty with concentration, focus, and memory. All of these conditions arise out of his MS, are fully medically documented, and are within your administrative record.

Despite this immense array of real and documented ailments which did indeed disabled him, as certified by his primary treating physician, Neurologist Dr. Nelson (see Attending Physician's Statement dated January 30, 2002 and attached hereto as Exhibit "C"), The Hartford acted to deny benefits on the pretext of Mr. Capianco's MS being an excluded "preexisting condition" under the group Plan Policy. It should be noted that Mr. Capianco has complied in full good faith with all of the requests made of him by Hartford, the plan administrator.

It should also be noted that at no time during the application period, between October of 2001 and May of 2002, was Mr. Capianco examined by any doctor on behalf of The Hartford to ensure that The Hartford was even familiar with the full scope of Mr. Capianco's illnesses; not even a "paper review" was apparently conducted. Yet The Hartford concluded, without any independent medical review, that his MS was a "preexisting condition" and apparently, that none of his other conditions arising out of his MS disabled him in any way. This failure in and of itself is a complete abuse of discretion and a breach of The Hartford's fiduciary obligations to Mr. Capianco to conduct a full and fair review within the meaning of ERISA.

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE FOUR

It should further be noted that an affirmative representation was made by Ms. Lisa Scibilia, of Mr. Capianco's employee benefits department at UroMed, that stated the following:

> " **I called the Hartford** and Blue Cross *and they had said* that *since your group is being considered a transfer and not as new hires and you are coming directly from another plan, then both for medical and all disabilities that **the pre-existing condition [limitations] are waived.**"   Letter e-mailed from Lisa Scibilia to Mr. Capianco, dated April 12, 2001,  attached hereto and incorporated herein as Exhibit "D"; **emphasis and italics added.**

Thus, Mr. Capianco proceeded in reasonable reliance on the promise that his condition would not be excluded under any "preexisting condition" limitation, and The Hartford has both waived any claim of exclusion and is also estopped from using any such exclusion.

Beyond the above facts, the decision to deny LTD benefits to Mr. Capianco constitutes an abuse of discretion even had a proper investigation and review been conducted on behalf of The Hartford. This abuse stems from The Hartford's complete abandonment of its own contractual policy language, in a transparent effort to wrongfully deny vital disability income in favor of its own economic self interest.

It should also be noted that since the time Mr. Capianco left work in 2001, his MS and related illnesses, and their symptomatology, have worsened. This includes the extent of his blindness, and his ever-increasing severe fatigue and related cognitive problems. He continued, and continues, to try medications when needed in order to attempt to alleviate his disabling symptoms, but nothing has appreciably helped. He will not use drugs that have addictive properties and tries to avoid medicines that significantly dull the senses, which are already impaired significantly due to the cognitive problems resulting from his illnesses.

It should be noted that The Hartford has admitted in writing that Mr. Capianco suffers from MS, a severe disease that severely disables many persons who suffer from it. This disabling

**AR279**

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE FIVE

character is universally *recognized in the medical community. However, this* issue does not even
need to be addressed any further, due to the fact that The Hartford is not even claiming that Mr.
Capianco is "not disabled", but rather that his claim is barred by the preexisting condition
limitation in the Plan Policy. The fatal flaw in this reasoning is that The Hartford ignores the
provision of that Policy contained in the sections immediately following the "preexisting bar",
which totally negate the application of that very prohibition. This inconsistency alone is grounds
for mandatory application of the de novo standard of review under settled federal ERISA law, as
will be discussed under the next two headings entitled "The Plan Policy" and "Summary of Mr.
Capianco's Position".

Mr. Capianco has never been able to return to any gainful employment since his last day of
work in October, 2001.

Mr. Capianco has continued with his treating physicians, all of whom continue to support
the medical facts showing that Mr. Capianco's illnesses totally and permanently disabled him from
any gainful employment.

## II.    THE PLAN POLICY

It should be noted that, like most private group LTD policies, the controlling Plan Policy
in my possession contains a "preexisting condition" limitation on coverage. In view of the fact
that The Hartford could not possibly claim that Mr. Capianco does not have MS and is not
disabled as a result thereof, it does not take a quantum leap of the imagination to deduce that The
Hartford was interested in seeing if it could terminate or deny Mr. Capianco's LTD benefits on
this contractual limitation. This provision has been improperly invoked in an out of context
manner, as explained below.

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE SIX

The Hartford's denial letter, which looks, on the surface, like it contains meaningful and reasonable statements, actually contains material misstatements and concealments of fact, misrepresents the true facts, and ignores and suppresses the most material portions of its own Plan Policy in a transparently forced attempt to justify its baseless decision to deny benefits.

The policy language quoted by The Hartford, which appears to be accurate, would indeed accomplish this goal, in accordance with the fiduciary requirements of plan administrators and insurers under ERISA, but for the following problems:

The face of the same Plan Policy quoted by Ms. Coleman of The Hartford in its May 3, 2002 denial letter contains, immediately beneath the "Pre-Existing Coverage Limitations", the following language:

## " CONTINUITY FROM A PRIOR PLAN

**Is there continuity of coverage from a Prior Plan ?**

If you were:

1. Insured under the Prior Plan;
2. Actively at Work; and
3. not eligible to receive benefits under the Prior Plan,

on the day before the Plan Effective Date, the Deferred Effective Date provision will **not** apply to you.

If you become insured under the Group Insurance Policy on the Plan Effective Date *and were covered under the Prior Plan on the day before the Plan Effective Date, the Pre-existing Conditions Limitation **will cease to apply*** on the first to occur of the following

**AR281**

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE SEVEN

dates:

1.      **the Policy Effective Date**, if your coverage for the Disability was not limited by a pre-existing condition restriction under the Prior Plan; **or**

2.      if your coverage was limited by a pre-existing condition restriction under the Prior Plan, the date the restriction would have ceased to apply had the Prior Plan remained in force." UROMED/HARTFORD PLAN POLICY, Page 10; *emphasis and italics added*.

Unfortunately for The Hartford, the above-quoted language operates to exempt Mr. Capianco from the pre-existing condition exclusion in the Plan Policy. In this case, the following facts are undisputed:

1.      Mr. Capianco was covered by a "Prior Plan", i.e. the Prowess LTD Plan;

2.      Mr. Capianco was insured under that Prior Plan, and was actively at work on the day before the Plan Effective Date of the UroMed/Hartford Plan, i.e. March 27, 2001, as admitted in the denial letter of May 3, 2002; and

3.      Mr. Capianco was **not** eligible to receive benefits under that Prior Plan, since he was still actively at work and not certified as disabled by his physicians at that time.

In view of the above facts, the preexisting condition limitation should not have been applied. Furthermore, the remaining condition set forth as quoted above for exclusion from this limitation are met as follows:

Mr. Capianco was indeed covered under the Prior Policy on the new Plan Effective Date, and thus the preexisting condition limitation should have "ceased to apply", as quoted from the Plan Policy above.

**AR282**

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE EIGHT

The Hartford did not inform Mr. Capianco, in its denial letter or elsewhere, of the real prerequisites for using the "preexisting condition" limitation. Instead, its wording made it appear that no other conditions even existed in the Plan Policy for the invocation of this exclusion. This constitutes another example in the series of deprivation of the right to a full and fair review of Mr. Capianco's LTD claim.

Also of note is that the record reflects that The Hartford conducted extensive and prolonged investigation into Mr. Capianco's medical records over a period of many months prior to denying his benefits, i.e. from the beginning of January of 2002 through early May of 2002. Not only does this delay constitute a violation of ERISA's 45-day requirement for a decision on a disability claim, but this pattern of activity serves to underscore that the attempted use of a "preexisting condition" exclusion was an afterthought, only resorted to by The Hartford when it had satisfied itself that it could not deny his claim on the basis of being "not disabled".

At any rate, on the basis of its inaccurate, unfounded, misleading, and biased misapplication of the clear language concerning the preexisting condition limitation by concealing the language concerning continuity of coverage, The Hartford acted to deny further LTD benefits to Mr. Capianco. The history of the handling of this claim rises to the level of denial of a full and fair review, as is Mr. Capianco's right under ERISA, in violation of ERISA, 29 USC Section 1133, via Dept. of Labor Regulations at 29 CFR Section 2560.503-1; see case law on point holding this to be a denial of full and fair review, and grounds for invocation of the de novo standard of review, including but not limited to White v. Jacobs Engineering Group LTD Benefit Plan (9th Cir. 1989) 896 F.2d 344; Booton v. Lockheed Med. Ben. Plan (9th Cir. 1997) 110 F.3d 1461); and Friedrich v. Intel (9th Cir. 1999).

Nowhere in the Plan language is any other requirement stated for exemption from the "preexisting condition limitation". This is the death knell for The Hartford in its attempt to deny

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE NINE

LTD benefits to Mr. Capianco. All that is required is that Mr. Capianco was covered under the Prior Plan, was not eligible to receive benefits under the prior plan, and was still working at the date the UroMEd Plan became effective as to him. He has met all of these requirements. Thus, The Hartford further violates ERISA's mandate of full and fair review in requiring evidence **beyond that which was required under its own LTD policy**, which also constitutes an arbitrary and capricious denial of LTD benefits and an abuse of the plan administrator's discretion under ERISA.

In view of the foregoing, it is Mr. Capianco's position that the denial of LTD benefits was without substantial evidentiary support, and, in fact, without any rational foundation whatsoever, and is thus an egregious violation of The Hartford's fiduciary duties to Mr. Capianco under ERISA.

On a preliminary note, please be advised that in the event of a denial of this appeal, Mr. Capianco will seek to litigate this matter in the United States District Court, on grounds of frustration of any further meaningful appeal in light of this well-recognized exception to the "exhaustion of administrative remedies doctrine". The reason for this would be that, in view of the further evidence presented in this letter, (and in view of the fact that case law unanimously requires only one administrative appeal to be made, regardless of the number of appeals available to a plan participant) no reasonable person would conclude that any further appeal will make any difference, other than to prejudice Mr. Capianco's ability to survive by forcing him to go through yet further rounds of delays, that could accumulate to more months or even years. This view is supported in <u>Smith v. Retirement Trust Fund of the Plumbing, Heating and Piping Industry of So. Calif.</u> (9th Cir. 1988) 857 F.2d 587.

**AR284**

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE TEN

III.    **SUMMARY OF MR. CAPIANCO'S POSITION** :

As you know, Mr. Capianco has been conclusively diagnosed with Multiple Sclerosis ("MS"), Optical Neuritis, bilateral partial blindness, and related ailments. These ailments are all recognized by the mainstream medical communities throughout the United States and abroad as physically-based illnesses, diseases, and/or disorders in which symptoms include serious vision impairment, muscle weakness, and constant fatigue, with frequent and unpredictable "spikes" of weakness and fatigue of extreme magnitude. These conditions, which frequently interact with each other and are frequently present at the same time, are objectively verifiable by medically-recognized tests, which were done with positive results on Mr. Capianco, also cause severe cognitive dysfunction and some secondary emotional distress/depression. As certified by his primary attending physician, they have caused Mr. Capianco to become totally disabled from his occupation, and probably from any job whatsoever on a full-time or even part-time basis.

Despite conclusive medical reports in The Hartford's administrative record, Hartford denied LTD benefits, not on the basis of claiming that Mr. Capianco was "not disabled", but rather on the pretext of a wrongful application of the Plan's preexisting condition exclusion, as described in detail above.

In view of the foregoing facts, which are incapable of dispute, the following issues exist, all of which would be found by a rational trier of fact and law to support liability under ERISA against The Hartford:

A.    THE STANDARD OF REVIEW

The record demonstrates that it was The Hartford, and only The Hartford, that has sent every letter concerning Mr. Capianco's claims for LTD benefits, as well as the ultimate

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE ELEVEN

denial of LTD benefits. This is confirmed in the facial language of the Plan Policy itself, which defines "We" and "Us" only as The Hartford (see Plan Policy at page 7), and then states the following:

> " Who interprets policy terms and conditions ?
>
> **We** have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy."
> PLAN POLICY at Page 19; **emphasis added**.

Thus, the evidence shows that no other party, including Mr. Capianco's employer, UroMed, was even mentioned at all within the text of the Plan Policy. This, coupled with clear language giving The Hartford the sole authority and discretion to interpret the terms of the Plan and to make all disability determinations clearly shows that The Hartford is the sole plan administrator as defined under ERISA. Thus, the issue is: has The Hartford's inherently conflicted status as both plan administrator and insurance carrier paying the claims tainted its decision, as ERISA fiduciary, to deny continued LTD benefits to Mr. Capianco ? Thus, since the *de novo* standard of review applies to any determination made by The Hartford in this matter, all of its deliberations, decisions and actions will be subject to full and searching judicial review. This is the law of the land, established by the United States Supreme Court in Firestone Tire & Rubber Co. v. Bruch (1988) 489 U.S. 101, and acknowledged in the Ninth Circuit in the following illustrative landmark cases: Taft v. Equitable Life Assurance Soc'y (9th Cir. 1993) 9 F.3d 1469; Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology (9th Cir. 1997) 125 F.3d 794; and Tremain v. Bell Industries (9th Cir. 1999) 196 F.3d 970.

Under *de novo* review, there can be no doubt that The Hartford failed to follow its own

**AR286**

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE TWELVE

plain plan policy language by ignoring the qualifying language concerning Continuation of Coverage, and its impact, i.e. extinguishment of the preexisting condition limitation.

(I)    If the de novo standard of review is applied, does The Hartford's misreading of the full language concerning whether and when to apply he preexisting condition limitation violate the doctrine of *contra proferentum* ?

In Lang, it was held that where ambiguity exists in a plan policy, ERISA does not preempt the doctrine of *contra proferentum* from applying to resolve such ambiguities in favor of the participant. Lang, *supra*, at 799.

It is law that nothing in ERISA preempts the application of State common law doctrines which have also become part of a body of federal common law. Among these doctrines is the doctrine of *contra proferentum*, i.e. that ambiguities in contracts of insurance are to be resolved against the drafter and in favor of the insured. Kearney v. Standard Ins. Co. (9th Cir, 1999; *en banc*) 175 F.3d 1084, 1089-1090.

In this case, in the Policy, the provisions concerning Continuity of Coverage clearly override the applicability in this case of the preexisting condition limitation, as proven in the section entitled "The Plan Policy" above. Mr. Capianco met all the necessary requirements for exemption from the preexisting condition exclusion. Thus, although the doctrine is not really needed here, in light of the "plain meaning rule" of contract interpretation, in the event some "ambiguity" is found to exist between the Preexisting Condition provisions and the Continuity of Coverage provisions, applying settled law, the doctrine of *contra proferentum* must interpret the terminology in the sense that it would be reasonably understood by a claimant of ordinary sensibilities. The only reasonable interpretation of these provisions, when read together and coupled with Mr. Capianco's status in this case, leads to the inescapable conclusion that the

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE THIRTEEN

doctrine will find that the Continuation of Coverage provisions would be reasonably construed to support Mr. Capianco's assertion that the language must be construed against the drafter, The Hartford, and in his favor.

B.   ASSUMING DE NOVO REVIEW IS NOT APPLIED, DID THE HARTFORD ABUSE ITS DISCRETION AS A FIDUCIARY UNDER ERISA ?

Even in the incredibly unlikely event that the *de novo* standard of review is not applied, The Hartford's acts and omissions in this matter clearly rise to such arbitrary and capricious levels as to qualify as abuse of discretion under that "deferential" standard of review. For example, The Hartford's failure to follow its own conditions under the "Continuity of Coverage" provisions, which in this case would defeat the otherwise applicable "preexisting condition limitation" is *per se* an abuse of discretion under Atwood v. Newmont Gold Co. (9th Cir. 1995) 45 F.3d 1317. Furthermore, its failure to base its denial of benefits upon substantial evidence also will be deemed an abuse of discretion under Zavora v. Paul Revere Life Insurance Co. (9th Cir. 1998) 145v F.3d 1118; Saltarelli v. Bob Baker Grp. Med. Trust (9th Cir. 1994) 35 F.3d 382; and Deegan v. Continental Cas. Co. (9th Cir. 1999) 167 F.3d 502.

Finally, in Friedrich v. Intel Corp. (9th Cir. 1999) 181 F.3d 1105, this Circuit held that INTEL's failure to follow the language of its own Plan Policy defining "objective medical evidence" by ignoring or discounting the same type of lab and related testing as conducted in that case constitutes an abuse of discretion, noting that CFIDS does not have one generally accepted "dipstick test". Friedrich, *supra*, at 1112. Applying Friedrich here, under the

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE FOURTEEN

facial language of the Plan Policy, The Hartford failed to defer to its own language concerning Continuity of Coverage, and such failure compels an interpretation in favor of Mr. Capianco.

C.     <u>DID THE HARTFORD WAIVE ANY ASSERTION OF THE PREEXISTING CONDITION EXCLUSION, AND/OR IS IT ESTOPPED FROM DENYING BENEFITS IN VIEW OF THE LANGUAGE CONTAINED IN MS. SCIBILIA'S LETTER ?</u>

The answer here is also an overwhelming "Yes". As set forth above, Mr. Capianco's employer sent him a letter in which the employer represented that The Hartford had assured it that due to the fact that Mr. Capianco's group was simply "switched", this would mean that the preexisting condition limitation/exclusion in the Plan Policy would be waived. This is an out and out waiver of any attempt by The Hartford to impose the preexisting limitation against Mr. Capianco, even in the event that The Hartford could actually use this limitation. Of course, in view of the Continuity of Coverage provision and Mr. Capianco's circumstances, the exclusion cannot be used in any event without violating The Hartford's fiduciary duties.

With respect to estoppel, federal courts, including those of this Circuit, have readily applied the common law doctrine of judicial estoppel in circumstances such as exist here. The doctrine of judicial estoppel prevents a party from benefitting from its own misleading conduct. The application of this doctrine has been recognized by the United States Supreme Court as the law of the land in <u>Heckler v. Community Health Services</u> (1984) 467 U.S. 51. This Circuit has held that benefit denials in the face of contrary language or representations are subject to the application of the estoppel doctrine, which has in turn been applied to find the denial to be an abuse of discretion under ERISA. <u>Blau v. Del Monte Corp.</u> (9th Cir. 1984) 748 F.2d 1348.

**AR289**

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE FIFTEEN

D.   DID THE HARTFORD VIOLATE THE DOCTRINE OF REASONABLE
     EXPECTATIONS OF AN INSURED WHEN IT DENIED MR. CAPIANCO'S
     CLAIM ?

Once again, the answer is "Yes".

The common-law doctrine of reasonable expectations of an insured is not preempted by
ERISA. In Saltarelli v. Bob Baker Group Medical Trust (9th Cir. 1994) 35 F.3d 382, the court
expressly adopted as applicable to ERISA claims the "doctrine of reasonable expectations" which
renders unenforceable any plan provision which is not clearly and conspicuously communicated to
the individual participant. This view was restated in Conseco v. Const. Laborers Pension Trust
(9th Cir. 1996) 93 F.3d 600, in which it was held that even under the arbitrary and capricious
standard, the plan administrator **must** interpret plan provisions in a reasonable, good faith manner
to accord with the expectations of the participant.

In this case, Mr. Capianco was covered under the "Prior Plan" and, according to the
provisions of the Plan Policy at issue here, he fulfilled each and every condition recited in that
Policy for eligibility for continued benefits under the Continuity of Coverage provisions. In  view
of these facts, Mr. Capianco's  reasonable expectation would be one of coverage under the Plan
without challenge. Thus, under Conseco, the denial of benefits is an abuse of discretion under
ERISA.

IV.   **CONCLUSION**

In the year that Gil Capianco has been out of work, his pain, discomfort and profound
fatigue have only gotten worse. This has caused a secondary but severe impact on

**AR290**

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE SIXTEEN

his cognitive capabilities, and of course have caused him some depression, as such debilitating factors would impact upon any person of ordinary sensibilities. However, The Hartford does not dispute that Mr. Capianco is in fact disabled under the terms of the Plan, but instead attempts to misuse the preexisting condition limitation in an out of context and misleading manner, in an attempt circumvent its contractual and fiduciary duties and instead act in its own economic self-interest

In view of the foregoing, Mr. Capianco asserts that the denial of LTD benefits lacks any rational basis, and thus would be actionable under ERISA even under the stricter "abuse of discretion" standard of judicial review. The record shows that The Hartford has acted in egregious violation of its fiduciary duties to Mr. Capianco under ERISA.

Mr. Capianco sincerely hopes that with the data provided here, The Hartford will finally be convinced that its attempt to deny benefits under a "preexisting illness limitation/exclusion" was misplaced at best and willful and fraudulent at worst, and in any event is in clear breach of its fiduciary obligations under ERISA to its claimant, Mr. Capianco. Mr. Capianco would of course still prefer not to be forced into federal court litigation, which under the facts of this case could also support supplemental state law causes of action for common-law or statutory fraud, negligent misrepresentation, and possibly other torts. Despite all this, Mr. Capianco sees no need for that result unless The Hartford yet again ignores the facts. My client and I appeal to you to grant him full LTD benefits, in accordance with the terms of the LTD Plan.

Finally, due to the series of The Hartford's unwarranted delays and failures, in violation of ERISA, in failing to provide a decision on Mr. Capianco's denial of LTD benefits without a cogent and valid explanation, Mr. Capianco has already been denied his right to a full and fair

**AR291**

MS. SABRINA COLEMAN, AND
MANAGER OR SPECIALIST,
APPEAL UNIT
HARTFORD DISABILITY MANAGEMENT SERVICES
OCTOBER 28, 2002
PAGE SEVENTEEN

review. In view of these facts, **any extension of another 45 days beyond the initial ERISA 45-day appeal response period, which will expire on December 13, 2002, <u>had better be fully documented and explained</u>; "we need more time" will not be tolerated. Any further unexcused delay will be construed as a refusal to finalize this protracted proceeding to the severe medical, emotional, and economic prejudice of Mr. Capianco, and grounds for immediate filing of a lawsuit in the appropriate US District Court.**

Thank you for your anticipated cooperation and considerate attention.

Very truly yours,

Howard Bennett Hellen
HBH/sls

cc:     Client
        File

encls. **(per above)**

**AR292**



Hartford Life

May 3, 2002

Gil Capianco
4274 Mt Hukee Ave
San Diego, CA 92117-4734

Policy Holder:     Alliant Medical Technologies
Claimant:          Gil Capianco
SSN:               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
Policy Number:     GLT219661

Dear Mr. Capianco:

We are writing to you about your claim for Long Term Disability (LTD) benefits. These benefits are under the group insurance policy number GLT219661 for Alliant Medical Technologies.

We have completed our review of your claim for benefits and have determined that the Pre-Existing Conditions Limitations Provision contained in the Policy applies to this Disability. Accordingly, LTD benefits are not payable to you under the terms of the Policy, and your claim must be denied.

Your policy states: "No benefit will be payable under the plan for any Disability that is due to, contributed to by, or results from a Pre-existing Condition, unless such Disability begins:
1.  after the last day of 90 consecutive day(s) while insured during which you received no medical care for Pre-existing Condition; or
2.  after the last day of 365 consecutive day(s) which you have been continuously insured under this plan.

Pre-existing Condition means:
1.  any accidental bodily injury, sickness, Mental Illness, pregnancy, or episode of Substance Abuse; or
2.  any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, Mental Illness, pregnancy, or Substance Abuse;

for which you received Medical Care during the 90 days period that ends the day before:
1.  your effective date of coverage; or
2.  the effective date of a Change in Coverage.

Medical Care is received when:
1.  a Physician is consulted or medical advice is given; or
2.  treatment is recommended, prescribed by, or received from a Physician.

**AR293**



EXHIBIT

A

Benefit Management Services
Syracuse Disability Claim Office
P.O. Box 4907
Syracuse, NY 13221-4907
Fax (315) 385-5014

Treatment includes but is not limited to:
1. medical examinations, tests, attendance or observation; and
2. use of drugs, medicines, medical services, supplies or equipment."

We based our decision to deny your claim on policy language. All the papers contained in your file were viewed as a whole. This included:

- The Employer and Employee sections of the Application for Long Term Disability Income Benefits.
- Attending Physician Statement completed by Dr. Nelson dated January 30, 2002.
- Medical records obtained from the office of Dr. Nelson.
- Pharmacy records from Express Scripts.

Alliant Medical Technologies reports that your Long Term Disability (LTD) Insurance coverage under Policy GLT219661 became effective on March 27, 2001 and that your last date worked was October 31, 2001.

The Attending Physician's Statement dated January 30, 2002 completed by Dr. Nelson reports a diagnosis of multiple sclerosis.

The medical records received from the office of James R. Nelson, M.D. report that you received Medical Care as defined in the Policy for multiple sclerosis on the following dates:

12-11-00: Office visit: Reference to the medication: Avonex noted.
04-16-01: Office visit: Reference to the medication: Avonex noted.
09-17-01: Office visit: Reference to your taking the medication: Avonex for 1 ½ years.
03-11-02: Office visit: medication : minimal reaction to Avonex (since April 2000).

The pharmacy records received from Express Scripts report that you received medical care as defined in the Policy for multiple sclerosis on the following dates:

06-20-01: medication: Avonex
07-05-01: medication: Avonex

Based on the above information, we have determined that:
(1) Your LTD insurance coverage had been in force for less that 365 consecutive days at the time of your last date worked on October 31, 2001.
(2) Your received Medical Care for your multiple sclerosis during the 90 day period prior to your effective date of LTD insurance on March 27, 2001.
(3) You did not experience a 90 consecutive days while insured during which you received no medical care for the Pre-Existing Condition of multiple sclerosis.

Therefore, it is our determination that your disability is due to, contributed to by, and results from the Pre-Existing Condition of multiple sclerosis; that the Pre-Existing Condition Limitations Provision applies to your disability due to multiple sclerosis; and that your claim for Long Term

Disability Benefits must be denied. Accordingly, LTD Benefits are not payable to you for this claim.

We reserve all rights and defenses available to us in making our determination.

The Employee Retirement Income Security Act of 1974 (ERISA) gives you with the right to appeal our decision and receive a full and fair review. You may appeal our decision even if you do not have new information to send us. You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. If you do not agree with our denial, in whole or in part, and you wish to appeal our decision, you or your authorized representative must write to us within one hundred eighty (180) days from your receipt of this letter. Your appeal letter should be signed, dated and clearly state your position. Along with your appeal letter, you may submit written comments, documents, records and other information related to your claim.

Once we receive your appeal, we will again review your entire claim, including any information previously submitted and any additional information received with your appeal. Upon completion of this review, we will advise you of our determination. After your appeal, and if we again deny your claim, you then have the right to bring a civil action under Section 502(a) of ERISA.

Please send your appeal letter to:

Disability Claim Appeal Unit
Benefit Management Services - Floor B2-E
P.O. Box 2999
Hartford, CT 06104-2999

You may also have this matter reviewed by the California Department of Insurance by writing directly to them at the following address:

California Department of Insurance
Consumer Service Division
300 South Spring Street, 11th Floor
Los Angeles, CA 90013
Telephone: (213) 897-8921 or (800) 927-HELP

If you have any questions, please feel free to contact our office at (888) 875-4727, x5952. Our office hours are 8:00 AM to 6:00 PM EST, Monday through Friday.

Sincerely,

Sabrina P. Coleman, Examiner
Hartford Life and Accident Insurance Co.

CC:    File Copy

**PRINCIPALS ONLY** -Submit a letter of application, salary requirement and résumé.
CONTACT: Human Resources
SSGI Prowess Systems
1370 Ridgewood Drive, Suite #20
Chico, CA 95973-7803
Tel: 530-898-0660
FAX: 530-342-8966
Email: hrdept@prowess.com

SSGI is seeking an individual to fill a highly visible, full-time position in Customer Technical Support. This individual will perform:

- telephone product customer support;
- test and document user problems; run regression tests on interim versions of software;
- assemble, test and configure computer systems;
- and manufacture software.

Extensive experience with MS-DOS and MS-Windows software; a good understanding of PC based computer hardware and configuration; and excellent problem-solving abilities and communication skills are required. Applicants should also have a rudimentary knowledge of some scripting language (e.g. batch files), networking, text editing tools, and databases. A bachelor's degree in a relevant field is preferred. The salary is commensurate with experience, and an extensive benefits package is provided.

*Occasional onsite travel*

Traits...
- Team Player
- Self-Directed
- Organized and Detail-Oriented
- Positive Attitude
- Outgoing
- Enjoys interaction with Clients and Staff

Skills...
- Technical support / training over the telephone
- Providing outstanding client support
- Technically skilled with PC hardware, especially current systems (e.g.. Pentium II, Pentium Pro )
- Able to install, configure and support Windows 3.11, Windows-95 and NT systems
- Network client configuration experience a PLUS

Responsibilities...
- Customer interaction on support calls.
- Troubleshooting software and hardware problems.
- Maintenance of all associated paperwork and databases.
- ~~Preparation of complete computer systems for shipment to customers, worldwide. To include PCs, Printers, Digitizers, Scanners, installed software.~~
- ~~Tracking customers system production for timely shipment.~~
- Receiving materials, and data entry into accounting system. ~~(Will be trained on-job)~~
- ~~Occasional lifting of heavy parcels up to 80 lbs.~~
- ~~Preparation of initial paperwork for shipping.~~
- ~~Assist with maintenance and quality control of in-house computers.~~
- ~~Assist with RMA's and other purchasing tasks.~~
- And other duties assigned on an as-needed basis

**AR296**

For prompt consideration, please send cover letter, resume, and salary history.

| Benefits | Bonus Benefits |
|---|---|
| - Medical/Prescriptions Insurance | - Small Community |
| - Dental Insurance | - Short commute to work |
| - Disability Insurance | - University Community |
| - Life Insurance | - Team Environment |
| - 401(K) Plan /Profit Sharing | - Close to big cities |
| - Vacation /Sick Leave | - Even closer to outdoor recreation |
| - Paid Holidays | |


EXHIBIT
B
exhibit

APPLICATION FOR LONG TERM DISABILITY INCOME BENEFITS          **Section IV**

**ATTENDING PHYSICIAN'S STATEMENT OF DISABILITY**

To be completed by the Employee

Name of patient _GIL CAPIANCO_  Social Security Number _12348 2072_ D.O.B _23 June 1956_

Address of patient _4274 MT. HUKEE AVE_  _SAN DIEGO_  _CALIF_  _92117-4734_
Street · City · State or Province · Zip Code or Postal Code

Employer's name (and division, if applicable) _ALLIANT MEDICAL TECHNOLOGIC_

I hereby authorize release of information on this form by the below named physician for the purpose of claim processing.  Signed (Patient) _____  Date: _____

To be completed by the Attending Physician (The patient is responsible for the completion of this form without expense to the Company.)

Patient's condition is the result of: ☒ Illness  ☐ Injury  ☐ Pregnancy  Height _5'10_  Weight _6C_

If pregnancy, what is the expected date of delivery? Month ___ Day ___ Year ___

Is condition due to illness or an injury that is work related? ☐ Yes ☐ No

**DIAGNOSIS**

Primary diagnosis: _Multiple Sclerosis_  ICD-9 Code: _340_

Secondary diagnosis(es): _optic neuritis_  ICD-9 Code(s): _377³_

Subjective symptoms: _bilateral spatial blindness low vanery_

Test Results (list all results, or enclose test):

Test: _visual_  Date: _11/20_ Results: _20/400 (R), 20/25 (L) with central sctoma_

Test: ___ Date: ___ Results: ___

Physical examination findings: _bilateral optic disk pallor R & L_

If pregnancy, indicate LMP date: Month _N_ Day _A_ Year ___

**TREATMENTS**

Date you first treated this patient: _4/7/98_  Date you first treated this patient for this condition: ___

Date of onset of this condition: ___  Date of most recent treatment: _12/17/01_

How often has patient been seen/treated? ___  Date of next office visit: ___

Has patient been referred to any other physician? ☐ Yes ☒ No  If "Yes," Date(s): ___

Name and address: ___  Specialty: ___

Nature of treatment for this condition: ___

Has surgery been performed? ☐ Yes ☒ No  If "Yes," Date: ___ Procedure: ___ CPT Code: ___

Was patient hospitalized for this condition? ☐ Yes ☒ No  If "Yes," Date(s) admitted: ___ Date(s) discharged: ___

Name and address of hospital(s): ___

AR297

Progress (Please check one): ☐ Recovered ☐ Improved ☒ Unchanged ☐ Retrogressed

**EXHIBIT C**

## ATTENDING PHYSICIAN'S STATEMENT OF DISABILITY *(Side two)*

**IMPAIRMENT**

If the patient's ability to perform any of the following activities is limited by his/her disorder, please describe the extent of the limitation and its expected duration.

Standing: _____

Walking: _____ Can do _____

Sitting: _____

Lifting/carrying: _____

Reaching/working overhead: _____ poor due to visual loss _____

Pushing: _____

Pulling: _____

Driving: _____ impaired partially _____

Keyboard use/repetitive hand motion: _____ OK _____

If any other activities are limited, please specify the activities and the limitations: _____ visual impairment impacts all work activities _____

If the patient's vision is impaired, please describe the extent of the impairment: _____ See previous _____

Do you believe the patient is competent to endorse checks and direct the use of the proceeds thereof? ☒ Yes ☐ No
What is the psychiatric impairment *(if applicable)?*

☐ Inadequate information to make assessment.

☐ Essentially good functioning in all areas. Occupationally and socially effective.

☐ Slight difficulty in occupational functioning, but generally functioning well. Has some meaningful interpersonal relationships.

☒ Moderate impairment in occupational functioning. Limited in performing some occupational duties.

☐ Major impairment in several areas—work, family relations. Avoidant behavior, neglects family, is unable to work.

☐ Inability to function in almost all areas.

Date patient became unable to work due to this impairment? Month _____ 10 _____ Day _____ 10 _____ Year _____ 2001 _____

If physical or psychiatric limitations exist, how long do you feel limitations will last? _____ permanent _____

Attending Physician's Name: _____ James R. Nelson M.D. _____ Telephone # (858) 646-0400
*(Please print or type.)*

License No. G10532 _____ FAX # (858) 646 0402

SS# or E.I.N.#: _____ 532 30 6557 _____ Degree: _____ M.D. _____ Specialty: _____ Neurology _____

Street Address: _____ 9850 Genesee Ave. _____ City: _____ La Jolla _____ State: _____ CA _____ Zip Code: _____ 92037 _____

Signature: _____ Date signed: _____ 11 30 02 _____

From: Lisa Scibilia <LScibilia@UROMED.com>
To: "'gcapianco@prowess.com'" <gcapianco@prowess.com>
Subject: benefit info
Date: Thu, 12 Apr 2001 15:35:44 -0400
X-Mailer: Internet Mail Service (5.5.2650.21)

Hi Gil,

I called the Hartrford and Blue Cross and they had said that since your
group is being considered a transfer and not as newhires and you are coming
directly from another plan, than both for medical and all disabilitites that
the pre-existing conditions are waived.

Hope this answers your question.

Take care

Lisa

EXHIBIT

D

AR299

Page 1

VOLUME:    I

PAGES:    1 - 128

EXHIBITS: A to R

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

Case No. 03-CV-562 DMS (AJB)

------------------------------------------

GIL CAPIANCO,                              )

                 Plaintiff                   )

v.                                         )

LONG-TERM DISABILITY PLAN OF SPONSOR       )

UROMED CORP., et. al.,                     )

                 Defendants                  )

------------------------------------------


VIDEO DEPOSITION OF LISA TRACEY


DATE:    January 18, 2008

TIME:    9:56 a.m.

PLACE:   Rosenfeld & Rafik, P.C.

         44 School Street, Suite 410

         Boston, Massachusetts


\* \* \* \* \* \* \* \*

EXHIBIT

4

Page 2

```
 1                  A P P E A R A N C E S

 2

 3        LAW OFFICES OF HOWARD BENNETT HELLEN

 4        Howard Bennett Hellen, Esq.

 5        380 South Melrose Drive, Suite 361

 6        Vista, California 92081

 7        (760) 942-7848

 8        hhellen@aol.com

 9        Counsel for the Plaintiff

10

11        SEDGWICK, DETERT, MORAN & ARNOLD, LLP

12        Dennis G. Rolstad, Esq.

13        One Market Plaza

14        Steuart Tower, 8th Floor

15        San Francisco, California 94105

16        (415) 627-3435

17        dennis.rolstad@sdma.com

18        Counsel for the Defendants

19

20

21     ALSO PRESENT:   Andrew R. Hoffman

22                     Medeiros Steno & Video

23

24
```

1/18/08 DEPOSITION OF LISA TRACEY        GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 3

```
 1                    I N D E X

 2    WITNESS                              PAGE

 3    LISA TRACEY

 4    By Mr. Hellen                 7, 105, 120

 5    By Mr. Rolstad                   76, 114

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 4

1                E X H I B I T S

2    LETTER                                              PAGE

3    A  Notice of Deposition                              28

4    B  Defendant's Objection to

5       Notice of Deposition                              28

6    C  E-mail from Lisa Scibilia                         30

7    D  Eudora Pro Screen                                 32

8    E  Letter to Lisa Tracey

9       Dated April 11, 2002                              35

10   F  Letter Addressed to Lisa Scibilia

11      Dated February 18, 2002                           40

12   G  Employer Statement                                42

13   H  Letter from Howard Hellen to Lisa Tracey

14      Dated October 13, 2003                            46

15   I  Stewart Reiser Letter to Dennis Rolstad

16      Dated April 29, 2004                              49

17   J  Letter from Howard Hellen to Lisa Tracey

18      Dated March 5, 2004                               52

19   K  Letter from Howard Hellen to Lisa Tracey

20      Dated March 10, 2004                              61

21   L  Letter to Lisa Tracey

22      Dated March 16, 2004                              58

23   M  Declaration of Lisa Scibilia-Tracey               66

24   N  Letter from Stewart Reiser to Howard Hellen

Page 5

```
 1        EXHIBITS (CONT'D)
 2      Dated February 19, 2004                        69
 3   O  Letter to Howard Hellen
 4      Dated April, 28, 2004                          72
 5   P  Letter from Howard Hellen
 6      Dated April 28, 2004                           83
 7   Q  Group Benefit Plan                             83
 8   R  Endorsement                                    95
 9
10
11
12
13   ***EXHIBITS MARKED DURING THIS DEPOSITION
14       ARE ATTACHED.
15
16
17
18
19
20
21
22
23
24
```

Page 6

```
 1              P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  We are now recording
 3    and on the record.  My name is Andy Hoffman.  I'm a
 4    legal video specialist working on behalf of Medeiros
 5    Steno and Video Group.  We are here in association
 6    with Jones Reporting Company.  Today is January 18,
 7    2008, and the time is 9:57.  This is the deposition
 8    of Lisa Tracey in the matter of Capianco versus
 9    Long-Term Disability Plan of Sponsor Uromed Corp.,
10    et. al. in the U.S. Direct Court, Eastern District
11    of Massachusetts.  This deposition is being taken at
12    44 School Street, Boston, Mass.  The court reporter
13    is Amie Rumbo of Jones Reporting Company.  Counsel
14    will state their appearances and the court reporter
15    will administer the oath.
16              MR. HELLEN:  Howard Hellen for the
17    plaintiff, Gil Capianco.
18              MR. ROLSTAD:  Dennis Rolstad for the
19    defendants, the Uromed Plan.
20              LISA TRACEY,
21    a witness called for examination by counsel for the
22    Plaintiff, and having been satisfactorily identified
23    by the production of her Massachusetts driver's
24    license, was duly sworn by the Notary Public and
```

1    testified as follows:

2

3                    DIRECT EXAMINATION

4

5    BY MR. HELLEN:

6        Q.  Good morning.  Would you please kindly state

7    your name and spell your last name for the record.

8        A.  Lisa Tracey, T-r-a-c-e-y.

9        Q.  Thank you very much.  Ms. Tracey, you

10   understand that you're at a deposition, correct?

11       A.  Correct.

12       Q.  Have you ever been to a deposition before?

13       A.  Never.  No.

14       Q.  Okay.  Very good.  The purpose of this

15   deposition is to inquire of your personal knowledge

16   of any events that you may have participated in, in

17   the processing of the plaintiff's, Gil Capianco's,

18   claim for long-term disability benefits.  And you

19   understand that; is that correct?

20       A.  Yes.

21       Q.  Okay.  Now, there are a few ground rules

22   that I'd like to cover for you in deposition so that

23   we make sure that, you know, you're not taken

24   advantage of and that you know, basically, the

Page 8

1    parameters of what we're doing here.  First of all,

2    all we're trying to do is find out information that

3    you know or that we can refresh your memory on.  And

4    we don't expect you to make up anything or guess at

5    anything.  And you understand that, right?

6    A.   Um-hmm.

7    Q.   Okay.  Is that a yes?

8    A.   Yes.

9    Q.   The next thing I would like to say in that

10    regard is, please make sure that you answer all

11    questions clearly with -- with -- with a verbal

12    response.  If it's a yes or no, it's better than a

13    shrug of the shoulders or a nod, because it might be

14    a little more difficult, even with video.  We want

15    to get the transcript correct.  So you understand

16    that, correct?

17    A.   Yes.

18    Q.   Okay.  Very good.  And let's see.  You

19    realize that you're under oath and you're under an

20    obligation to answer the questions as truthfully and

21    accurately as you can, right?

22    A.   Yes.

23    Q.   Okay.  All right.  If you don't understand a

24    question that either of us may ask you, we don't

Page 9

1    want you to guess at what we're trying to tell you.

2    So please feel free to ask us to repeat or to

3    further explain the question.  Do you understand?

4        A.  Yes.

5        Q.  Okay.  Very good.  And is there any reason

6    why you feel you cannot testify truthfully or

7    accurately today?

8        A.  No.

9        Q.  Okay.  Very good.  Well, we're finished with

10   that stage.  Okay.  Have you discussed your

11   deposition today with any attorneys?

12       A.  Yes.

13       Q.  And who would that with?

14       A.  My attorney, Mr. Michael Kahill.

15       Q.  And who or what organization does Mr. Kahill

16   represent or work for?

17       A.  Me, personally, and my company.

18       Q.  And what is your company?

19       A.  Flooring Designs.

20       Q.  Okay.  And is that here in the Boston area?

21       A.  Brockton, Mass.  Yes.

22       Q.  You wouldn't -- Would you happen to know a

23   street address for them?

24       A.  For him?

Page 10

1      Q.   For Flooring Designs?

2      A.   707 Centre Street.

3      Q.   In Brockton?

4      A.   Yes.

5      Q.   Okay.  And have you worked with -- I'm

6  sorry, could you give me the name of that attorney

7  again one more time?  I'll write it down.

8      A.   Michael Kahill.

9      Q.   Okay.

10     A.   K-a-h-i-l-l.

11     Q.   Thank you.  And does Mr. Kahill work inhouse

12 at Flooring Designs?

13     A.   No.

14     Q.   Is he a retained attorney to Flooring

15 Designs?

16     A.   No.

17     Q.   Okay.  Has Mr. Kahill represented you in any

18 legal matters prior to discussion at this deposition

19 today?

20     A.   Yes.

21     Q.   And may I ask what those matters were?

22     A.   Nonpayment of clients.  I don't know --

23     Q.   You mean his clients?  Of yours --

24     A.   Customers.

1/18/08 DEPOSITION OF LISA TRACEY

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 11

```
 1        Q.   Customers of --
 2        A.   Accounts.
 3        Q.   -- of Flooring Designs?
 4        A.   Yeah.
 5        Q.   Okay.  So he's worked as, would you say, a
 6   collections attorney?
 7        A.   Collections, yes.  He got us incorporated,
 8   things like that.
 9        Q.   Okay.  So business -- a business attorney?
10        A.   Yes.
11        Q.   Okay.  Very good.  And so you've -- you've
12   discussed the substance of this deposition today
13   with Mr. Kahill?
14        A.   I read the letter to him.
15        Q.   I'm sorry, which letter did you --
16        A.   The letter for me to come here as a witness.
17        Q.   Just the --
18        A.   To see if I needed --
19        Q.   -- your subpoena?
20        A.   Yes.  To see if I needed to have him attend
21   with me.
22        Q.   Oh, okay.
23        A.   That is it.
24        Q.   Okay.  Very good.  Did you discuss your
```

Page 12

1    deposition with anyone connected with Hartford

2    Insurance Company?

3    A.  No.

4    Q.  Is anyone else representing you with respect

5    to this deposition today?

6    A.  No.

7    Q.  Okay.  Very good.  Thank you.  All right.

8    Now, in order to get an idea of what you may have

9    been involved with in this particular situation, I

10    need to just get a little bit of information on your

11    experience in that area in terms of your job.  So

12    I'm just going to ask a few background questions.

13    We'll start with your education.  What is the

14    highest level of education that you've reached?

15    A.  High school.

16    Q.  Okay.  Very good.  Do you have any

17    professional licenses or affiliations?

18    A.  Cosmetology.

19    Q.  Okay.  That's fine.  Hey, we need you guys.

20    Okay.  Have you ever taught any courses in the area

21    of insurance claims processing?

22    A.  No.

23    Q.  Okay.  Now, I know that -- Well, we'll make

24    sure, but my understanding is that you were in the

1/18/08 DEPOSITION OF LISA TRACEY      GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 13

1    employment of the company that at one time was

2    called Uromed Corporation; is that correct?

3        A.   Yes.

4        Q.   Okay.  And was that in the human resources

5    area?

6        A.   I was hired for payroll.

7        Q.   For payroll.  After you were hired for

8    payroll, did you switch positions?

9        A.   No.

10       Q.   Okay.  Before you worked at Uromed --

11       A.   Um-hmm.

12       Q.   -- did you work at any other companies in

13    which you handled employee benefits?

14            MR. ROLSTAD:  Objection.  Misstates the

15    witness' testimony.  Lacks foundation.

16       Q.   You may answer.

17       A.   Could you repeat that?  I'm sorry.

18       Q.   Yes.  Prior to Uromed, did you work at any

19    other companies that -- in which you handled

20    employee benefits?

21            MR. ROLSTAD:  Same objections.

22       A.   I'm just thinking.

23       Q.   Yeah.  Let me just advise you for a second,

24    Ms. Tracey, that if there's an objection --

Page 14

1     A.  Yes.

2     **Q.  -- you still may answer the question.**

3     A.  Oh, I know.  I'm trying to think back.

4     **Q.  Okay.**

5     A.  It's been so long.

6     **Q.  Take your time, please.**

7     A.  Before Uromed?

8     **Q.  Yes.**

9     A.  I can't remember.  I was always payroll.

10  Benefits always was connected with payroll in one

11  way or another.

12     **Q.  Okay.**

13     A.  So before Uromed, I'm not sure.

14     **Q.  Okay.  Did you --**

15     A.  I was just payroll.

16     **Q.  I'm sorry, I didn't mean to interrupt you.**

17  **Was Uromed called a different company name before it**

18  **was called Uromed?**

19     A.  It was.

20     **Q.  And do you recall what that company name**

21  **was?**

22     A.  I do not.

23     **Q.  To refresh your memory, was the company**

24  **named Prowess SSGI?**

1/18/08 DEPOSITION OF LISA TRACEY                GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 15

1        A.   I don't remember.

2        Q.   Would you have any notes or documentation at

3    home or anything that might refresh your memory as

4    to, you know, your employment history around that

5    period of time?

6        A.   No.

7        Q.   After the name Uromed, do you recall if

8    there was any change at the same company of names --

9    of the company name?

10       A.   I do not remember.

11       Q.   Do you remember the name ever being Alliant

12   Medical Technologies?

13       A.   I'm -- I don't remember.   I'm sorry.

14       Q.   When, approximately, did you leave Uromed

15   Corporation?

16       A.   I left on maternity leave in May of 2001.

17       Q.   And did you return to the company after

18   maternity leave?

19       A.   I returned in September.

20       Q.   Of 2001?

21       A.   2001, two days a week and left permanently,

22   I think, December of 2001.

23       Q.   Of 2001.   Okay.   After you left Uromed, what

24   is the next employer that -- or who is the next

Page 16

1    employer that you worked for?

2         A.   I stayed home for three years.

3         Q.   Okay.  And then after staying home, did you

4    go back to work?

5         A.   I went back to work to Lids Corporation in

6    Weymouth.

7         Q.   Could you spell that, please.

8         A.   L-i-d-s.

9         Q.   Okay.  And may I ask what kind of company

10   that is, or was?

11        A.   They manufactured hats.

12        Q.   Okay.  And what was your position there?

13        A.   Payroll.

14        Q.   Okay.  Okay.  Now, you had said that in some

15   of your positions that payroll kind of interacted

16   with benefits; is that correct?

17        A.   I've always worked for small companies, so

18   at Uromed I did customer service a couple days a

19   week.  I was in charge of the deductions for

20   benefits.  You know, it all goes into the payroll

21   area.  So for small companies you kind of do a lot

22   of everything.

23        Q.   Okay.  Did -- In these small companies, was

24   part of that getting and processing applications for

1/18/08 DEPOSITION OF LISA TRACEY        GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 17

 1    **benefits for employees?**

 2         A.   Yes.

 3         **Q.   And would that have included disability**

 4    **benefits?**

 5         A.   Yes.

 6         **Q.   Okay.  And are you familiar with the**

 7    **disability benefits policies?  Have you been -- have**

 8    **you been privy to them?  Have the employers given**

 9    **you that while you're processing these claims?**

10         A.   I do -- I would have had copies of all of

11    the --

12         **Q.   Policies?**

13         A.   -- policies.

14         **Q.   Okay.  Are you familiar with provisions in**

15    **group benefits policies for disability that contain**

16    **provisions respecting pre-existing conditions?**

17         A.   Can you repeat that?

18         **Q.   Yes.  Are you familiar with policy -- group**

19    **policies for disability benefits that contain**

20    **provisions respecting pre-existing conditions?**

21         A.   I -- Am I familiar with them?

22         **Q.   Yes.**

23         A.   Not really.

24         **Q.   Have you ever seen them, those types of**

Page 18

1    provisions?

2       A.   I really didn't too much get involved with

3    that.

4       Q.   Okay.

5       A.   At each company, we always had a human

6    resources manager.  For Uromed, Domenic would have

7    been in charge and oversaw everything.

8       Q.   Okay.

9       A.   And I --

10      Q.   And Domenic's last name is?

11      A.   Micale.

12      Q.   Okay.

13      A.   He was in charge of customer service

14   benefits, payroll.  He was my boss.

15      Q.   Okay.  And that -- this was at Uromed?

16      A.   Yes.

17      Q.   Okay.  And do you know where Mr. Micale is

18   now?

19      A.   No.

20      Q.   Have you ever worked -- Just to make sure.

21   And you've given a pretty good background.  But have

22   you ever worked in the insurance industry in any

23   capacity?

24      A.   No.

1    Q.  Okay.  Do you remember who -- how you

2  obtained your job with Uromed in terms of having a

3  job interview?

4    A.  Uromed was located, back when I interviewed,

5  in Newton.

6    Q.  In Newton.  Okay.  And do you remember who

7  you spoke with in your interview?

8    A.  I do.  I spoke with two people.  Domenic.

9  And then there was another girl in charge of

10  payroll, and she was going on maternity leave and

11  leaving, and I don't remember her name.

12    Q.  Okay.  Was she the person whose position you

13  replaced?

14    A.  Yes.

15    Q.  Okay.  During your interview, were there any

16  requirements of your job that were described to you

17  by the person who was interviewing you?

18    A.  No.

19    Q.  Okay.

20    A.  She just trained me for two weeks before she

21  left.

22    Q.  Okay.  And you -- you don't remember her

23  name; is that correct?

24    A.  I don't.

Page 20

```
 1        Q.   Okay.

 2        A.   I know her husband was a lawyer.

 3        Q.   Okay.   There are a lot of us around, I

 4   guess, but anyway.  After you had the interview,

 5   okay, and you were training, do you remember if you

 6   were given any documentation or training manuals or

 7   anything of that nature?

 8        A.   No, I don't remember that.  I know they had

 9   a huge layoff.  I guess Uromed was really, really

10   big.

11        Q.   Um-hmm.

12        A.   And then when I got there, there was, I

13   think, maybe ten people there.  It was very tiny.

14        Q.   Were -- So as far as you know, there were

15   considerably more people than ten at a prior point

16   in time?

17        A.   Yes.

18        Q.   Okay.

19        A.   When they moved.

20        Q.   All right.  Do you remember while at any

21   time during your employment anyone telling you that

22   there was going to be a merger acquisition of

23   Uromed?

24        A.   Yes.
```

1        Q.    Okay.   And do you remember who told you

2    that?

3        A.    Dan Muscatello was the president.

4        Q.    Okay.

5        A.    And Domenic Micale, who was the CFO, I think

6    he was.

7        Q.    Okay.   And Mr. Muscatello, would you happen

8    to know what company he's at now?

9        A.    No.   Muscatello.

10       Q.    Muscatello.   I think that's -- Maybe I

11   didn't pronounce it right.

12       A.    I was just making sure that I did.

13       Q.    Right.   In fact, I'm going to take a guess

14   at the spelling.   If it's not right, tell me you're

15   not sure, okay.   Would that be M-u-s-c-a-t-e-l-l-o?

16       A.    Yes.

17       Q.    Okay.   All right.   Let's see.   Did

18   Mr. Muscatello or Mr. Micale provide any details to

19   you about this -- these mergers?

20       A.    No.

21       Q.    Did they happen to mention a company name of

22   some other company that was going to merge with

23   Uromed?

24       A.    I'm sure.

Page 22

1    Q.   Okay.

2    A.   I don't remember.  I mean, they had to have.

3    Q.   Okay.

4    A.   They merged.

5    Q.   Right.  Would that company have been Alliant

6  Medical Technologies?

7    A.   It -- there -- We did merge with a company.

8  I'm not sure of the name.

9    Q.   Okay.  Do you remember the name Alliant

10  Medical Technologies?

11   A.   No.

12   Q.   Okay.  Now, in your job at Uromed -- We'll

13  just call it Uromed, by the way, for the record,

14  okay -- did your job duties change over time at all?

15   A.   Yes.

16   Q.   They did.  And could you just generally, to

17  the best of your recollection, explain from what

18  they changed and to what they changed?

19   A.   Well, I was hired for payroll.

20   Q.   Um-hmm.

21   A.   Sometimes I would answer the phone.

22   Q.   Uh-huh.

23   A.   I would be in customer service two days a

24  week.  Everybody had a little -- moved everywhere.

1/18/08 DEPOSITION OF LISA TRACEY          GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 23

1     Q.  Uh-huh.  So let me make sure I understand

2   what that last comment means.  Do you mean that

3   various employees, including yourself, were switched

4   from one area of responsibility to another?

5     A.  We weren't switched.  It was just if -- if

6   the front office person was out, we'd go over there

7   for the day.  If customer service was out, we would

8   go over there.  So it was more like team playing.

9     Q.  So it was like putting out fires sort of,

10   that sort of thing?

11    A.  Yeah.

12    Q.  Okay.

13    A.  It was small.  We all helped out.

14    Q.  Okay.  That's great.  And were you in charge

15   of taking all applications for long-term disability

16   benefits there?

17    A.  They would be sent into the payroll to be

18   included as a deduction, yes.

19    Q.  Okay.  To whom would they be sent.  What

20   person?  Do you know the person's name?

21    A.  That they would be sent?

22    Q.  Yeah.  You said it would have been given to

23   payroll --

24    A.  Payroll.

Page 24

1     Q.  -- for deductions.  Does that mean it would
2  be given to you for deductions?
3     A.  Yes.
4     Q.  Okay.  Thank you.  Was there anyone, other
5  than Mr. Micale, who was senior to you during this
6  time, other than the president?
7     A.  No.
8     Q.  Okay.  Was there anyone who was junior to
9  you that -- in your --
10    A.  No.
11    Q.  -- area?  Okay.  That was a no?  I'm sorry,
12 I spoke over you.  Correct?
13    A.  Oh, you -- No.
14    Q.  Did Uromed ever sponsor any sort of seminars
15 or educational programs that you attended?
16    A.  No.
17    Q.  Okay.  Okay.  Now, with respect to handling
18 the disability claims, are you aware of whether
19 there was a contract between Uromed and Hartford
20 Insurance Company for group disability claims?
21    A.  I don't remember.
22    Q.  Okay.  Would you have anything at home that
23 might constitute a copy of anything like that?
24    A.  No.

1/18/08 DEPOSITION OF LISA TRACEY          GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 25

1      Q.   Okay.

2      A.   I live clutter free.

3      Q.   I'm sorry?

4      A.   I said I live clutter free.

5      Q.   Clutter free.  Okay.  Thank you.  Let's see.

6   Were you given any -- let's start with written --

7   any written guidelines or procedures for dealing

8   with Hartford Insurance Company when processing

9   disability benefits?

10     A.   No.

11     Q.   Okay.  Were you ever given verbal for oral

12  instruction about processing Hartford disability

13  benefits?

14     A.   I don't think -- I don't remember.  I don't

15  think so.

16     Q.   Okay.  You're doing well.  Okay.  Let's see.

17  When you received an application for disability

18  benefits, did you look at the applications?

19     A.   Yes.

20     Q.   Okay.  Did you review the applications to

21  make sure they were completely filled out?

22     A.   No.  I was -- I -- I was in charge of

23  putting them in the system for deductions.

24     Q.   Okay.  So you didn't look for --

Page 26

1       A.  I don't remember any disability claims ever

2   at Uromed.

3       Q.  **Really?**

4       A.  Yes.

5       Q.  **Okay.  Well, we'll get into that issue --**

6       A.  Okay.

7       Q.  **-- in a little while.  Okay.  At Uromed, did**

8   **anybody ever provide you with a contact list for**

9   **people to communicate with at Hartford Insurance**

10  **Company?**

11      A.  No.  I don't remember.

12      Q.  **Well, is it no, or I don't remember?**

13      A.  I don't remember.

14      Q.  **Okay.  Do you remember ever contacting**

15  **anyone at Hartford Insurance Company about a**

16  **disability benefits claim?**

17      A.  I don't remember.

18      Q.  **Were you ever, to your recollection,**

19  **personally allowed to make determinations as to**

20  **whether any employee of Uromed would be entitled to**

21  **receive disability benefits?**

22      A.  Can you repeat that?

23      Q.  **Yeah.**

24          MR. HELLEN:  Could you read that back,

1/18/08 DEPOSITION OF LISA TRACEY                    GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 27

 1    please, so I make sure I don't garble that.

 2              MR. ROLSTAD:  Too late.

 3              MR. HELLEN:  Too late?  Okay.

 4              MR. ROLSTAD:  Oh, she can read it.  I'm

 5    sorry.  I said it was already garbled.  I was just

 6    kidding.  Go ahead.

 7              MR. HELLEN:  Could you read the last

 8    question back, please.

 9              (Previous question read

10              back.)

11              THE WITNESS:  Can you read that one more

12    time?  I'm sorry.  I'm sorry.

13              THE COURT REPORTER:  Yes.

14              (Question read again.)

15        A.   No.

16        Q.   Okay.  Okay.

17              MR. HELLEN:  Before I go forward, I

18    realized that I neglected to introduce the first

19    exhibit, which is just a copy of the notice of

20    deposition and deposition subpoena.  It's marked for

21    identification as Exhibit A.

22              MR. ROLSTAD:  Could we mark these as

23    numbers instead, just because it doesn't get as

24    confusing, and we might have more numbers than

Page 28

1    letters.

2                    MR. HELLEN:  Okay.  I'll try to do that.

3                    MR. ROLSTAD:  All right.

4                    MR. HELLEN:  All right.  So let's make

5    this Exhibit 1, if we can.

6                    MR. ROLSTAD:  Thank you.

7                    MR. HELLEN:  You're welcome.  And I'd

8    like to introduce that into the record, please.  I'm

9    sorry.  I think we -- I told the reporter --

10                   MR. ROLSTAD:  Oh, oh, I see.

11                   MR. HELLEN:  -- to pre-mark everything

12   with letters.  It that -- That hopefully won't be a

13   major inconvenience to change it to numbers.

14                   MR. ROLSTAD:  We can go off the record

15   for a second.

16                   MR. HELLEN:  Okay.

17                   THE VIDEOGRAPHER:  The time is 10:19.

18   We are off the record.

19            (Discussion held off the record.)

20                   THE VIDEOGRAPHER:  The time is 10:20.

21   We are back on the record.

22                   MR. HELLEN:  Okay.

23                   MR. ROLSTAD:  Before we do that, may I

24   mention we agreed off the record to go ahead and

Page 29

1    leave the exhibits with letters, so the first

2    exhibit is Exhibit A.  Would it be appropriate now

3    for me to make just Exhibit B, for lodging sake, the

4    objection?

5              MR. HELLEN:  I don't see anything wrong

6    with that.  Sure, we can do that.

7              MR. ROLSTAD:  Thank you very much.  If

8    we could just mark the next document as Exhibit B.

9    This is our objection to the scope of the notice.

10   The court, in this matter, has reduced the issues to

11   a very few, in fact, only two issues.  And we object

12   to some of the scope set forth in the notice.

13   That's all I need to say for now.

14             MR. HELLEN:  Okay.

15             MR. ROLSTAD:  Thank you, Howard.

16             MR. HELLEN:  Okay.  Sure.  The only

17   thing that I would add to that is that, maybe

18   stating the obvious, but the objection is obviously

19   not agreed to by plaintiff.  At any rate, we can go

20   forward.

21             (Exhibit A marked for identification.)

22             (Exhibit B marked for identification.)

23        Q.   Ms. Tracey, I'm going to hand you a letter

24   that's marked for identification as Exhibit C --

Page 30

1          A.   Okay.

2          Q.   -- and it's actually an e-mail.  And it's

3    one page, and it is listed as from Lisa Scibilia.

4    You want to just take a moment to read that, please.

5          A.   Okay.

6          Q.   Do you recognize that e-mail?

7          A.   No.

8          Q.   Is that your e-mail address, or was that

9    your e-mail at Uromed, lscibilia@uromed.com?

10         A.   That's my name and --

11         Q.   Okay.

12         A.   Yes.

13         Q.   And that was your name prior to Lisa Tracey?

14         A.   It was, yes.

15         Q.   Okay.  Does the e-mail say to

16   gcapianco@prowess.com?  Under from.

17         A.   It does, yes.

18         Q.   Okay.  And you see that it says the

19   salutation is, Hi Gil, correct?

20         A.   Yes.

21         Q.   Okay.  Do you have any reason to doubt that

22   you generated this e-mail?

23         A.   No.

24         Q.   Okay.

1/18/08 DEPOSITION OF LISA TRACEY      GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 31

1              MR. HELLEN:  I'd like to introduce this

2    into the record as Exhibit C, please.

3              (Exhibit C marked for identification.)

4      Q.  **Okay.  The next thing that I have is the**

5    **document marked for identification.  It will now be**

6    **Exhibit D, which I'm going to show you, Ms. Tracey.**

7    **This is a computer screen.**

8      A.  Okay.

9      Q.  **And it says Eudora Pro on the top.**

10     A.  Okay.

11     Q.  **Do you recognize that screen?**

12     A.  No.

13     Q.  **Okay.  Do you recognize that your name is on**

14    **that screen in several places?**

15     A.  I do, yes.

16     Q.  **At Uromed, did you have an internal e-mail**

17    **system?**

18     A.  We had an e-mail system.

19     Q.  **Okay.  Could it have been the system, the**

20    **Eudora Pro system, that we're looking at right here?**

21     A.  Yes, it could have been.

22     Q.  **Okay.  I notice some other names on this**

23    **listing.**

24              MR. HELLEN:  I'm sorry, Dennis.  Did I

Page 32

1    not give you a copy of this?

2             MR. ROLSTAD:  No, you didn't.

3             MR. HELLEN:  I apologize.

4    Q.  Do you recognize any of those other names?

5    For instance, I think there's a Diahanna McCracken

6    listed.

7    A.  I don't, no.

8    Q.  Okay.  Do you see three lines down a listing

9    that says Lisa Scibilia, 7:35 a.m., 4/12/2001?

10   Three lines down.

11   A.  Yes, I do.

12   Q.  And do you notice that the subject says

13   benefit information or benefit info?

14   A.  Um-hmm.  Yes, I do.

15   Q.  Okay.  And do you see that that benefit info

16   matches with the date and time of the memo that we

17   showed you as the prior Exhibit C?  It's underneath

18   the listing of benefits.

19   A.  Yes, I do.

20   Q.  Okay.  Would you say that that confirms that

21   you, indeed, authored this memo?

22             MR. ROLSTAD:  Objection.  Calls for

23   speculation.

24   Q.  You can answer the question.

1/18/08 DEPOSITION OF LISA TRACEY      GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 33

1    A.  Can you repeat it?

2    Q.  Yes.  Would you say that the listing on the

3  Eudora up on the top part of this exhibit confirms

4  that it was you that authored the memo that's on the

5  bottom part of this exhibit?

6    A.  I -- It matches.  It looks like it was sent

7  by Lisa Scibilia, yes.

8    Q.  Okay.  Would you have any reason to believe

9  that anyone else would ever use your name at Uromed

10  to send an e-mail?

11    A.  No.

12    Q.  Okay.

13        MR. HELLEN:  I'd like to introduce this

14  into the record as Exhibit D please.

15        (Exhibit D marked for identification.)

16    Q.  Do you recall the --

17        THE COURT REPORTER:  Just one moment.

18        MR. HELLEN:  Oh, I'm sorry.  Please take

19  your time.  I'm just eager.

20        THE COURT REPORTER:  Okay.

21    Q.  Okay.  All right.  Good.  Make sure I've got

22  the copy here.  I'm going to show you now a document

23  that's marked for identification -- let me just

24  staple this -- as Exhibit E.  And please tell me if

Page 34

1    you recognize that document.  And it's a letter

2    dated April 11, 2002 addressed to Lisa Tracey with

3    Hartford Life letterhead on it.  Do you recognize

4    it?

5        A.   No.

6        Q.   You don't recognize it?

7        A.   No.

8        Q.   Notice that the letter is signed by someone

9    named Sabrina Coleman.

10       A.   Okay.

11       Q.   Do you recall Sabrina Coleman?

12       A.   No.

13       Q.   Do you have any reason to believe that

14   anyone else would have written a letter addressed to

15   you from Hartford by that name?

16       A.   No.

17            MR. ROLSTAD:  Objection.  Vague and

18   ambiguous.  Calls for speculation.

19       Q.   Do you have -- Do you feel that that letter

20   is in any way vague?

21       A.   I don't recall this letter at all.

22       Q.   Okay.  But you're able to read it; is that

23   correct?

24       A.   That's correct, yes.

1      Q.   Okay.   Is the letter dated April 11, 2002?

2      A.   Yes.

3      Q.   Okay.   Does it say Alliant Medical

4  Technologies on it?

5      A.   It does.   But can I stop?   I don't think I

6  was at Uromed at this time (indicating).

7      Q.   Well, why would a letter -- I mean, to the

8  extent that you know, and if you don't know, that's

9  fine.   Was there anything that you can recollect

10  that would have had anyone send you a letter from

11  Hartford after you left Uromed?

12      A.   They just might have had me as a contact.

13  I'm not sure.

14      Q.   So they -- they -- But they may have still

15  had you as a contact?

16      A.   I'm not sure.

17      Q.   Would they have -- Do you recall if you were

18  still available to answer questions about disability

19  matters in which you had been involved?

20      A.   After I left?

21      Q.   After you left.

22      A.   No.

23      Q.   Okay.   All right.

24           MR. HELLEN:   I'm going to introduce this

Page 36

1    as Exhibit E.  Did I give you a copy of that,

2    Dennis?

3              MR. ROLSTAD:  You did.  Thank you.

4              (Exhibit E marked for identification.)

5        Q.  I'm going to show you -- Or before I do

6    that, as far as you can recollect, okay, would you

7    have ever, in your position, taken it upon yourself

8    to inform an employee that they would be barred from

9    disability benefits by a pre-existing condition

10   exclusion?

11       A.  Can you just repeat that, please?

12       Q.  Yes.  Would you ever, in your position at

13   Uromed, have taken it upon yourself --

14       A.  No.

15       Q.  -- independent -- That was a no?

16       A.  No.

17       Q.  Okay.

18       A.  I had a boss I reported to.

19              MR. ROLSTAD:  I'm sorry, I didn't hear

20   that last piece.  Could you read it back, please.

21              THE COURT REPORTER:  Which part did you

22   not here?

23              MR. ROLSTAD:  The answer.

24              THE COURT REPORTER:  Okay.

1          (Answer read back.)

2          MR. ROLSTAD:  Thank you.

3     Q.  And was that boss Mr. Micale?

4     A.  Yes.

5     Q.  Okay.  Did Mr. Micale ever tell you that he

6  would make determinations as to whether one of

7  Uromed's employees was barred by a pre-existing

8  condition clause?

9     A.  Did he ever, or would he ever?  Can you

10  repeat that?

11     Q.  Yes.  Did Mr. Micale ever inform you that he

12  would make decisions, himself, regarding whether a

13  Uromed employee was barred from disability benefits

14  by a pre-existing condition provision?

15     A.  I don't recall.

16     Q.  Which means that you don't recall that he

17  ever told you that; is that correct?

18     A.  I'm confused now.

19     Q.  Okay.  You don't recall that Mr. Micale ever

20  talked to you about him making --

21     A.  No.  He --

22     Q.  -- decisions?

23     A.  He did not.

24     Q.  Okay.  All right.  I'm going to show you

Page 38

1    **another document.**

2        A.   Okay.

3        **Q.  It's marked for identification as, I think,**

4    **we're now up to Exhibit F, if I'm not mistaken.**

5    **It's a letter dated February 18, 2002 addressed to**

6    **you --**

7        A.   Okay.

8        **Q.  -- Lisa Scibilia at Uromed Corporation.**

9        A.   Um-hmm.

10       **Q.  Again, on the letterhead of Hartford Life.**

11       A.   Um-hmm.

12       **Q.  Again, listing claimant Gil Capianco titled**

13    **or addressed, Dear Lisa, and signed on the second**

14    **page by a Christina M. Diecuch.**

15       A.   Okay.

16       **Q.  Do you remember Ms. Diecuch?**

17       A.   I do not.

18       **Q.  Okay.  Did you -- Do you recall ever**

19    **receiving letters similar to this in which you're**

20    **asked to fill in information about a disability**

21    **claimant?**

22       A.   I don't.  But, again, I don't think I was

23    employed at Uromed at that time.

24       **Q.  Um-hmm.  Okay.**

1/18/08 DEPOSITION OF LISA TRACEY          GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 39

1     A.   So...

2     Q.   Would you have had communications from

3  people or anyone at Hartford respecting disability

4  claims while you were still employed at Uromed?

5     A.   While I was still employed?

6     Q.   Yes.  While you were still employed at

7  Uromed.

8     A.   Can you repeat that?

9     Q.   Yes.  Would you have had communications with

10  anyone at Hartford while you were still employed at

11  Uromed?

12     A.   I don't remember.  If I was on disability,

13  on maternity leave, no.

14     Q.   No.  I'm talking about in terms of your

15  position as handling these claims at Uromed.

16          MR. ROLSTAD:  Objection.  Misstates the

17  witness' testimony.

18     Q.   In your -- In connection with your position

19  of receiving applications and processing --

20     A.   Yes.

21     Q.   That's a yes?

22     A.   Yes.

23     Q.   Do you recall who any of those persons at

24  Hartford were who you had communications with?

Page 40

1      A.   No.

2      Q.   Do you think that it's reasonable that if

3  you were receiving letters addressed to yourself

4  from people at Hartford, such as the two that I've

5  shown you, that even if you had left Uromed, that

6  these people were aware that you were working for

7  Uromed?

8           MR. ROLSTAD:   Objection.   Calls for

9  speculation.

10     A.   I don't --

11          MR. ROLSTAD:   Vague and ambiguous.

12     A.   I don't know.

13     Q.   Do you have any other evidence to indicate

14  that the people at Hartford who wrote these letters

15  addressed to you had some other way of determining

16  where you were located at the time they wrote those

17  letters?

18     A.   No.

19     Q.   Was there a successor to you at Uromed who

20  handled the same duties and functions as you did?

21     A.   I reported to my boss.

22     Q.   I understand that.

23     A.   When I left?   I'm not sure.

24     Q.   Okay.   Do you know, did Mr. Micale ever

1/18/08 DEPOSITION OF LISA TRACEY       GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 41

1   **indicate that he would be looking for a replacement**

2   **for you?**

3      A.  I don't remember.

4      **Q.  Okay.**

5          MR. HELLEN:  We'll introduce this into

6   the record as Exhibit F.

7         (Exhibit F marked for identification.)

8      **Q.  Okay.  I'm going to show you another**

9   **document --**

10      A.  Okay.

11      **Q.  -- that's marked for identification as**

12   **Exhibit G.  The title of the document is Hartford**

13   **Life Insurance Company, Hartford Life and Accident**

14   **Company.  Okay.  It's several pages long, and it**

15   **starts with Section 1, employee statement.  Have you**

16   **ever seen documents at Uromed that looks like this?**

17         MR. ROLSTAD:  I believe the question

18   misstates the document itself.  It says employer

19   statement.

20         MR. HELLEN:  Oh, I'm sorry.  That is

21   correct.  I apologize.

22         MR. ROLSTAD:  The upper right-hand

23   corner.

24         MR. HELLEN:  Yes.  I apologize for that.

Page 42

1      Q.   Okay.  Can you see that the name Uromed

2  Corporation is listed about four lines down on that

3  first page?

4      A.   Yes.

5      Q.   Okay.  And you see the name Gil Capianco

6  listed on the first line; is that correct?

7      A.   Yes.

8      Q.   Now, let me try this question again, okay.

9  Did you ever see a document that looked like this --

10  And feel free to look through it.  In fact, I think

11  you should look through all of it --

12      A.   Um-hmm.

13      Q.   -- and then I'll ask you a question.  Okay.

14      A.   Okay.

15      Q.   Okay.  Have you ever seen a document like

16  that when you were working at Uromed?

17      A.   Yes.

18      Q.   Okay.  And do you recall approximately how

19  many times, to the best of your recollection, you

20  had seen a document that looked like that at Uromed?

21      A.   I don't --

22      Q.   Approximately?

23      A.   I don't remember.

24      Q.   Would it be more than say three times?

1          MR. ROLSTAD:  Objection.  Calls for

2   speculation.

3       Q.  I'm only asking it --

4       A.  I don't --

5       Q.  -- to try to help you.

6       A.  I don't remember.

7       Q.  Okay.  So you don't know whether you saw one

8   of them or twenty of them; is that correct?

9       A.  I don't remember, no.  I'm sorry.

10      Q.  Okay.  That's all right.  Is this a document

11  that would be related to your answer earlier that

12  you would receive applications for processing?

13      A.  Yes.

14      Q.  Okay.  And bear with me for a moment.  I'm

15  just going to look at this myself for another two

16  seconds here.  Okay.  That's good.

17      A.  Okay.

18          MR. HELLEN:  Let's introduce this as

19  Exhibit G.

20          (Exhibit G marked for identification.)

21      Q.  Now, Ms. Tracey, you had testified, I

22  believe, before that there came a point when you

23  were at Uromed that you -- I think that you said it

24  was down to about ten employees; is that correct?

Page 44

1      A.   Yes.

2      Q.   **Okay.  And how -- how big was the facility**

3   **at Uromed?  Was it -- Did it have a building all to**

4   **itself?**

5      A.   No.

6      Q.   **Was in part of a building?**

7      A.   I think, yes.

8      Q.   **Okay.  It occupy an entire floor of a**

9   **building?**

10          MR. ROLSTAD:  Objection.

11     A.   No.

12          MR. ROLSTAD:  Vague and ambiguous.

13     A.   I don't remember.

14     Q.   **Well, if there were ten employees in the**

15  **company, how -- approximately in what kind of**

16  **proximity, physically, were you to these other**

17  **employees?**

18     A.   Can you repeat that?

19     Q.   **Yeah.  If there were ten employees at the**

20  **whole company, how close were you, physically, from**

21  **your work space to the other employees?**

22     A.   The accounting girl in front of me --

23     Q.   **Uh-huh.**

24     A.   -- was just a cubicle away.

1      **Q. Uh-huh.**

2      A. It was a small cubicle set up.

3      **Q. Uh-huh.**

4      A. Marketing beside me.

5      **Q. Right.**

6      A. Receptionist over there (indicating),

7 customer service.

8      **Q. Okay. Were there, like, individual offices**

9 **in addition to cubicles?**

10      A. Yes.

11      **Q. Okay. And to the best of your recollection,**

12 **if you walk from one end of the Uromed offices to**

13 **the other, about how long would it have taken you at**

14 **a normal pace to do that?**

15      A. I don't -- It's so tiny. It was tiny in

16 there.

17      **Q. It was tiny. Okay. So do you think that**

18 **you would have had contact with every employee at**

19 **some point who worked for Uromed while you were**

20 **there?**

21      A. Yes.

22      **Q. Okay. Given that proximity and the other**

23 **exhibits that we've gone through --**

24      A. Um-hmm.

Page 46

1    Q.  -- that show identification of Mr. Capianco,

2    including the e-mail, does this refresh your memory

3    that you would have known Gil Capianco while you

4    were at Uromed?

5    A.  No.

6    Q.  I'm going to show you a document marked for

7    identification as Exhibit H, and this document is a

8    letter from me from my office with my letterhead on

9    --

10   A.  Um-hmm.

11   Q.  -- top of it dated October 13, 2003 and

12   addressed to Ms. Lisa Tracey.  Do you recall this

13   letter?

14   A.  Can I read it?

15   Q.  Yes, please.  And take your time.

16         MR. ROLSTAD:  I note for the record that

17   many of the statements in Exhibit H are speculative.

18         MR. HELLEN:  And, of course, I take

19   exception to that.  Plaintiff takes exception to

20   that.

21   Q.  Do you recognize this letter?

22   A.  I don't.

23   Q.  Okay.  Did you see that at the end of this

24   letter is an attachment of the same e-mail that

Page 47

1    we've already introduced as an exhibit in this case?

2        A.   Yes.

3        Q.   Okay.  Okay.  Thank you.

4             MR. HELLEN:   I'm going to introduce this

5    as Exhibit H.

6             (Exhibit H marked for identification.)

7        Q.   Okay.  Now, do you recall someone coming to

8    your home in Avon, Massachusetts in year 2003 or

9    thereabouts, to the best of your recollection, to

10   speak with you about this particular case regarding

11   Mr. Capianco?

12       A.   I do.

13       Q.   Okay.  Do you remember him identifying

14   himself to you at that time?

15       A.   I do.

16       Q.   Okay.  Did you invite him into your home at

17   that time?

18       A.   No.

19       Q.   Okay.  I'm going to show you now an exhibit

20   that's marked for identification as Exhibit I.  Let

21   me get one for counsel.  Okay.  This is a letter on

22   letterhead named Stewart Reiser, Huron

23   Investigators, Incorporated, dated April 29, 2004

24   and addressed to opposing counsel, Dennis Rolstad.

Page 48

1    **Do you see that?**

2      A.   Um-hmm.   Yes.

3      **Q.   Okay.   Would you like to just review that**

4 **letter?**

5      A.   I did.

6      **Q.   Thank you.**

7      A.   Okay.

8      **Q.   Okay.   Was that letter understandable to**

9 **you?   It is clear?**

10      A.   Yes.

11      **Q.   Okay.   Does that refresh your memory as to**

12 **the visit that you had with Mr. Reiser?**

13      A.   It refreshes it, yes.

14      **Q.   Okay.   So would you now change your**

15 **testimony to say that Mr. Reiser was invited into**

16 **your home?**

17      A.   He was not.

18      **Q.   Okay.**

19      A.   It took place on my driveway.   I was

20 leaving --

21      **Q.   Okay.**

22      A.   -- to go to the store, and he was out there.

23      **Q.   Okay.   Was Mr. Reiser in any way hostile or**

24 **intimidating to you?**

1/18/08 DEPOSITION OF LISA TRACEY        GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 49

1      A.   No.

2      Q.   Did you have the discussion essentially as

3    he described it in the first full -- first large

4    paragraph of that letter where he talks about -- I'm

5    sorry, the next one on April 16th, 2004?

6      A.   I -- I don't remember that at all.

7      Q.   Okay.

8      A.   The investigator I remember -- only remember

9    coming to my house once.

10     Q.   Okay.  Do you have any reason to -- any

11   facts in support of the fact that this Mr. Reiser is

12   fabricating what he's written in this letter?

13     A.   Do I have any reason to believe that he is?

14     Q.   No.  Do you have any evidence to show --

15     A.   No.

16     Q.   -- that he's fabricating this letter?

17     A.   Do I have any evidence?

18     Q.   Yes.

19     A.   No.

20     Q.   Okay.

21     A.   This is the first time I saw this letter.

22     Q.   I understand that.  Okay.  I'm just trying

23   to find another copy of that.  Okay.  Here we go.

24   Okay.  Is your husband's name Jason Tracey?

Page 50

1     A.   It is.

2     Q.   Okay.  Do you recall you giving Mr. Reiser

3  permission to call you regarding the Capianco

4  matter?

5     A.   I'm sure I would.

6     Q.   Okay.  Did you say that it would be all

7  right to communicate with Mr. Capianco's attorney,

8  which would be me?

9     A.   I don't -- I don't remember.

10    Q.   Okay.  All right.

11         MR. HELLEN:  I'm going to introduce this

12  as Exhibit I.

13         (Exhibit I marked for identification.)

14         MR. HELLEN:  Did I give you a copy?

15  Yes, I did.  Pardon me.  I have to keep remarking

16  these exhibits.  All right.

17    Q.   All right.  The next thing that I have is a

18  letter.  It's marked for identification as Exhibit

19  J.  And let me find the copy here.  This is it.

20    A.   That's it, yeah.

21         MR. HELLEN:  There you are.

22    Q.   This is a letter from, again, my office, Law

23  Offices of Howard B. Hellen.

24    A.   Okay.

1/18/08 DEPOSITION OF LISA TRACEY      GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 51

1      Q.  Dated March 5th, 2004 and addressed to you.

2  At that point I used Lisa Scibilia-Tracey.  Do you

3  want to review that --

4      A.  Sure.

5      Q.  -- please.  And take your time.

6      A.  Okay.

7      Q.  Do you recognize that letter?

8      A.  I don't.  I'm sorry.

9      Q.  Do you recall if the faxed number listed on

10  that letter of 508-897-0831 was your fax number at

11  that time?

12      A.  What was the number again?  I'm sorry.

13      Q.  The number is listed right on this letter.

14  It says via facsimile transmission only to

15  508-897-0831.

16      A.  That's the second line to my house.

17      Q.  Okay.  Thank you.

18      A.  Was.  Sorry.

19      Q.  Was.  But at that point in time in March of

20  2004, it would have been, correct?

21      A.  Correct.

22      Q.  All right.  Does this letter refresh your

23  memory about the phone call between the two of us

24  that took place on February 21st, 2004?

Page 52

1              MR. ROLSTAD:  Objection.  Lacks

2    foundation.

3        Q.  Do you recall having a telephone

4    conversation --

5        A.  I don't.

6        Q.  -- with me?

7        A.  I don't.  I'm sorry.

8        Q.  In the future, please let me finish the

9    question --

10       A.  I'm sorry.

11       Q.  -- before you answer.  Okay.  And this mem-

12   -- this letter states that I had given you a

13   declaration to review based on your personal

14   knowledge of this matter.  Do you recall me

15   attaching a declaration to for your review about

16   this situation?

17       A.  I do not.

18       Q.  Do you have any evidence to support a

19   contention that you never received this letter at

20   all?

21       A.  Can you repeat that?

22       Q.  Do you have any evidence to support a

23   contention that you never received this letter at

24   all?

1     A.   Nope.   No.

2     Q.   Okay.   Do you have any evidence to --

3     available to you that would suggest that I did not

4     author this letter?

5     A.   No.

6     Q.   Okay.

7          MR. HELLEN:   Well, I'd like to introduce

8     this letter as Exhibit J.

9          (Exhibit J marked for identification.)

10    Q.   Okay.   Do you ever recall at any time

11    speaking with me about the Gil Capianco matter on

12    the telephone?

13    A.   I do not.   Except for last week, I'm sorry,

14    when I called you when I got the letter.

15    Q.   Okay.   I'm going to show you another letter.

16    A.   Okay.

17    Q.   This one is marked for identification as

18    Exhibit K.   Okay.   This letter is dated March 10th,

19    2004.   Again, it is on my letterhead.   It is

20    addressed to you, and it uses the same fax number as

21    the previous letter, correct?

22    A.   Correct.

23    Q.   Please take your time to review that letter.

24    A.   Okay.

Page 54

1  Q. Okay. Do you recognize that letter?

2  A. No.

3  Q. Do you recall from the letter that my office

4 left you voicemail messages about your response to

5 my previous communications on this matter?

6  A. Can you repeat that, please?

7  Q. Yes. Do you recall, as stated in the

8 letter, that my office left you voicemail messages

9 about the Capianco matter?

10   MR. ROLSTAD: Objection. Lacks

11 foundation.

12  A. I see it in the letter. I do not recall it,

13 no.

14  Q. Okay. Now, Ms. Tracey, you're a very

15 likable person, and I don't mean to misspeak here,

16 but I have so far shown you a number of letters --

17  A. I know.

18  Q. -- with your admitted fax number on them --

19  A. But --

20  Q. Please let me finish the question. --

21 relating to a number of conversations which we had,

22 which we're now up to 2004, which is not that long

23 ago, okay. And I just want to remind you, with all

24 due respect and courtesy -- it's my job to do

1/18/08 DEPOSITION OF LISA TRACEY        GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 55

1   this --

2      A.   Okay.

3      Q.   -- that you are under oath here.

4      A.   I understand that.

5      Q.   And that you're sworn to testify under

6   penalty of perjury.  With that in mind, do you still

7   maintain that you have no recollection of any of

8   these letters?

9      A.   I do a hundred percent.  My fax number is

10  hooked up to AOL, which is a computer.  I very

11  rarely use the fax at my house.  I've never seen

12  these letters.  I'm sorry.  As you're presenting

13  them in front of me, I'm in shock that there's so

14  many of them.  And this is to the best of my

15  knowledge, and I understand I'm under oath.

16          MR. ROLSTAD:  I need to interpose a late

17  objection to the prior question and soliloquy.  It

18  lacks foundation and calls for speculation.

19          MR. HELLEN:  And I object to the

20  characterization of that as a soliloquy.  At any

21  rate...

22      A.   I'm sorry.

23      Q.   Are you saying that you never looked at your

24  faxes that were coming in to you by this e-mail

Page 56

1    **hookup?**

2            MR. ROLSTAD:  Objection --

3    A.  I don't --

4            MR. ROLSTAD:  Misstates the witness'

5    testimony.

6    A.  I don't have -- If it's AOL, I don't have

7    faxes coming in.  I don't have two -- I have one

8    line.  So the faxes would not come in if my internet

9    was hooked up.

10    **Q.  Okay.  If that -- Would the faxes be saved?**

11    A.  No.  I don't recall ever receiving any of

12    these.  Did you follow-up with a letter in --

13    mailed?

14    **Q.  I think on some of the letters, we did mail**

15    **them, okay, including the next one that I'm going to**

16    **introduce into evidence.**

17    A.  Okay.

18    **Q.  Let me get a copy of that.  Okay.  This**

19    **document is mark marked for identification as**

20    **Exhibit L.  I'm sorry.  I should have left that on**

21    **for now.  It's dated March 16, 2004.  It is**

22    **addressed to you --**

23    A.  Okay.

24    **Q.  -- Lisa Tracey at 10 Lothrop Drive, Avon,**

Page 57

1   **Massachusetts.  Was that your address at the time of**

2   **the date of this letter?**

3      A.  That is.

4           MR. ROLSTAD:  Is this a different

5   letter?

6           MR. HELLEN:  Didn't I --

7           MR. ROLSTAD:  No.

8           MR. HELLEN:  I didn't give that to you.

9   I'm sorry.

10          MR. ROLSTAD:  Thank you.

11     A.  Okay.  I read it.

12     **Q.  You read it.  Okay.  Do you recognize this**

13   **letter?**

14     A.  I do not.

15     **Q.  Do you see that the letter was marked**

16   **urgent?**

17     A.  Yes.

18     **Q.  Okay.  Do you see that the letter says that**

19   **we -- I had left several voice messages to you over**

20   **the past week?**

21     A.  Yes.

22     **Q.  Was your telephone on or about March 16,**

23   **2004, 508-586-7205?**

24     A.  Yes.

Page 58

1      Q.  Do you note that I attached a copy of the

2  March 10th letter that I faxed to you to this

3  letter?

4      A.  Yes.

5      Q.  Do you note that I mention that I tried to

6  fax you; however, your fax number appears to be no

7  longer in service?

8      A.  I -- Yes, I see that.

9      Q.  Okay.  Did you disconnect your fax machine

10 at or around this time?

11     A.  I don't think so.

12     Q.  Did you disconnect your fax machine prior to

13 this time?

14     A.  If it's hooked up to my internet --

15     Q.  Okay.

16     A.  -- it wouldn't respond to a fax.

17     Q.  Okay.  What if I told you that I have fax

18 transmission records of these faxes to you, would

19 that change your testimony?

20     A.  No, it would not.

21     Q.  Okay.  I can produce them.  Okay.

22         MR. HELLEN:  Okay.  We're going to

23 introduce this letter as Exhibit L.  I'm sorry.

24 What do we have here?

1     THE WITNESS:  Oh, you --

2     MR. HELLEN:  Oh, that's the prior one

3 that was attached to this.  Okay.  Sorry about that.

4 This whole thing is -- Staple it one exhibit.

5    (Exhibit L marked for identification.)

6  Q.  Okay.  Now, do you recall being visited

7 again by Mr. Reiser?

8  A.  I only remember once --

9  Q.  Okay.

10  A.  -- him coming to my house.

11  Q.  Okay.  Do you recall speaking to Mr. Reiser

12 on the telephone after the one time that he visited

13 you?

14  A.  I don't remember.

15  Q.  Okay.  I'm going to call your attention

16 again back to the exhibit on which the letter of

17 April 29th, 2004 from Mr. Reiser was.  I'm trying to

18 remember what exhibit letter that is.  I'll get it

19 in a second.  I believe that was Exhibit H.  I'll

20 show that to you again.  Would you please read the

21 paragraph that starts on April 21st, 2004 at the

22 bottom of the page, please.  Have you read that?

23  A.  I did.

24  Q.  Does that refresh your memory as to that

Page 60

1    **phone conversation?**

2         A.   It does not.

3              MR. ROLSTAD:   Objection.   Lacks

4    foundation.

5         A.   It does not.

6         **Q.  You do not recall speaking to Mr. Reiser**

7    **saying that you would call him back -- Well, let --**

8    **let me rephrase the question.   There is a reference**

9    **in this paragraph to another phone conversation on**

10   **April 26th, 2004.   Do you recall that conversation?**

11             MR. ROLSTAD:   Objection.   Lacks

12   foundation.

13        A.   I don't recall it.

14        **Q.  Do you recall ever telling Mr. Reiser, as**

15   **stated in his letter, that you would get back to him**

16   **with your thoughts regarding the declaration stating**

17   **your personal knowledge in this particular matter?**

18        A.   I don't recall.   I don't even know who the

19   former colleague was.   And it said "him".   I don't

20   even --

21        **Q.  Could it have been Mr. Micale?**

22        A.   No.   I have not had contact with him since I

23   left.

24        **Q.  The next exhibit will be exhibit -- a**

 1    **document marked for identification as Exhibit M.**

 2              MR. ROLSTAD:  Do you need a break?

 3              THE COURT REPORTER:  No.

 4              MR. HELLEN:  Does anyone else need a

 5    break?  Are we all right?  Okay.

 6       **Q.  All right.  I'm going to show you a document**

 7    **as marked for identification as Exhibit M.**

 8       A.  Okay.

 9       **Q.  This document is entitled declaration of**

10    **Lisa Scibilia-Tracey.  Do you see that?**

11       A.  I do.

12       **Q.  Would you please take a couple of minutes to**

13    **look that declaration over.**

14              MR. ROLSTAD:  Could we go off the

15    record, give the reporter a quick break?

16              THE VIDEOGRAPHER:  Sure.

17              MR. HELLEN:  Yeah, that's fine.

18              THE VIDEOGRAPHER:  The time is 11:06.

19    We are off the record.

20              (Brief break taken.)

21              THE VIDEOGRAPHER:  The time is 11:11.

22    We are back on the record.

23              MR. HELLEN:  Thank you.  Just a

24    procedural matter.  I want to -- We've had a little

Page 62

1    discussion off the record about one of the exhibits

2    that was referred to as the letter dated March 10th,

3    2004 identified as Exhibit K, and I just want

4    introduce that formally into the record.

5         (Exhibit K marked for identification.)

6    **Q.   Now, Ms. Tracey --**

7    A.   Yes.

8    **Q.   -- you have read the declaration, correct?**

9    A.   Correct.  Yes.

10   **Q.   Do you recognize the declaration?**

11   A.   No.

12   **Q.   Okay.  Let me take your attention to Page 2**

13   **of that declaration.  Okay.  Now, you can see**

14   **Paragraph 3 where it states -- I'm not, you know,**

15   **saying you state -- but the declaration states that**

16   **in 2001, Mr. Capianco was an employee of Uromed and**

17   **applied for disability benefits with Hartford,**

18   **correct?**

19   A.   Yes.

20        MR. ROLSTAD:  Object to the

21   categorization of the documents.  It's a proposed

22   declaration, presumably prepared by Mr. Hellen's

23   office.

24        MR. HELLEN:  Yes, it is a proposed

1   declaration, Counsel, and that's why I said that you

2   didn't -- technically, you haven't said it, but it's

3   stated in the declaration.  But yes, technically, it

4   is definitely a proposed declaration.  We have no

5   argument with that.  Okay.

6        **Q.  Now, it says, however, that in the year**

7   **2001, Mr. Capianco, an employee of Prowess and**

8   **Uromed, applied for long-term disability benefits**

9   **with Hartford, correct?**

10       A.   Correct, yes.

11       **Q.   Okay.  And do you remember the exhibit that**

12  **I showed you that was an application with**

13  **Mr. Capianco's name on it for disability benefits?**

14       A.   Yes.

15       **Q.   Okay.  Do you have any reason to believe**

16  **that Mr. Capianco did not present an application for**

17  **you for disability benefits?**

18            MR. ROLSTAD:  Objection.  Calls for

19  speculation.  Misstates the witness' prior

20  testimony.

21       A.   The signature on the disability was Domenic

22  Micale.

23       **Q.   But the name -- You didn't answer the**

24  **question.  The name on the disability application on**

Page 64

1    Page 1, the first line was Gil Capianco?

2        A.  Yes.

3            MR. ROLSTAD:  Objection.  The document

4    speaks for itself.

5        Q.  Do you recall Mr. Capianco inquiring of you

6    as to whether there would be any problem with him

7    being barred by a pre-existing condition clause in

8    the Hartford policy?

9        A.  I don't --

10           MR. ROLSTAD:  Objection.  Lacks

11   foundation.

12       A.  I don't recall.

13       Q.  But you recall the exhibit that I showed you

14   before of the e-mail with your name on it dated

15   April 12th, 2001 and addressed to Mr. Capianco; is

16   that correct?

17           MR. ROLSTAD:  Objection.  Misstates the

18   witness' prior testimony.

19           MR. HELLEN:  I don't believe so.

20           MR. ROLSTAD:  Asked and answered.

21       A.  Yes, correct.

22       Q.  You do recall looking --

23       A.  I don't -- I recall seeing that, yes.

24       Q.  Right.

1/18/08 DEPOSITION OF LISA TRACEY        GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 65

 1              MR. ROLSTAD:  Do you recall --

 2    Objection.  Vague and ambiguous.

 3              MR. HELLEN:  Well, if it -- I suggest

 4    that the deponent can answer if it's not vague and

 5    ambiguous.

 6        Q.  **Did you have any trouble with that question,**

 7    **Ms. Tracey?**

 8        A.  No.  I --

 9              MR. ROLSTAD:  I'd like to --

10        Q.  **Okay.**

11              MR. ROLSTAD:  I'll correct it when I get

12    to my questioning, but I'm just saying the

13    transcript is not clear at this point.

14        Q.  **Okay.  Would you normally write e-mails to**

15    **anyone who might have been an employee of Uromed**

16    **saying that you -- that you spoke to someone at**

17    **Hartford about their disability benefits?**

18        A.  Can you repeat the beginning of that

19    question?

20        Q.  **Yes.  Would you ever have written an e-mail**

21    **to any employee of Hartford in which you said that**

22    **you conferred with someone at Hartford about their**

23    **disability benefits -- and let me add to that -- if**

24    **you had not spoken to someone at Hartford about**

Page 66

1    their disability benefits?

2              MR. ROLSTAD:  Objection.  Vague and

3    ambiguous.

4        Q.  Do you understand the question?

5        A.  I do.  No, I wouldn't put something in

6    writing.

7        Q.  Okay.  Would you, in the normal course of

8    your duties at Uromed, call someone at Hartford if

9    there was a question about whether they were

10   eligible for disability coverage?

11       A.  Yes.  My boss and I would.

12       Q.  Okay.  Thank you.  Okay.  I'll be with you

13   in a moment.  I just have to find the other copy of

14   what I'm going to show you next.  Okay.  I believe

15   this is it.  Yes.  Okay.  Okay.  I'm going to show

16   you a document that's marked for identification as,

17   I think, Exhibit M.  I apologize.  I've lost track

18   as to what exhibit letter we're up to at this point.

19   We did have a change, and I don't think I changed

20   the next exhibit number in the same proportion here

21   as to what I did before.

22              MR. ROLSTAD:  You already marked an M,

23   although the reporter --

24              THE WITNESS:  Oh.

1/18/08 DEPOSITION OF LISA TRACEY          GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 67

1          MR. ROLSTAD:  -- does not appear to have

2     it.

3          MR. HELLEN:  Oh, that is probably it.

4     Thank you.

5          THE WITNESS:  I'm sorry.  It's right

6     here.

7          MR. HELLEN:  Oh, yes.  Yes.  Introduce,

8     please, the declaration as Exhibit M.  Thank you,

9     Dennis.

10          (Exhibit M marked for identification.)

11     Q.  Okay.  I'm going to show you now a document

12     that's marked for identification as Exhibit N, as in

13     Nancy.  It is a letter, again, on the letterhead of

14     Stewart Reiser, Huron Investigators, Inc. dated

15     February 19, 2004, addressed to me, Howard Bennett

16     Hellen, Attorney at Law.  Would you please take a

17     moment to review that letter.  Have you read that?

18     A.  I did.

19     Q.  Okay.  In the second large paragraph in that

20     letter --

21     A.  Um-hmm.

22     Q.  -- okay, Mr. Reiser recounts his

23     recollection of an interview with you.  And I want

24     to see if you recall any of this, okay, a little bit

Page 68

1    at a time.  All right.  Do you recall telling

2    Mr. Reiser that you were a former human resource

3    officer at Uromed?

4        A.  No.

5            MR. ROLSTAD:  Objection.  Lacks

6    foundation.

7        A.  No.

8        Q.  You can answer.  Do you recall Mr. Reiser

9    visiting -- interviewing you?

10       A.  Talking to me, not interviewing.

11       Q.  Okay.  Maybe a semantic difference, but

12   okay.  You recall him asking you questions?

13       A.  I remember a brief conversation of like five

14   minutes.

15       Q.  Okay.  Do you recall him mentioning the name

16   of Mr. Capianco to you in his conversation?

17       A.  Yes.

18       Q.  Okay.  Do you remember him asking you about

19   the e-mail that we've gone over a couple of times?

20       A.  I don't remember.  He could have.

21       Q.  Okay.  Do you remember telling Mr. Reiser as

22   he states, and you know, you don't have to agree,

23   but as he states in his letter, that you recalled

24   Hartford's rationale or reason behind them saying or

1/18/08 DEPOSITION OF LISA TRACEY      GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 69

1    your understanding of them saying that the

2    pre-existing conditions are waived?

3        A.  I don't recall.

4        Q.  Okay.  But you do recall stating that in the

5    e-mail of February 2001, correct?

6                MR. ROLSTAD:  Objection.  Misstates the

7    witness' prior testimony.  Lacks foundation.  Asked

8    and answered.

9        Q.  Do you recall that?

10       A.  I recall the --

11       Q.  Saying --

12       A.  -- letter.

13       Q.  Okay.  Do you recall telling Mr. Reiser that

14   you would look into this further and that you had

15   taken home some disks that contained files that you

16   would look at?

17       A.  No.

18       Q.  Do you have any reason to believe that

19   Mr. Reiser was lying when he wrote this letter?

20               MR. ROLSTAD:  Objection.  Calls for

21   speculation.

22       A.  I know.  I don't know why he would say I had

23   disks at my house, property of Uromed.  I'm not

24   sure.

Page 70

1      Q.  Do you remember ever speaking with

2  Mr. Reiser at any date after April of -- mid April,

3  let's say, or late April of 2004?

4      A.  I -- No.

5      Q.  Okay.

6           MR. HELLEN:  I'd like to introduce this

7  letter as Exhibit N.

8           (Exhibit N marked for identification.)

9      Q.  Do you recall ever speaking with your

10  husband, Jason, about any visits from Mr. Reiser?

11      A.  No.

12      Q.  Okay.  Let's find another copy of that.

13  Okay.  Okay.  I'm going to show you a copy of a

14  document marked for identification as Exhibit O.

15  This document is dated April 28th, 2004.  It's on

16  the letterhead of Sedgwick, Detert, Moran & Arnold.

17  It says it was sent via facsimile and regular mail

18  to me.

19      A.  Um-hmm.

20      Q.  Okay.  Would you take a moment to read the

21  letter, please.

22      A.  I read it.

23      Q.  Okay.  Now, the letter, of course, speaks

24  for itself and says that you contacted Mr. Rolstad

Page 71

1    to complain about being harassed by Mr. Reiser and,

2    perhaps, myself.  Do you recall having a

3    conversation with Mr. Rolstad to that effect?

4         A.   I don't.

5         Q.   Okay.  Do you recall speak ever speaking

6    with Mr. Rolstad before today?

7         A.   I don't.

8         Q.   To the best of your recollection, did you

9    even know who Mr. Rolstad was prior to today?

10        A.   No.

11        Q.   Okay.  Did you ever tell anyone that you can

12   recall that Mr. Reiser stopped by your house on at

13   least four occasions?

14        A.   I don't recall.

15        Q.   But you testified before that he only

16   stopped by your house on one occasion; is that

17   correct?

18        A.   I did.

19                  (Interruption.  Phone buzzes and

20                  vibrates.)

21                  THE WITNESS:  That's mine.

22                  MR. HELLEN:  Oh, okay.

23                  THE WITNESS:  It's my ride.  I thought

24   it was only --

Page 72

1          MR. HELLEN:  Oh.

2          THE WITNESS:  -- going to be an hour and

3    a half.

4          MR. HELLEN:  Oh, it's -- I mean, I don't

5    -- I mean, depending upon Mr. Rolstad, it shouldn't

6    --

7          THE WITNESS:  That's fine.

8          MR. HELLEN:  I'm almost done, so another

9    five or ten minutes should do it for me.

10     **Q.  Let's see.  Okay.  Actually, I only have, I**

11   **think, one more exhibit, which I think is this one.**

12   **We have that copy.**

13     A.  This is such a long period of time in

14   between.

15          MR. HELLEN:  Well, let's -- let's strike

16   that.  There wasn't a question.  Okay.  Strike that

17   comment, please.  Unresponsive.

18     **Q.  I'm going to show a declaration -- I'm**

19   **sorry, not a decoration, a letter, a document marked**

20   **for identification as Exhibit P, and it's a letter**

21   **from me to you dated April 29th, 2004.  Would you**

22   **take a little time to read that and the attachments**

23   **to it, please.  Okay.**

24          MR. HELLEN:  I'm sorry?

1/18/08 DEPOSITION OF LISA TRACEY          GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 73

1             Court Reporter:  "O".

2             MR. HELLEN:  The last one?

3             THE COURT REPORTER:  Yes.

4             MR. HELLEN:  I'm sorry.

5        (Exhibit O marked for identification.)

6     A.   Okay.

7     Q.   **Do you recognize this letter?**

8     A.   I don't.

9     Q.   **The letter is addressed to you, is it not?**

10    A.   It is, yes.

11    Q.   **It's addressed to you at the address that**

12    **you were living at, at its date?**

13    A.   (Witness nods.)

14    Q.   **Is that a yes?**

15    A.   Yes.

16    Q.   **Okay.  Sorry.  You have to respond verbally**

17    **or it's difficult.**

18    A.   Okay.

19    Q.   **All right.  And you read the attachments to**

20    **it, correct?**

21    A.   Yes.

22    Q.   **Okay.  And as far as you can recall, other**

23    **than the phone call that we had about a week and a**

24    **half ago when you called me, correct?**

Page 74

1    A.   Yes.

2    Q.   Okay.  Have you had any further discussions

3  with me about this case?

4    A.   I don't -- No.

5    Q.   No?  That's a no?

6    A.   I don't recall any of these letters, but no,

7  since --

8    Q.   No --

9    A.   -- last week, no.

10    Q.   -- but other than the letters --

11    A.   No.

12    Q.   Okay.  You don't recall having -- I just

13  want to make sure record is clear here.

14    A.   No.

15    Q.   No.  Let me ask the question one more time,

16  please, and then you may say no again.  But I just

17  want to get it on the record.  Okay.  In between the

18  time that -- I mean, other than the letters -- Let's

19  make it very clear.  Other than the letters that

20  you've seen, okay, is it true that you recall having

21  no contact with me at all until the date that you

22  called me a week and a half or so ago about the

23  location and -- and procedure of the deposition?

24    A.   Yes.

1/18/08 DEPOSITION OF LISA TRACEY          GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 75

1      Q.  And is it true that in that -- that

2  conversation was reasonably brief?

3      A.  Yes.

4      Q.  Okay.  And is the true that there was no

5  conversation about how you should testified today

6  that that conversation?

7      A.  Correct.  Yes.

8      Q.  Okay.  I think I have one last question.

9  Two last questions.

10     A.  Okay.

11     Q.  Okay.  Well, maybe one.  Maybe two.  Okay.

12  First of all, do you recall having any conversations

13  with anyone else concerning -- Let me make it more

14  specific -- with anyone at the Hartford Insurance

15  Company concerning the Capianco matter from the time

16  you left Uromed to today?

17     A.  No.

18     Q.  Okay.  Do you recall having any

19  conversations with anyone else concerning the

20  Capianco matter who was an attorney, other than the

21  gentleman that you mentioned, between the time you

22  left Uromed and today?

23     A.  No.

24     Q.  I notice that you were having a conversation

Page 76

1    in the waiting room --

2        A.    Yes.

3        Q.    -- with Mr. Rolstad?

4        A.    (Witness nods.)

5        Q.    Did that conversation include any material

6    about your testimony today?

7        A.    No.

8        Q.    Okay.  Let's see.  I think that might be

9    about it.  One last thing that I can think of.  Is

10    it possible that you would have any other documents

11    or records at home at all that would have to do with

12    this matter or your employment at Uromed?

13        A.    No.

14        Q.    Okay.

15                MR. HELLEN:  I think that's all I have

16    for now.  So Dennis, if you want to ask some

17    questions, go ahead.

18                MR. ROLSTAD:  I will.

19                THE WITNESS:  This is yours.

20                MR. HELLEN:  Oh.  Yes.

21                MR. ROLSTAD:  Why don't we go off the

22    record though, and give Ms. Tracey a chance to

23    contact her ride.

24                MR. HELLEN:  Yeah, that's a good idea.

 1            THE VIDEOGRAPHER:  The time is 11:33.

 2  We are off the record.

 3            (Brief break taken.)

 4            THE VIDEOGRAPHER:  The time is 11:35.

 5  We are back on the record.

 6

 7               CROSS-EXAMINATION

 8

 9  BY MR. ROLSTAD:

10    Q.  Good morning, Ms. Tracey.  My name is Dennis

11  Rolstad.  I'm here for the defendants, including the

12  Uromed Plan.  And I just have a few questions to

13  follow-up.

14    A.  Okay.

15    Q.  Let's look at Exhibit C, the e-mail that was

16  previously marked.

17          MR. HELLEN:  You might have to dig it

18  out from there.

19    Q.  ** Now, as I recall your testimony, and

20  please correct me if I'm wrong, you do not recall

21  having any conversation with Hartford regarding Mr.

22  Capianco; is that correct?

23    A.  No --

24          MR. HELLEN:  Objection.  Asked and

Page 78

1   answered.  You can answer.

2      A.  I don't recall.  Yes, I don't remember.

3      **Q.  Do you recall having any conversations with**

4   **Hartford regarding anything during the time of your**

5   **employment with Uromed?**

6      A.  No, I do not.

7      **Q.  Was there one particular contact at**

8   **Hartford, if you recall, that you would bring**

9   **questions to if you had any questions?**

10    A.  No.  We had an 800 number.  It was probably

11  just customer service.  I don't...

12     **Q.  But you don't recall, as you sit here today,**

13  **ever actually calling the 1-800 number; is that**

14  **correct?**

15          MR. HELLEN:  Objection.

16     A.  For -- for --

17          MR. HELLEN:  Leading.  Go ahead.

18     A.  For the -- for Mr. -- For this particular?

19  No.  If I had a question about -- No.  I don't --

20  We -- No, I don't.

21     **Q.  Do you recall speaking to them for any**

22  **reason?**

23     A.  No.

24     **Q.  Now, you testified that your job at Uromed**

1/18/08 DEPOSITION OF LISA TRACEY          GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 79

1    was payroll?

2        A.   Yes.

3        Q.   What all does that include?

4        A.   Payroll includes just processing the

5    payroll, getting the hours, the timesheets, vacation

6    time, filling out calendars.  But that was only a

7    small part since the payroll really didn't take up

8    much time.  So I was in customer service.  I helped

9    out with accounting functions.  I did accounts

10   payable and accounts receivable.  I'm sorry.  I

11   forgot about that until just now.  I did all the

12   accounts receivables and payables.  So the payroll

13   was small function because we were so tiny.

14       Q.   Did you help design Uromed's benefit plans?

15       A.   No, I did not.

16       Q.   Did you have any role with regard to

17   Uromed's benefit plans, other than receiving the

18   applications as you already testified?

19       A.   No.

20       Q.   Did you have any role in negotiating

21   insurance policies to insure benefits under Uromed's

22   plans?

23       A.   No.

24       Q.   Do you know who negotiated such policies, if

Page 80

1    anyone?

2        A.   That would have been Domenic or Dan, the

3    president and the CFO.

4        Q.   Did but you did not assist them with that

5    duty?

6        A.   No.

7        Q.   Do you recall having any telephone

8    conversations or meetings with Hartford regarding

9    the terms of the Hartford policy?

10            MR. HELLEN:   Objection.   Asked and

11   answered.   You can --

12       A.   I don't.

13            MR. HELLEN:   -- go ahead.

14       A.   I don't.

15       Q.   Other than Hartford, during your employment

16   at Uromed, did you commonly speak to insurers of

17   benefits under Uromed's welfare benefit plans?

18            MR. HELLEN:   Objection.   Asked and

19   answered.   You can go ahead.

20       A.   I don't remember.

21       Q.   Do you remember ever speaking to any of

22   Uromed's insurers for any reason?

23            MR. HELLEN:   Objection.   Asked and

24   answered.   You can answer.

1/18/08 DEPOSITION OF LISA TRACEY          GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 81

1      A.   No.

2      Q.   **Did you have any role in distributing Uromed**

3  **plan documents to participants, say other employees?**

4      A.   On an open enrollment period, possibly yes.

5  Domenic and I would go over them, and I would hand

6  and distribute out if things changed, if price --

7  the rates changed each year.  You know, if somebody

8  wanted to add on medical, an additional person or

9  take one off, things like that, 401(k).

10     Q.   **So if there were written changes in plan**

11 **terms, those were things that you would distribute**

12 **to the employees?**

13     A.   I would distribute them, yes.

14     Q.   **Okay.  Did you have any -- And I realize**

15 **that some of these questions, Mr. Hellen touched**

16 **upon, but I am entitled to ask you again.**

17     A.   Okay.

18          MR. HELLEN:  Yes.  And -- Go ahead.  I'm

19 sorry, Counsel.  Go ahead.

20     Q.   **I just wanted to follow-up on your**

21 **involvement, if any, in Uromed's mergers or**

22 **acquisitions of other companies.  Did --**

23          MR. HELLEN:  Objection.  Asked --

24     Q.   **-- you have any such involvement?**

Page 82

1              MR. HELLEN:  Objection.  Asked and

2      answered.  You can go ahead.

3          A.  No.  I think I was gone at that time.

4          **Q.  Did you ever have any discussions, to your**

5      **knowledge, with any officers of Hartford regarding**

6      **the Hartford policy?**

7          A.  No.

8              MR. HELLEN:  Objection.  Asked and

9      answered.

10         **Q.  And this is just to clear up the record.  Do**

11     **you recall ever having any discussions with Mr. Gil**

12     **Capianco?**

13         A.  No, I do not.

14             MR. HELLEN:  You know, late objection.

15     Asked and answered.

16         **Q.  Do you know what Mr. Capianco's job duties**

17     **were for Uromed?**

18         A.  I do not.

19             MR. HELLEN:  Objection.  Please let me

20     -- If you can pause --

21             THE WITNESS:  Oh, I'm sorry.

22             MR. HELLEN:  -- just a moment so I

23     could get my objection in.

24             THE WITNESS:  I'm sorry.

1/18/08 DEPOSITION OF LISA TRACEY          GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 83

```
 1                    MR. HELLEN:  I certainly will do it
 2       fast, okay.  Objection.  Calls for speculation.
 3       Okay.
 4            A.  I do not.
 5            Q.  Do you know whether Uromed is still in
 6       business?
 7                    MR. HELLEN:  Objection to the extent it
 8       might call for speculation.  If you know, please
 9       tell us.
10            A.  I do know.
11            Q.  What do you know?
12            A.  They are not in business.
13            Q.  How do you know that?
14            A.  We knew that -- I knew when I was there
15       before I was leaving that they were in financial
16       difficulty.
17            Q.  I see.  Were -- Had they been terminating
18       employees?
19            A.  They were terminating employees.  They had a
20       major layoff before I left.
21            Q.  Were you involved at all in notifying
22       employees that they'd been terminated?
23            A.  No.  My boss was.
24            Q.  And that's Mr. Micale?
```

Page 84

1      A.   Yes.   I would just do the payroll and get

2    their severance packages and pay out their

3    vacations.

4              MR. ROLSTAD:   I'm just continue using

5    the same letters that we were using before for

6    exhibits.   This exhibit will be the next letter.   I

7    believe that's Letter Q.   Please mark that as

8    Exhibit Q and show it to the witness.

9              MR. HELLEN:   Well, let's give one of

10   these to -- I assume there's going to be a question

11   coming.

12             MR. ROLSTAD:   She's going to mark it

13   first.

14             MR. HELLEN:   Okay.

15             THE COURT REPORTER:   Also, I do not --

16             MR. ROLSTAD:   There's no P.

17             THE COURT REPORTER:   I didn't put a

18   label on P.

19             MR. HELLEN:   Oh, okay.

20             THE COURT REPORTER:   Wait a minute.

21   Here it is right here.

22             MR. HELLEN:   Oh.   Thank you.

23        (Exhibit P marked for identification.)

24        (Exhibit Q marked for identification.)

1          MR. HELLEN:  Pass that over to the

2     witness, please.

3          THE WITNESS:  Did you want that one

4     back?

5          MR. HELLEN:  That that's already been

6     introduced.  Oh, okay.  That is the attachment.

7     **Q.  Ms. Tracey, do you recall seeing this**

8     **document before?**

9     A.  I remember this document.

10    **Q.  Okay.  How familiar are you with the terms**

11    **and provisions of this document?**

12    A.  Not -- not familiar.

13    **Q.  Do you know whether or not this document**

14    **includes within it the Hartford insurance policies**

15    **that insured benefits under some of the Uromed**

16    **welfare benefit plans?**

17    A.  I'm sorry, can you repeat that?

18    **Q.  Sure.  Well, let me ask -- Let me break it**

19    **down.**

20    A.  Okay.

21    **Q.  What do you know this document to be?**

22    A.  I would have distributed these to the

23    employees at open enrollment time.

24    **Q.  Okay.  And what is this?**

Page 86

1    A.  A group benefit plan.

2    Q.  **For Uromed Corporation?**

3    A.  Yes.

4    Q.  **From time to time, were there ever changes**

5    **in the terms of the group benefit plans?**

6    A.  I do not recall.

7    Q.  **Were you at all involved with changes to**

8    **group benefit plans for Uromed?**

9    A.  No.

10        MR. HELLEN:  Asked and answered.

11   Objection.

12   Q.  **Do you know whether any changes to the terms**

13   **of group benefit plans would have been in writing?**

14        MR. HELLEN:  Objection to the extent it

15   might call for speculation.  Go ahead.

16   A.  I don't know.

17   Q.  **Do you know whether an insurer would have**

18   **ever verbally made changes to the terms of a group**

19   **benefit plan?**

20        MR. HELLEN:  Objection.  Calls for

21   speculation.

22   A.  I don't recall.

23   Q.  **Now, you'll notice this document has numbers**

24   **at the bottom that say POL.  Those are just so that**

1/18/08 DEPOSITION OF LISA TRACEY                    GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 87

1    you know stamp numbers that my office put on --

2        A.   Okay.

3        Q.   -- to help identify the documents, and when

4    we produce it so all parties have the same document

5    and can identify pages.  Why don't you turn to the

6    page that says POL 49 towards the back.

7        A.   Okay.

8        Q.   Okay.  Do you see towards the middle of that

9    page a title in bold that says change in the policy?

10       A.   Yes.

11       Q.   Could you read the two sentences underneath

12   that heading?

13       A.   No change may be made unless approved in

14   writing by the president, or a vice president, an

15   assistant vice president, a secretary, an assistant,

16   or an assistant secretary of Hartford Life.  No

17   other person may change or waive any part of the

18   policy.  Any approved change shall be added to the

19   policy in writing.

20       Q.   That's fine.  Thank you.  Are you familiar

21   with that provision?

22       A.   I'm not, no.

23       Q.   And just following up, are you aware of

24   whether or not any provisions of the Hartford

Page 88

```
 1   policies changed?

 2       A.  I do not.

 3       Q.  In the course of your career, whether while

 4   employed by Uromed or at other times, have you been

 5   in a position to be familiar with the terms of

 6   insurance policies?

 7               MR. HELLEN:  Objection.  Asked and

 8   answered.  You can go ahead.

 9       A.  No.

10       Q.  So it's never been part of your job, whether

11   for Uromed or somebody else, to be -- to negotiate

12   terms of insurance policies?

13               MR. HELLEN:  Objection.  Asked and --

14       A.  No.

15               MR. HELLEN:  -- answered.  Please wait.

16       Q.  Has it ever been part --

17               THE WITNESS:  Okay.

18       Q.  -- was it part of your job at Uromed or at

19   any other time during your career to explain

20   insurance policy provisions to insureds or

21   participants?

22       A.  Yes.

23       Q.  When did you do that?

24       A.  I'm not sure.  It wasn't my job, but if they
```

1/18/08 DEPOSITION OF LISA TRACEY                    GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 89

1    asked questions, I always had the policies in hand.

2        Q.  **Did you do that while you worked at Uromed?**

3        A.  I could have, yes.

4        Q.  **You don't recall having --**

5        A.  I don't recall.

6        Q.  **-- done so?  Okay.  And in order to explain**

7    **policy provisions, would you look at the written**

8    **policies and the endorsements?**

9        A.  I would look at their -- Yes, I would, and

10   then I would also talk to my boss.

11       Q.  **Okay.  Let's look back at the page that's**

12   **stamped POL 08.  And the third description down, you**

13   **see the heading, prior plan?  Third from the top.**

14       A.  Okay.  Yes.

15       Q.  **Could you read that for the record.**

16       A.  Prior plan means the long-term disability

17   insurance carried by the employer on the days before

18   the plan effective date.

19       Q.  **Do you know what that means?**

20       A.  No, I don't.

21       Q.  **Do you know the date that the Hartford**

22   **policy insuring long-term disability benefits here**

23   **took effect?**

24       A.  I do not.

Page 90

1     Q.  Do you know whether or not Uromed had a

2 prior long-term disability plan?

3     A.  I do not.

4     Q.  Do you know when this plan terminated?

5     A.  I do not.

6     Q.  Let's look at Page POL 11.

7     A.  Okay.

8     Q.  Do you see the heading, pre-existing

9 conditions limitation?

10     A.  I do.

11     Q.  And then down below, there's a heading,

12 continuity from a prior plan.

13     A.  Okay.

14     Q.  Okay.  I'm not going to ask you to read that

15 for the record.  Just take a moment.  If you could

16 read those two provisions to yourself, and then I'm

17 going to ask you a couple of questions.

18     A.  Okay.

19     Q.  Okay.  Do you understand those two

20 provisions?

21     A.  A -- a little, yes.

22     Q.  What do you understand the pre-existing

23 condition limitation to mean?

24           MR. HELLEN:  I'm going to object to the

1/18/08 DEPOSITION OF LISA TRACEY          GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 91

1    extent that it may call for a legal opinion.  You

2    can go ahead.

3         A.   That if you came over from a prior plan --

4    I'm not sure.

5         Q.   Okay.  So let's look just at the top part,

6    the pre-existing condition limitation.

7         A.   Okay.

8         Q.   And I'm asking you only because I understand

9    you may have, at times, explained insurance policy

10   provisions to employees.

11        A.   Okay.

12        Q.   And so I'm just asking you, looking at the

13   pre-existing condition limitation provision, what

14   you understand that to mean, if anything?

15             MR. HELLEN:  Objection to the extent it

16   may call for a legal opinion.  You can answer.

17        A.   That he was insured under the -- That if

18   you're insured under a previous plan -- Is that what

19   it's saying -- that you are not eligible if you had

20   a pre-existing condition.  I mean, that's what I

21   take out of this paragraph.

22        Q.   Okay.  To be more specific than my prior

23   question --

24        A.   Um-hmm.

Page 92

1      Q.  -- looking at this plan --

2      A.  Yep.

3      Q.  -- did you ever explain the clauses on this

4   page to any employees of Uromed?

5      A.  I don't recall.

6      Q.  Is this the type of thing that you would

7   have attempted to explain to employees if they had a

8   question?

9      A.  I would talk to my boss first.

10      Q.  Okay.  Do you recall ever speaking to your

11   boss about these two provisions in the Hartford

12   policy?

13      A.  I don't.

14      Q.  Do you ever recall speaking to your boss

15   while you were employed at Uromed regarding the

16   interpretation of any of the provisions in the

17   Hartford policies?

18      A.  I don't.  No.

19      Q.  Okay.  Looking at Page POL 006.

20      A.  Okay.

21      Q.  Okay.  The second bolded word is employer,

22   and it says, employer means the policy holder.  Do

23   you see that?

24      A.  I do.

Page 93

1      Q. And then if we look at POL 004 towards the

2 top, it says, policy holder, Uromed Corporation. Do

3 you see that?

4      A. I do.

5      Q. Do you understand this, then, to be a policy

6 of insurance issued to Uromed?

7      A. I do.

8      Q. Do you know whether or not Mr. Capianco

9 participated in any prior plans of Uromed?

10         MR. HELLEN: Objecting to the extend it

11 may have been asked and answered and to the extent

12 it might call for a speculation. But go ahead,

13 please.

14      A. What was the question?

15      Q. Sure. Do you know whether or not Mr.

16 Capianco participated in any prior plans of Uromed?

17      A. I think the acquisition was happening when I

18 left. So I don't -- No, he wouldn't have.

19      Q. Also looking at Page POL 004, we looked at

20 policy holder. Two columns down from that it says,

21 plan effective date. Do you see that?

22      A. I do, yes.

23      Q. And it says April 1, 2000.

24      A. Yes.

Page 94

1     **Q.  Were you employed at Uromed on April 1,**

2     **2000?**

3     A.  I was.

4     **Q.  Okay.  Do you recall when you began first**

5     **working at Uromed?**

6     A.  I do not.

7     **Q.  Independent of what it may say on this page,**

8     **do you recall that the Hartford policy took effect**

9     **on April 1, 2000?**

10     MR. HELLEN:  Objection to the extent

11     that it was asked and answered.  It might call for

12     speculation.  You can go ahead.

13     A.  I don't recall.  But it does say that on

14     this paper.

15     **Q.  Okay.**

16     THE VIDEOGRAPHER:  I'm sorry to

17     interrupt, but while we're in a little break here,

18     we're just about out of tape.  Could we go off the

19     record for just a minute?

20     MR. HELLEN:  Sure.

21     MR. ROLSTAD:  Sure.  We can take a

22     break, and then you can change the tape.

23     THE VIDEOGRAPHER:  The time is 11:58.

24     This is the end of Cassette No. 1.  We are off the

1/18/08 DEPOSITION OF LISA TRACEY      GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 95

 1   record.

 2             (Brief break taken.)

 3             THE VIDEOGRAPHER:  The time is 12:01.

 4   This is the beginning of Cassette No. 2 in the

 5   deposition of Lisa Tracey.  We are back on the

 6   record.

 7      **Q.  Ms. Tracey, you were just discussing off the**

 8   **record maybe the scope of the type of provisions of**

 9   **insurance policies that you would explain to**

10   **employees.**

11      A.  Yes.

12      **Q.  Could you tell us what you were saying?**

13      A.  A few people went on maternity leave, so I

14   would explain the short-term disability benefits --

15      **Q.  Right.**

16      A.  -- like, to them.

17      **Q.  But do you recall ever explaining long-term**

18   **disability benefits?**

19      A.  I don't recall, no.

20      **Q.  Is that the type of thing you would have**

21   **done in your employment at Uromed?**

22      A.  I would have talked to -- to people about

23   that, yes.  At Uromed, when I was there, I think

24   there was only ten people.  I don't remember anybody

Page 96

1  leaving on long-term disability.

2      Q.  Okay.

3          MR. ROLSTAD:  I'm going to mark this

4  page as the next exhibit in order.  I think it's

5  Exhibit R.

6          MR. HELLEN:  I think you're right.

7      (Exhibit R marked for identification.)

8      Q.  Ms. Tracey, do you recognize this type of

9  document?

10     A.  I don't, no.

11     Q.  Do you know what an endorsement is?

12     A.  I do not.

13     Q.  If I told you this was a written change to a

14  policy term, does that make since?

15         MR. HELLEN:  Objection to the extent

16  that it make call for a speculation and for a legal

17  opinion.

18     A.  It does make sense if...

19     Q.  Okay.  In the course and scope of your

20  duties at Uromed, would you expect to see any

21  changes to insurance policies written and provided

22  to Uromed?

23     A.  No.

24     Q.  No, meaning you don't know?

1/18/08 DEPOSITION OF LISA TRACEY          GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 97

1      A.  They wouldn't come directly to me.  They'd

2  go to my boss, and he'd give me a copy to probably

3  put in the folder.

4      Q.  I see.

5      A.  Yes.

6      Q.  All right.  So you're not really involved in

7  changes to the policy?

8      A.  Not at all.

9      Q.  Okay.  Thank you.  I want to show you an

10  exhibit previously marked as Exhibit G.  I think --

11  Is that G?

12      A.  Yes.

13      Q.  Now, just looking at the first and second

14  pages, is that your handwriting?

15      A.  No.

16      Q.  Do you recognize the handwriting?

17      A.  No.

18      Q.  Looking at the second page towards the

19  bottom, and I don't recall if you were asked this

20  before, do you recognize the signature?

21      A.  I don't recognize the signature, but I

22  know -- I can read what it says.

23      Q.  On the name above the signature?

24      A.  Yes.  Yes.

Page 98

1      Q.  And what does it say?

2      A.  Domenic Micale.

3      Q.  And he was your boss?

4      A.  Yes.

5      Q.  I think you've test- --

6      A.  Yes.

7      Q.  -- testified?  And he was the CFO?

8      A.  Yes.

9      Q.  Now, it's signed, it appears, January 8th of

10   2002.  Do you see that?

11     A.  I do, yes.

12     Q.  Were you Uromed at that time?

13     A.  I was not.

14     Q.  Is that when you were on maternity leave or

15   after you'd left the second time?

16     A.  After I'd left.

17     Q.  Okay.  Looking at the first page, towards

18   the top, there's a heading, information about the

19   employee.  Do you see that?

20     A.  Yes.

21     Q.  It says, date employee was hired.  It

22   appears to say December 16, 2000.  Do you see that?

23     A.  Yes.

24     Q.  Does that refresh your recollection as to

1/18/08 DEPOSITION OF LISA TRACEY                    GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 99

1    when Mr. Capianco was first hired by Uromed?

2        A.   It doesn't, no.

3        Q.   Does it refresh your recollection as to

4    whether when there may have been a merger or

5    acquisition by Uromed of another company?

6        A.   I remember there was a merger.  I thought it

7    happened after I left.  They were in California.  I

8    don't remember much about it.

9        Q.   Just to the right of that date, there's a

10   heading, date employee became unsure -- insured

11   under this plan.  Do you see that?

12       A.   I do.

13       Q.   It appears to say March 27, 2001.

14       A.   Yes.

15       Q.   Do you know if that's the date Mr. Capianco

16   became insured under the long-term disability

17   benefit plan?

18       A.   I'm not sure.

19       Q.   Do you have any reason to believe that's not

20   the date he became insured?

21            MR. HELLEN:   Objection to the extent it

22   may call for speculation.  You can answer.

23       A.   No, I'm not sure.

24       Q.   Okay.  Do you recognize -- Is the

Page 100

1    handwriting on this page Mr. Micale's, if you know?

2              MR. HELLEN:  Yeah.

3         A.   I'm not sure.

4         Q.   Looking down a couple of columns, it says,

5    has the employee been terminated.  Do you see that?

6         A.   Information about the claim.  Do you know

7    where -- where is that?

8         Q.   Okay.  It -- Oh.  Oh.  That.

9         A.   Oh, has the employee been terminated.  Yes.

10   Okay, I see that.

11        Q.   And do you see a check mark in a box?

12        A.   Yes.

13        Q.   And which box is checked?

14        A.   It says, yes.

15        Q.   And do you see the date that's written

16   there?

17        A.   Yes.

18        Q.   And what is the date of termination?

19        A.   10/31/01.

20        Q.   And then I'm going to ask you if that

21   refreshes your recollection, but first, there's a

22   statement written in underneath the checked box.  Do

23   you see that?

24        A.   Yes.

1      Q.   Can you read that for us?

2      A.   The information of group life?

3      Q.   No.   The employee -- the handwritten portion

4   --

5      A.   Oh.

6      Q.   -- right under the checked box.

7      A.   All right.   The employee was terminated as

8   part of a companywide workforce reduction.   He was

9   informed on 10/18/01 that he would be terminated as

10   of 10/31/01.

11      Q.   Does this refresh your recollection at all

12   as to Mr. Capianco's termination?

13      A.   It does not, no.

14      Q.   Does this refresh your recollection at all

15   as to the time of any of the companywide

16   terminations of Uromed?

17      A.   No.   I was talking about a different

18   termination companywide.

19      Q.   Okay.   And, again, just to put this in

20   perspective, at this time period, was this before

21   you went on maternity leave, the October of '01?

22      A.   October of '01 is when I came back.

23      Q.   Okay.   So you were back in the office in

24   October of '01?

Page 102

1    A.  Yes.

2    Q.  But you were not involved with any --

3    A.  No.  I was there two days a week, AP and AR.

4    Q.  Okay.  So you weren't involved in

5  communications with Mr. Capianco regarding his

6  termination?

7    A.  No.

8    Q.  And you don't know anything else about his

9  termination?

10    A.  No.

11    Q.  Do you know anything about Mr. Capianco's

12  claim to disability?

13    A.  No, I don't.

14    Q.  Do you know anything about Mr. Capianco's

15  medical condition?

16    A.  No, I don't.

17    Q.  You did not have any information about his

18  medical condition at the time of your employment at

19  Uromed, correct?

20    A.  No.

21    Q.  Did you have any discussions with Mr. Hellen

22  today regarded his medical condition?

23    A.  Mr. Hellen?

24    Q.  Yes (indicating).

1      A.   No.

2      **Q. I thought you told me something about his**

3 **possible condition.**

4      A.   No.   Mr. -- The investigator came to my

5 house and said that Mr. Capianco was dying and that

6 they would greatly appreciate my help.

7      **Q. I see. And that's all you know about his**

8 **purported condition?**

9      A.   That's it, yes.

10      **Q. Do you know whether he is or is not dying?**

11      A.   I don't think he's dead.

12      **Q. Okay.**

13      MR. HELLEN:   It would be pretty hard to

14 have a litigation --

15      THE WITNESS:   Well --

16      MR. HELLEN:   -- with a dead plaintiff.

17      THE WITNESS:   -- I didn't know if his

18 family maybe was doing this, or I don't know.

19      **Q. Your current company, was that Flooring**

20 **Design, F-l-o-o-r-i-n-g?**

21      A.   Yes.

22      **Q. Okay. And you said that's your company?**

23      A.   And my husband's.

24      **Q. Okay. You and your husband are the owners**

Page 104

1    of this company?

2        A.   Um-hmm.  Yes.

3        Q.   Great.  And you operate this company?

4        A.   Yes.

5        Q.   Do you have any employees?

6        A.   We do.

7        Q.   How many?

8        A.   We have a lot of contractors, but employees,

9    we have about six.

10       Q.   Do you have a long-term disability plan for

11   those employees?

12       A.   We don't have benefits.

13       Q.   I just want to see if your recollection is

14   refreshed.

15            MR. ROLSTAD:  Howard, so please, if you

16   would bear with me.

17       Q.   Given the discussion today, do you recall

18   the name SSGI Prowess Systems?

19       A.   I do not.

20       Q.   And so you would not know or recall whether

21   Mr. Capianco was a participant in an SSGI welfare

22   benefit plan?

23       A.   I would not, no.

24       Q.   Do you have any reason to know whether Mr.

1    Capianco would or would not be entitled to long-term

2    disability benefits under the Uromed program?

3         A.   I don't, no.

4         Q.   Mr. Hellen showed you earlier today a

5    document he called a declaration.  Do you recall

6    that?

7         A.   I do, yes.

8         Q.   Did you ever refuse to sign a declaration

9    like that?

10        A.   I don't remember seeing a declaration.  I

11   don't remember refusing.

12        Q.   Okay.  But as you sit here, you don't recall

13   ever speaking to Hartford about Mr. Capianco?

14        A.   No.

15        Q.   So you can cannot declare under penalty of

16   perjury that you have done so, correct?

17        A.   Correct.

18             MR. HELLEN:  Objection.  Counsel's

19   testifying for the deponent.  Asked and answered.

20   It's okay.  You can repeat your answer if the court

21   reporter didn't get it.

22        A.   I said correct.

23             MR. ROLSTAD:  Do you have some follow-up

24   questions, Howard?

Page 106

1             MR. HELLEN:  Just a couple.

2             MR. ROLSTAD:  Why don't you ask a couple

3    while I look over my notes --

4             MR. HELLEN:  Okay.

5             MR. ROLSTAD:  -- to see if I have

6    anymore.

7             MR. HELLEN:  That's great.  Okay.  Thank

8    you.

9                    REDIRECT EXAMINATION

10

11   BY MR. HELLEN:

12       Q.  Just a few more questions, Ms. Tracey.

13       A.  That's okay.

14       Q.  I appreciate your patience.  Okay.  These

15   questions are going to have to do with try and

16   clarify your testimony --

17       A.  Okay.

18       Q.  -- mostly on the cross-examination by

19   Mr. Rolstad.  You were asked a question that went to

20   Exhibit C, your -- which, of course, was your -- the

21   document purporting to be your e-mail, correct?

22       A.  Yes.

23       Q.  Okay.  And I believe the question was, do

24   you recall consulting with Hartford about Mr.

1    Capianco's disability status; is that correct?

2                MR. ROLSTAD:  I don't --

3                MR. HELLEN:  Do you recall, Mr. Rolstad,

4    exactly how the question -- It was something like

5    that.  I wrote it down so I don't -- Do you recall?

6                MR. ROLSTAD:  I don't.

7                MR. HELLEN:  It looks like any consults

8    with Hartford.

9                MR. ROLSTAD:  I don't remember the word

10   consults or consulting.

11               MR. HELLEN:  Is there a way you can go

12   back in the record and find that question easily?

13               THE COURT REPORTER:  I will look.

14               MR. HELLEN:  While you're looking, I'll

15   try the question a different way.

16               MR. ROLSTAD:  Well, she's got to type if

17   you're asking a question.

18               MR. HELLEN:  Okay.  That's true.

19               MR. ROLSTAD:  So she can't look.

20               MR. HELLEN:  That's true.  Never mind.

21   May I try to help?  This question would have

22   occurred at the beginning of Mr. Rolstad's

23   cross-examination, if that helps you find it at all.

24   If it's too difficult, just let me know.

Page 108

1            THE COURT REPORTER:  Just a moment.

2       (**Question beginning Page 76, Line 19 read back.)

3            MR. ROLSTAD:  "...regarding Mr.

4    Capianco."

5            MR. HELLEN:  Are we on?

6            THE VIDEOGRAPHER:  Yes.

7            MR. HELLEN:  Okay.  Good.

8       Q.  Did you hear the question repeated?

9       A.  I did.

10      Q.  Okay.  And do you recall answering that you

11   did not recall such a conversation with Hartford?

12      A.  That's correct.

13      Q.  Okay.  But is it not true that you also

14   testified that you -- that such a memo as you saw in

15   Exhibit C, that you would not have drafted such a

16   memo saying you talk with someone at Hartford about

17   coverage if you had not talked to someone at

18   Hartford; is that correct?

19      A.  Well, my boss or the Hartford.

20      Q.  Okay.  But you do recall that in your

21   e-mail -- or in the e-mail, it said, I called the

22   Hartford.  Do you recall that?

23      A.  It did say that, yes.

24      Q.  Okay.  Would you normally say that in the

1/18/08 DEPOSITION OF LISA TRACEY        GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 109

1    course of the business if it were not you actually

2    making the communication?

3        A.   No.

4        Q.   Okay.  All right.  Now, you testified on

5    cross-examination that there was some sort of a

6    major layoff at Uromed, correct?

7        A.   Um-hmm.

8        Q.   Okay.  Did you know -- Did you have any

9    personal knowledge during that period of time that

10   Mr. Capianco was about to be terminated?

11       A.   There was a -- I stated that there was a

12   different layoff that we were talking about.

13       Q.   Okay.

14       A.   It -- I wasn't employed, I think, when the

15   layoff that you're talking about.  I'm talking about

16   people that were working with only Uromed.  This was

17   even before an acquisition.

18       Q.   Great.  So you've clarified that.

19       A.   Yes.

20       Q.   And I appreciate it.  So but that would mean

21   that -- just to make sure I'm not being dense --

22   that you did not have any direct knowledge of a

23   layoff that would have happened to Mr. Capianco?

24       A.   No.

Page 110

1        Q.   Okay.   Thank you.   Okay.   I believe you
2    testified that you sometimes would explain or
3    attempt to explain provisions of the insurance
4    contract to employees; is that --
5        A.   No.
6        Q.   -- correct?
7        A.   That's not correct.
8        Q.   You did not try -- Well, okay.
9        A.   Not provisions --
10       Q.   Good.   Again --
11       A.   -- no.
12       Q.   All right.   If an employee contacted you --
13   And this is only based on your personal knowledge.
14   I'm not asking you to speculate.   Okay.   If an
15   employee contacted you while you were there and
16   asked about whether or not they were covered, would
17   you give them a direct answer without first
18   inquiring of someone else as to whether they were
19   covered?
20       A.   No, I would not give them a direct answer.
21       Q.   Okay.   And who, if you did not, would there
22   be somebody that you passed that by in order to
23   provide an answer?
24       A.   My boss.

1      Q.   Mr. Micale?

2      A.   Mr. Micale, yes.

3      Q.   Okay.   And do you know whether Mr. Micale

4 would get his information from?

5      A.   I'm not sure.

6      Q.   Okay.   Did he ever tell you that he called

7 Hartford to obtain the kind of information about

8 coverage?

9      A.   No, I don't recall that.

10      Q.   Okay.   Did he ever tell you that he did not

11 call Hartford to get that information?

12      A.   I wouldn't recall that.

13      Q.   Okay.   This is really good.   Your last two

14 answers answered my next several questions, so I

15 have left -- left for you -- left -- less left for

16 you.   Okay.

17      A.   Good.

18      Q.   Let's see.   Okay.   You had testified that

19 most of the work, I believe, and correct me if I'm

20 wrong, that you did or the communicating that you

21 did with employees with respect to benefits had to

22 do with short-term disability such as maternity; is

23 that correct?

24      A.   On an -- on an occasion or so, I talked to

Page 112

1   them about the short-term disability, just how long

2   the waiting period was --

3       Q.  **Right.**

4       A.  -- how much the money -- how much we'd have

5   to take out, how much they're eligible for, things

6   like that.

7       Q.  **Okay.  Do you -- do you feel, based on**

8   **your -- what you did at Uromed, that you were**

9   **qualified to explain the details of pre-existing**

10  **condition exclusions to employees?**

11      A.  I would talk to somebody first.  I

12  wouldn't -- If I didn't deal with it, or it was new

13  to me --

14      Q.  **Um-hmm?**

15      A.  -- I would have went to somebody else first.

16      Q.  **Okay.  And was that person usually**

17  **Mr. Micale?**

18      A.  He was the only person there, yes --

19      Q.  **Okay.**

20      A.  -- who was above me.

21      Q.  **All right.  Did you -- Is that the -- Would**

22  **that be the same answer with respect to the**

23  **provision for continuity of coverage, also?**

24      A.  Yes.

1/18/08 DEPOSITION OF LISA TRACEY          GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 113

1      Q.  Okay.  Now, you had said something about

2   when Mr. Reiser, the investigator, did speak to you

3   that he told you Mr. Capianco is dying; is that

4   correct?

5      A.  Yes.

6      Q.  How is it that you so clearly remember that

7   comment?

8      A.  Because I felt so bad.  He's dying --

9      Q.  Okay.

10     A.  -- and I couldn't help, and I didn't

11  remember much.

12     Q.  Okay.  But you -- you don't remember

13  anything else about the conversation; is that

14  correct?

15     A.  No, I don't.  I don't.  It was very quickly.

16  It was about five minutes, and he was more like

17  grasping trying to get me to help saying he's dying,

18  he's dying.  I mean, if somebody says they're dying,

19  you're going to remember that.

20     Q.  Okay.  Let me just ask if you recall

21  Mr. Reiser ever telling you that Mr. Capianco had

22  multiple sclerosis?

23     A.  No, I don't.

24     Q.  Do you ever recall Mr. Reiser mentioning

Page 114

1    that Mr. Capianco has an illness that is usually
2    terminal?
3        A.  If he was dying, I would think it would be
4    terminal.
5              MR. ROLSTAD:  Objection.  It assumes
6    facts not in evidence.  It lacks foundation.
7              MR. HELLEN:  I was just asking the
8    question.  Okay.  All right.
9        Q.  Take one more quick look.  I think I might
10   be done.  To the best of your recollection, has
11   anyone ever advised you not to cooperate in the --
12   in this case?
13       A.  Absolutely not.
14       Q.  Okay.  Has anyone ever advised you not to I
15   attend the deposition?
16       A.  No.  Only if it was a bad snowstorm.
17       Q.  Okay.  Well, of course.  None of us would be
18   here.  Okay.
19       A.  We were supposed to have snow today my
20   lawyer was saying.  I said, what happens if we have
21   snow.
22       Q.  Okay.  Did your lawyer ever advise you to --
23   And with all due respect, I just have to ask the
24   question.  Okay.  Did your lawyer ever advise you to

1    not fully answer any questions that were asked of

2    you today?

3        A.   No.

4        Q.   Okay.

5             MR. HELLEN:   That's all I have.

6

7                    RECROSS-EXAMINATION

8

9    BY MR. ROLSTAD:

10       Q.   Okay.  Let me just follow-up.  We're almost

11   finish.

12       A.   Okay.

13       Q.   Thank you very much for your patience.

14            MR. HELLEN:   Yeah.

15       Q.   We do appreciate it.  Do you need to take a

16   quick break?

17       A.   No.  No.

18       Q.   All right.  As I understand the testimony

19   you just gave, if you were asked questions about

20   things such as pre-existing conditions and the like,

21   you would go to your boss; is that correct?

22       A.   Yes.

23       Q.   And that's because -- Or why would you go to

24   your boss?

Page 116

1     A.   Well, I would think that pre-existing

2  conditions, it's not something I dealt with on an

3  everyday, and I'd go to him.

4     Q.   **You weren't very familiar with that**

5  **provision?**

6     A.   No.

7     Q.   **And let me just figure out, if we're looking**

8  **at Exhibit C, that's e-mail --**

9     A.   Yes.

10     Q.   **-- that you were previously shown.**

11     A.   Yes.

12     Q.   **It said something about calling BlueCross.**

13  **Would it be true to say that you'd speak to the**

14  **health insurer much more frequently than say the**

15  **disability insurer?**

16     A.   Yes.

17     Q.   **Okay.  So speaking to BlueCross, was that a**

18  **frequently occurrence?**

19     A.   No.  We didn't -- like I -- we didn't have a

20  lot of employees, so if somebody's -- say they said

21  the prescription wasn't covered or something, I

22  would call them and ask why --

23     Q.   I see.

24     A.   -- you know, things like that.

1/18/08 DEPOSITION OF LISA TRACEY                    GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 117

1      Q.   So you -- And would it be true to say you

2   were much more familiar with the medical coverage

3   than you were the disability coverage?

4      A.   Yes.  And dental, yep.

5      Q.   Now, there's something in your e-mail about

6   a group being considered a transfer.  Do you know

7   what that means?

8      A.   No.  I would think it would be something

9   about the acquisition.  That's what I get out of

10  reading it.  Transferring over to us.

11     Q.   And it says something about coming directly

12  from another plan.  Do you know what that means?

13     A.   He -- They would have had existing plans

14  there, their existing medical, dental, 401(k),

15  everything.

16     Q.   So if an acquired employee hadn't been a

17  participate in a plan with an acquired company, then

18  they would be affected?

19          MR. HELLEN:  Objection to the extent

20  that it calls for speculation, and it may call for a

21  legal opinion.

22     A.   Can you repeat that again?

23     Q.   Sure, I'm just asking about -- And you can

24  look at the e-mail if you'd like.  It's Exhibit C.

Page 118

1           MR. HELLEN:  Yeah.  That might be

2    helpful.  Would you like to see that?

3           MR. ROLSTAD:  Did you put it back here?

4           MR. HELLEN:  I have another --

5           MR. ROLSTAD:  Well --

6           MR. HELLEN:  -- if it's okay with

7    everyone.

8           MR. ROLSTAD:  I'd prefer --

9           MR. HELLEN:  It's the same thing.  Okay.

10          MR. ROLSTAD:  -- she look at the one --

11          MR. HELLEN:  Of course.

12          MR. ROLSTAD:  -- that's marked, if you

13   don't mind.

14          MR. HELLEN:  No, I don't mind at all, as

15   I said.

16          THE WITNESS:  Oh, I might have it.

17          MR. ROLSTAD:  Here it is.

18          MR. HELLEN:  Okay.

19          MR. ROLSTAD:  And you can take the

20   Post-it off that.  That's not important, I don't

21   think.

22          MR. HELLEN:  Yeah.  Just my marker is on

23   it.

24      Q.  So I'm just looking at the middle.  It says

1/18/08 DEPOSITION OF LISA TRACEY          GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 119

1    something about a group being considered a transfer

2    not as new hires and are coming directly from

3    another plan.

4        A.   Okay.   Yep.

5        Q.   Okay.   So now, looking at the e-mail, what

6    -- what do you think that means?

7             MR. HELLEN:   I repeat the objection.   Go

8    ahead.

9        A.   To me, it would say that if they were

10   transferring over to the new company's plan, that

11   all -- everything will be waived.

12       Q.   Okay.   If they're coming directly from

13   another plan?

14       A.   Exactly.

15       Q.   Does that mean if they're a part -- Or do

16   you understand what it means when I say a

17   participant in a plan?

18       A.   Yes.   That they were enrolled --

19       Q.   Okay.

20       A.   -- and had deductions taken out.

21       Q.   Thank you.   So would this mean if they were

22   enrolled in the other company's plan?   Is that how

23   this applies?

24             MR. HELLEN:   Objection to the extent

Page 120

1  that it may call for speculation and a legal

2  conclusion.

3      A.  To me, it says that if you were coming from

4  another plan directly over to another one with no --

5  with -- with a period at all not being covered --

6      Q.  **Okay.**

7      A.  -- that you -- that it was waived.

8      Q.  **So if there wasn't a -- a lapse period?**

9      A.  Exactly.

10     Q.  **And you understand what --**

11     A.  That's what --

12     Q.  **-- a lapse is?**

13     A.  Yes.

14     Q.  **What is a lapse?**

15     A.  When there's no coverage.

16     Q.  **Okay.  So if someone was coming over from**

17  **another plan and there was no lapse, no time without**

18  **coverage, then maybe there was a waiver here --**

19          MR. HELLEN:  Objection --

20     Q.  **-- is that what we're saying?**

21          MR. HELLEN:  -- to the extent it may

22  mischaracterize the former question --

23          MR. ROLSTAD:  And I don't mean to

24  mischaracterize.

1/18/08 DEPOSITION OF LISA TRACEY                    GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 121

1            MR. HELLEN:  -- and it calls for a legal

2     opinion and --

3        A.  That's how I --

4            MR. HELLEN:  -- speculation.

5        A.  That's how I am reading this e-mail.

6        Q.  **Okay.**

7            MR. ROLSTAD:  All right.  Thank you very

8     much.  I have -- I'll pass it onto Mr. Hell- --

9            MR. HELLEN:  I have one --

10           MR. ROLSTAD:  -- Hellen if he has --

11           MR. HELLEN:  -- one and a half --

12           MR. ROLSTAD:  -- more questions.

13           MR. HELLEN:  -- one and a half more

14    questions.  Okay.

15           THE WITNESS:  I knew it.

16           MR. HELLEN:  Of course you knew.  This

17    is what we do, you know.

18

19               FURTHER DIRECT EXAMINATION

20

21    BY MR. HELLEN:

22       Q.  **Okay.  Let's see.  Now, you just testify --**

23    **I'm just -- One or two questions about what you just**

24    **testified to.**

Page 122

1      A.   Okay.

2      Q.   Okay.  First of all, I believe you testified

3   that you most likely contacted or had contact with

4   BlueCross more than with Hartford; is that correct?

5      A.   Well, yes.

6      Q.   Okay.  But does that mean that -- I mean,

7   can you say with certainty that you never had

8   contact with Hartford?

9      A.   You know, he's asking what would I have more

10  contact with.

11     Q.   I understand that.

12     A.   I would have more probably with medical

13  than -- Do I recall calling the Hartford?  No.

14     Q.   Do you recall calling BlueCross?

15     A.   No.

16     Q.   Okay.  Thank you.  And then you had

17  testified, also -- and this is the last question, I

18  hope -- that you were asked about what your

19  understanding of the language in that e-mail is --

20     A.   Yes.

21     Q.   -- in terms of being considered a transfer

22  and so forth, correct?

23     A.   Correct.

24     Q.   All right.  And you testified, I think, as

1/18/08 DEPOSITION OF LISA TRACEY     GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 123

1    to what you think some of that language means to

2    you, correct?

3        A.   Um-hmm.

4        Q.   Okay.   Now, in the real life situation --

5        A.   Yes.

6        Q.   -- where you would have had somebody coming

7    to you, okay, to see if, you know, this type of

8    situation existed, would you actually say what you

9    thought might be true to the applicant; or would you

10   clear the information with somebody else?

11       A.   I would clear the information.

12       Q.   Okay.   And who would you clear it with?

13       A.   My boss.

14       Q.   Okay.   And is your -- Mr. Micale, if you

15   know, was he an attorney?

16       A.   No.   He's a CPA.

17       Q.   He's a CPA.   Okay.   So do you have any

18   information that he's ever been involved in drafting

19   any legal documents?

20       A.   No.

21       Q.   Okay.   Did the company -- Did Uromed have a

22   counsel, an attorney, while you were working there?

23       A.   I -- Yes.   They -- Yes.   I paid bills.

24       Q.   Okay.

Page 124

1      A.   So I knew that.  I did accounts payable.  I

2  never met them.  I never talked to them.  It was

3  always with Domenic and Dan.

4      **Q.   Okay.  Do you know if the attorney that did**

5  **work for Uromed is connected in any way with any**

6  **subsequent employers that you might have had?**

7      A.   I don't know.

8      **Q.   Okay.**

9           MR. HELLEN:  That's it.

10           THE VIDEOGRAPHER:  The time is 12:30,

11  and the deposition is concluded.  This is the end of

12  Cassette No. 2.  We are off the record.

13           (Discussion was held off the record.)

14           THE VIDEOGRAPHER:  The time is 12:34,

15  and we are back on the record.

16           MR. HELLEN:  Thank you.  I just request

17  that the deponent be given a period of 15 days to

18  review and make any changes if she feels it's

19  necessary to the deposition transcript from the date

20  she receives it.  Do you agree counsel?

21           MR. ROLSTAD:  That's fine.  I just note

22  for the record that if you do make any changes,

23  those can be commented upon by counsel before the

24  court.

1/18/08 DEPOSITION OF LISA TRACEY                    GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 125

1          MR. HELLEN:  Yeah.  I was getting to
2     that.
3          MR. ROLSTAD:  Sorry.
4          MR. HELLEN:  But thank you.  I won't
5     repeat it.  And let's see.  Is there anything else I
6     need to say.
7          THE VIDEOGRAPHER:  I'm sorry,
8     Mr. Hellen.  I thought it was recording, but it had
9     stopped.  If we could just...
10         MR. HELLEN:  From the top?
11         THE VIDEOGRAPHER:  Just start from the
12    beginning, yeah.  I'm sorry.
13         MR. HELLEN:  I'd like to stipulate with
14    counsel that the deponent be given 15 days from the
15    -- her receipt of the deposition transcript to
16    review it and make any changes, noting, of course,
17    that any changes that you do make may be questioned
18    at later date in the case.  You understand that?
19         THE WITNESS:  I do.
20         MR. HELLEN:  So stipulated?
21         MR. ROLSTAD:  Yes.  I just caution two
22    things: that the changes are only if you think the
23    transcript doesn't accurately reflect your true and
24    correct testimony.

Page 126

 1                    MR. HELLEN:  Of course.

 2                    MR. ROLSTAD:  And No. Two, I understand

 3     that the court reporter is going to mail a copy of

 4     the transcript directly to Ms. Tracey; is that

 5     correct?

 6                    MR. HELLEN:  That is correct.  And one

 7     last thing.  If for any reason the original

 8     transcript is lost or destroyed, a copy may be used

 9     in its place.  I mean, that's typical in California.

10                    MR. ROLSTAD:  That's fine.

11                    MR. HELLEN:  Okay.  That's it.  That's

12     all I've got.

13                    THE VIDEOGRAPHER:  The time is 12:35.

14     We are off the record.

15                    (Whereupon the deposition

16                    was adjourned at 12:35 p.m.)

17

18

19

20

21

22

23

24

Page 127

1          E R R A T A     S H E E T

2          I, LISA TRACEY, do hereby certify that I

3   have read the foregoing transcript of my testimony,

4   and further certify that it is a true and accurate

5   record of my testimony (with the exception of the

6   corrections listed below):

7   Page    Line          Correction

8   _____ _____  _____

9   _____ _____  _____

10  _____ _____  _____

11  _____ _____  _____

12  _____ _____  _____

13  _____ _____  _____

14  _____ _____  _____

15                    _Lisa Tracey_____

16                    LISA TRACEY

17  On this 19th day of February, 2008, before me

18  personally appeared Lisa Tracey, proved to me

19  through satisfactory evidence of identification,

20  namely MA License, to be the person whose name

21  is signed on the preceding document in my presence.

22  My commission expires: 5/11/2011

23  _____     Notary Public

24                             DOROTHY L. TRACEY
                               Notary Public
                               Commonwealth of Massachusetts

Page 128

1    Commonwealth of Massachusetts

2    Middlesex, ss.

3         I, Amie D. Rumbo, Notary Public in and

4    for the Commonwealth of Massachusetts, do hereby

5    certify that LISA TRACEY came before me on Friday,

6    January 18, 2008, the deponent herein, who was duly

7    sworn; the examination was reduced to printing under

8    my direction and control; and the within transcript

9    is a true record of the testimony given at said

10   deposition.

11        I FURTHER CERTIFY that I am neither

12   attorney or counsel for, nor related to or employed

13   by any of the parties to the action in which this

14   deposition is taken; and, further, that I am not a

15   relative or employee of any attorney or counsel

16   employed by the parties hereto, or financially

17   interested in the outcome of the action.

18        IN WITNESS WHEREOF I have hereunto set my

19   hand and affixed my seal of office this 21st day of

20   January, 2008.

21

22   Amie D. Rumbo, Notary Public

23   My Commission expires:  11/01/2013

24

1/18/08 DEPOSITION OF LISA TRACEY

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 129

**A**

able 34:22
Absolutely 114:13
Accident 41:13
accounting 44:22
  79:9
accounts 11:2 79:9
  79:10,12 124:1
accurate 127:4
accurately 8:21 9:7
  125:23
acquired 117:16,17
acquisition 20:22
  93:17 99:5 109:17
  117:9
acquisitions 81:22
action 128:13,17
add 29:17 65:23
  81:8
added 87:18
addition 45:9
additional 81:8
address 9:23 30:8
  57:1 73:11
addressed 4:10
  34:2,14 38:5,13
  40:3,15 46:12
  47:24 51:1 53:20
  56:22 64:15 67:15
  73:9,11
adjourned 126:16
administer 6:15
admitted 54:18
advantage 7:24
advise 13:23
  114:22,24
advised 114:11,14
affiliations 12:17
affixed 128:19
ago 54:23 73:24
  74:22
agree 68:22 124:20
agreed 28:24 29:19
ahead 27:6 28:24
  76:17 78:17 80:13
  80:19 81:18,19

82:2 86:15 88:8
  91:2 93:12 94:12
  119:8
AJB 1:6
al 1:12 6:10
Alliant 15:11 22:5
  22:9 35:3
allowed 26:19
ambiguous 34:18
  40:11 44:12 65:2
  65:5 66:3
Amie 6:13 128:3,22
Andrew 2:21
Andy 6:3
answer 8:10,20
  13:16 14:2 22:21
  32:24 35:18 36:23
  37:1 43:11 52:11
  63:23 65:4 68:8
  78:1 80:24 91:16
  99:22 105:20
  110:17,20,23
  112:22 115:1
answered 64:20
  69:8 78:1 80:11
  80:19,24 82:2,9
  82:15 86:10 88:8
  88:15 93:11 94:11
  105:19 111:14
answering 108:10
answers 111:14
anybody 26:8
  95:24
anymore 106:6
anyway 20:4
AOL 55:10 56:6
AP 102:3
apologize 32:3
  41:21,24 66:17
appear 67:1
appearances 6:14
appeared 127:18
appears 58:6 98:9
  98:22 99:13
applicant 123:9
application 25:17

63:12,16,24
applications 16:24
  23:15 25:18,20
  39:19 43:12 79:18
applied 62:17 63:8
applies 119:23
appreciate 103:6
  106:14 109:20
  115:15
appropriate 29:2
approved 87:13,18
approximately
  15:14 42:18,22
  44:15
April 4:9,16 5:4,6
  34:2 35:1 47:23
  49:5 59:17,21
  60:10 64:15 70:2
  70:2,3,15 72:21
  93:23 94:1,9
AR 102:3
area 9:20 12:11,20
  13:5 16:21 23:4
  24:11
argument 63:5
Arnold 2:11 70:16
asked 38:20 64:20
  69:7 77:24 80:10
  80:18,23 81:23
  82:1,8,15 86:10
  88:7,13 89:1
  93:11 94:11 97:19
  105:19 106:19
  110:16 115:1,19
  122:18
asking 43:3 68:12
  68:18 91:8,12
  107:17 110:14
  114:7 117:23
  122:9
assist 80:4
assistant 87:15,15
  87:16
association 6:5
assume 84:10
assumes 114:5

attached 5:14 58:1
  59:3
attaching 52:15
attachment 46:24
  85:6
attachments 72:22
  73:19
attempt 110:3
attempted 92:7
attend 11:20
  114:15
attended 24:15
attention 59:15
  62:12
attorney 9:14 10:6
  10:14 11:6,9 50:7
  67:16 75:20
  123:15,22 124:4
  128:12,15
attorneys 9:11
author 53:4
authored 32:21
  33:4
available 35:18
  53:3
Avon 47:8 56:24
aware 24:18 40:6
  87:23
a.m 1:19 32:9

**B**

B 4:1,4 29:3,8,22
  50:23
back 14:3 16:4,5
  19:4 26:24 27:8
  27:10 28:21 36:20
  37:1 59:16 60:7
  60:15 61:22 77:5
  85:4 87:6 89:11
  95:5 101:22,23
  107:12 108:2
  118:3 124:15
background 12:12
  18:21
bad 113:8 114:16
barred 36:8 37:7

37:13 64:7
based 52:13 110:13
  112:7
basically 7:24
bear 43:14 104:16
began 94:4
beginning 65:18
  95:4 107:22 108:2
  125:12
behalf 6:4
believe 33:8 34:13
  41:17 43:22 49:13
  59:19 63:15 64:19
  66:14 69:18 84:7
  99:19 106:23
  110:1 111:19
  122:2
benefit 5:7 32:13
  32:13,15 79:14,17
  80:17 85:16 86:1
  86:5,8,13,19
  99:17 104:22
benefits 7:18 13:13
  13:20 14:10 16:16
  16:20 17:1,4,7,15
  17:19 18:14 23:16
  25:9,13,18 26:16
  26:21 32:18 36:9
  37:13 62:17 63:8
  63:13,17 65:17,23
  66:1 79:21 80:17
  85:15 89:22 95:14
  95:18 104:12
  105:2 111:21
Bennett 2:3,4 67:15
best 22:17 42:19
  45:11 47:9 55:14
  71:8 114:10
better 8:12
big 20:10 44:2
bills 123:23
bit 12:10 67:24
BlueCross 116:12
  116:17 122:4,14
bold 87:9
bolded 92:21

1/18/08 DEPOSITION OF LISA TRACEY
Page 130

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

**boss** 18:14 36:18
37:3 40:21 66:11
83:23 89:10 92:9
92:11,14 97:2
98:3 108:19
110:24 115:21,24
123:13
**Boston** 1:22 6:12
9:20
**bottom** 33:5 59:22
86:24 97:19
**box** 100:11,13,22
101:6
**break** 61:2,5,15,20
77:3 85:18 94:17
94:22 95:2 115:16
**brief** 61:20 68:13
75:2 77:3 95:2
**bring** 78:8
**Brockton** 9:21 10:3
**building** 44:3,6,9
**business** 11:9,9
83:6,12 109:1
**buzzes** 71:19

**— C —**

**C** 2:1 4:6 6:1 29:24
31:2,3 32:17
77:15 106:20
108:15 116:8
117:24
**calendars** 79:6
**California** 1:5 2:6
2:15 99:7 126:9
**call** 22:13 50:3
51:23 59:15 60:7
66:8 73:23 83:8
86:15 91:1,16
93:12 94:11 96:16
99:22 111:11
116:22 117:20
120:1
**called** 6:21 13:2
14:17,18 53:14
73:24 74:22 105:5
108:21 111:6

**calling** 78:13
116:12 122:13,14
**calls** 32:22 34:18
40:8 43:1 55:18
63:18 69:20 83:2
86:20 117:20
121:1
**capacity** 18:23
**Capianco** 1:8 6:8
6:17 38:12 42:5
46:1,3 47:11 50:3
53:11 54:9 62:16
63:7,16 64:1,5,15
68:16 75:15,20
77:22 82:12 93:8
93:16 99:1,15
102:5 103:5
104:21 105:1,13
108:4 109:10,23
113:3,21 114:1
**Capianco's** 7:17
50:7 63:13 82:16
101:12 102:11,14
107:1
**career** 88:3,19
**carried** 89:17
**case** 1:6 47:1,10
74:3 114:12
125:18
**Cassette** 94:24 95:4
124:12
**categorization**
62:21
**caution** 125:21
**Centre** 10:2
**certainly** 83:1
**certainty** 122:7
**certify** 127:2,4
128:5,11
**CFO** 21:5 80:3
98:7
**chance** 76:22
**change** 15:8 22:14
28:13 48:14 58:19
66:19 87:9,13,17
87:18 94:22 96:13

**changed** 22:18,18
66:19 81:6,7 88:1
**changes** 81:10 86:4
86:7,12,18 96:21
97:7 124:18,22
125:16,17,22
**characterization**
55:20
**charge** 16:19 18:7
18:13 19:9 23:14
25:22
**check** 100:11
**checked** 100:13,22
101:6
**Christina** 38:14
**claim** 7:18 26:16
100:6 102:12
**claimant** 38:12,21
**claims** 12:21 17:9
24:18,20 26:1
39:4,15
**clarified** 109:18
**clarify** 106:16
**clause** 37:8 64:7
**clauses** 92:3
**clear** 48:9 65:13
74:13,19 82:10
123:10,11,12
**clearly** 8:11 113:6
**clients** 10:22,23
**close** 44:20
**clutter** 25:2,4,5
**Coleman** 34:9,11
**colleague** 60:19
**collections** 11:6,7
**columns** 93:20
100:4
**come** 11:16 56:8
97:1
**coming** 47:7 49:9
55:24 56:7 59:10
84:11 117:11
119:2,12 120:3,16
123:6
**comment** 23:2
72:17 113:7

**commented** 124:23
**commission** 127:22
128:23
**commonly** 80:16
**Commonwealth**
128:1,4
**communicate** 26:9
50:7
**communicating**
111:20
**communication**
109:2
**communications**
39:2,9,24 54:5
102:5
**companies** 13:12
13:19 16:17,21,23
81:22
**company** 6:6,13
9:17,18 12:2 13:1
14:17,20,23 15:8
15:9,17 16:9 18:5
21:8,21,22 22:5,7
24:20 25:8 26:10
26:15 41:13,14
44:15,20 75:15
99:5 103:19,22
104:1,3 117:17
123:21
**companywide**
101:8,15,18
**company's** 119:10
119:22
**complain** 71:1
**completely** 25:21
**computer** 31:7
55:10
**concerning** 75:13
75:15,19
**concluded** 124:11
**conclusion** 120:2
**condition** 36:9 37:8
37:14 64:7 90:23
91:6,13,20 102:15
102:18,22 103:3,8
112:10

**conditions** 17:16,20
69:2 90:9 115:20
116:2
**conferred** 65:22
**confirms** 32:20
33:3
**confused** 37:18
**confusing** 27:24
**connected** 12:1
14:10 124:5
**connection** 39:18
**considerably** 20:15
**considered** 117:6
119:1 122:21
**constitute** 24:23
**consulting** 106:24
107:10
**consults** 107:7,10
**contact** 26:8 35:12
35:15 45:18 60:22
74:21 76:23 78:7
122:3,8,10
**contacted** 70:24
110:12,15 122:3
**contacting** 26:14
**contain** 17:15,19
**contained** 69:15
**contention** 52:19
52:23
**continue** 84:4
**continuity** 90:12
112:23
**contract** 24:19
110:4
**contractors** 104:8
**control** 128:8
**CONT'D** 5:1
**conversation** 52:4
60:1,9,10 68:13
68:16 71:3 75:2,5
75:6,24 76:5
77:21 108:11
113:13
**conversations**
54:21 75:12,19
78:3 80:8

1/18/08 DEPOSITION OF LISA TRACEY

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 131

cooperate 114:11
copies 17:10
copy 24:23 27:19
  32:1 33:22 36:1
  49:23 50:14,19
  56:18 58:1 66:13
  70:12,13 72:12
  97:2 126:3,8
corner 41:23
Corp 1:12 6:9
Corporation 13:2
  15:15 16:5 38:8
  42:2 86:2 93:2
correct 7:10,11,19
  8:15,16 13:2
  16:16 19:23 24:12
  30:19 34:23,24
  37:17 41:21 42:6
  43:8,24 51:20,21
  53:21,22 62:8,9
  62:18 63:9,10
  64:16,21 65:11
  69:5 71:17 73:20
  73:24 75:7 77:20
  77:22 78:14
  102:19 105:16,17
  105:22 106:21
  107:1 108:12,18
  109:6 110:6,7
  111:19,23 113:4
  113:14 115:21
  122:4,22,23 123:2
  125:24 126:5,6
Correction 127:7
corrections 127:6
Cosmetology 12:18
counsel 2:9,18 6:13
  6:21 47:21,24
  63:1 81:19 123:22
  124:20,23 125:14
  128:12,15
Counsel's 105:18
couple 16:18 61:12
  68:19 90:17 100:4
  106:1,2
course 46:18 66:7

70:23 88:3 96:19
  106:20 109:1
  114:17 118:11
  121:16 125:16
  126:1
courses 12:20
court 1:4 6:10,12
  6:14 27:13 29:10
  33:17,20 36:21,24
  61:3 73:1,3 84:15
  84:17,20 105:20
  107:13 108:1
  124:24 126:3
courtesy 54:24
cover 7:22
coverage 66:10
  108:17 111:8
  112:23 117:2,3
  120:15,18
covered 110:16,19
  116:21 120:5
CPA 123:16,17
cross-examination
  77:7 106:18
  107:23 109:5
cubicle 44:24 45:2
cubicles 45:9
current 103:19
customer 16:18
  18:13 22:23 23:7
  45:7 78:11 79:8
Customers 10:24
  11:1

**D**

D 3:1 4:7 6:1 31:6
  33:14,15 128:3,22
Dan 21:3 80:2
  124:3
date 1:18 32:16
  57:2 70:2 73:12
  74:21 89:18,21
  93:21 98:21 99:9
  99:10,15,20
  100:15,18 124:19
  125:18

dated 4:9,11,14,16
  4:18,20,22 5:2,4,6
  34:2 35:1 38:5
  46:11 47:23 51:1
  53:18 56:21 62:2
  64:14 67:14 70:15
  72:21
day 23:7 127:17
  128:19
days 15:21 16:18
  22:23 89:17 102:3
  124:17 125:14
dead 103:11,16
deal 112:12
dealing 25:7
dealt 116:2
Dear 38:13
December 15:22
  98:22
decisions 37:12,22
declaration 4:23
  52:13,15 60:16
  61:9,13 62:8,10
  62:13,15,22 63:1
  63:3,4 67:8 72:18
  105:5,8,10
declare 105:15
decoration 72:19
deduction 23:18
deductions 16:19
  24:1,2 25:23
  119:20
defendants 1:13
  2:18 6:19 77:11
Defendant's 4:4
definitely 63:4
Dennis 2:12 4:15
  6:18 31:24 36:2
  47:24 67:9 76:14
  77:10
dennis.rolstad@s...
  2:17
dense 109:21
dental 117:4,14
depending 72:5
deponent 65:4

105:19 124:17
  125:14 128:6
deposition 1:16 4:3
  4:5 5:13 6:7,11
  7:10,12,15,22
  9:11 10:18 11:12
  12:1,5 27:20,20
  74:23 95:5 114:15
  124:11,19 125:15
  126:15 128:10,14
described 19:16
  49:3
description 89:12
design 79:14
  103:20
Designs 9:19 10:1
  10:12,15 11:3
destroyed 126:8
details 21:18 112:9
determinations
  26:19 37:6
determining 40:15
Detert 2:11 70:16
Diahanna 32:5
Diecuch 38:14,16
difference 68:11
different 14:17
  57:4 101:17
  107:15 109:12
difficult 8:14 73:17
  107:24
difficulty 83:16
dig 77:17
direct 6:10 7:3
  109:22 110:17,20
  121:19
direction 128:8
directly 97:1
  117:11 119:2,12
  120:4 126:4
disability 1:11 6:9
  7:18 17:3,7,15,19
  23:15 24:18,20
  25:9,12,17 26:1
  26:16,21 35:18
  36:9 37:13 38:20

39:3,12 62:17
  63:8,13,17,21,24
  65:17,23 66:1,10
  89:16,22 90:2
  95:14,18 96:1
  99:16 102:12
  104:10 105:2
  107:1 111:22
  112:1 116:15
  117:3
disconnect 58:9,12
discuss 11:24
discussed 9:10
  11:12
discussing 95:7
discussion 10:18
  28:19 49:2 62:1
  104:17 124:13
discussions 74:2
  82:4,11 102:21
disks 69:15,23
distribute 81:6,11
  81:13
distributed 85:22
distributing 81:2
District 1:4,5 6:10
DMS 1:6
document 29:8
  31:5 33:22 34:1
  38:1 41:9,12,18
  42:9,15,20 43:10
  46:6,7 56:19 61:1
  61:6,9 64:3 66:16
  67:11 70:14,15
  72:19 85:8,9,11
  85:13,21 86:23
  87:4 96:9 105:5
  106:21 127:21
documentation
  15:2 20:6
documents 41:16
  62:21 76:10 81:3
  87:3 123:19
doing 8:1 25:16
  103:18
Domenic 18:6 19:8

1/18/08 DEPOSITION OF LISA TRACEY
Page 132

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

21:5 63:21 80:2
81:5 98:2 124:3
**Domenic's** 18:10
**doubt** 30:21
**drafted** 108:15
**drafting** 123:18
**Drive** 2:5 56:24
**driver's** 6:23
**driveway** 48:19
**due** 54:24 114:23
**duly** 6:24 128:6
**duties** 22:14 40:20
66:8 82:16 96:20
**duty** 80:5
**dying** 103:5,10
113:3,8,17,18,18
114:3

**E**

**E** 2:1,1 3:1 4:1,8
6:1,1 33:24 36:1,4
127:1,1,1
**eager** 33:19
**earlier** 43:11 105:4
**easily** 107:12
**Eastern** 6:10
**education** 12:13,14
**educational** 24:15
**effect** 71:3 89:23
94:8
**effective** 89:18
93:21
**either** 8:24
**eligible** 66:10 91:19
112:5
**employed** 38:23
39:4,5,6,10 88:4
92:15 94:1 109:14
128:12,16
**employee** 13:13,20
26:20 36:8 37:13
41:15 45:18 62:16
63:7 65:15,21
98:19,21 99:10
100:5,9 101:3,7
110:12,15 117:16

128:15
**employees** 17:1
23:3 37:7 43:24
44:14,17,19,21
81:3,12 83:18,19
83:22 85:23 91:10
92:4,7 95:10
104:5,8,11 110:4
111:21 112:10
116:20
**employer** 4:12
15:24 16:1 41:18
89:17 92:21,22
**employers** 17:8
124:6
**employment** 13:1
15:4 20:21 76:12
78:5 80:15 95:21
102:18
**endorsement** 5:8
96:11
**endorsements** 89:8
**enrolled** 119:18,22
**enrollment** 81:4
85:23
**entire** 44:8
**entitled** 26:20 61:9
81:16 105:1
**Esq** 2:4,12
**essentially** 49:2
**et** 1:12 6:10
**Eudora** 4:7 31:9,20
33:3
**events** 7:16
**Everybody** 22:24
**everyday** 116:3
**evidence** 40:13
49:14,17 52:18,22
53:2 56:16 114:6
127:19
**exactly** 107:4
119:14 120:9
**examination** 6:21
7:3 106:9 121:19
128:7
**exception** 46:19,19

127:5
**exclusion** 36:10
**exclusions** 112:10
**exhibit** 27:19,21
28:5 29:2,2,3,8,21
29:22,24 31:2,3,6
32:17 33:3,5,14
33:15,24 36:1,4
38:4 41:6,7,12
43:19,20 46:7,17
47:1,5,6,19,20
50:12,13,18 53:8
53:9,18 56:20
58:23 59:4,5,16
59:18,19 60:24,24
61:1,7 62:3,5
63:11 64:13 66:17
66:18,20 67:8,10
67:12 70:7,8,14
72:11,20 73:5
77:15 84:6,8,23
84:24 96:4,5,7
97:10,10 106:20
108:15 116:8
117:24
**exhibits** 1:3 5:1,13
29:1 45:23 50:16
62:1 84:6
**existed** 123:8
**existing** 117:13,14
**expect** 8:4 96:20
**experience** 12:11
**expires** 127:22
128:23
**explain** 9:3 22:17
88:19 89:6 92:3,7
95:9,14 110:2,3
112:9
**explained** 91:9
**explaining** 95:17
**extend** 93:10
**extent** 35:8 83:7
86:14 91:1,15
93:11 94:10 96:15
99:21 117:19
119:24 120:21

**e-mail** 4:6 30:2,6,8
30:9,15,22 31:16
31:18 33:10 46:2
46:24 55:24 64:14
65:20 68:19 69:5
77:15 106:21
108:21,21 116:8
117:5,24 119:5
121:5 122:19
**e-mails** 65:14

**F**

**F** 4:10 38:4 41:6,7
**fabricating** 49:12
49:16
**facility** 44:2
**facsimile** 51:14
70:17
**fact** 21:13 29:11
42:10 49:11
**facts** 49:11 114:6
**familiar** 17:6,14,18
17:21 85:10,12
87:20 88:5 116:4
117:2
**family** 103:18
**far** 20:14 36:6
54:16 73:22
**fast** 83:2
**fax** 51:10 53:20
54:18 55:9,11
58:6,6,9,12,16,17
**faxed** 51:9 58:2
**faxes** 55:24 56:7,8
56:10 58:18
**February** 4:11 5:2
38:5 51:24 67:15
69:5
**feel** 9:2,6 34:19
42:10 112:7
**feels** 124:18
**felt** 113:8
**figure** 116:7
**files** 69:15
**fill** 38:20
**filled** 25:21

**filling** 79:6
**financial** 83:15
**financially** 128:16
**find** 8:2 49:23
50:19 66:13 70:12
107:12,23
**fine** 12:19 35:9
61:17 72:7 87:20
124:21 126:10
**finish** 52:8 54:20
115:11
**finished** 9:9
**fires** 23:9
**first** 8:1 27:18 29:1
42:3,6 49:3,3,21
64:1 75:12 84:13
92:9 94:4 97:13
98:17 99:1 100:21
110:17 112:11,15
122:2
**five** 68:13 72:9
113:16
**floor** 2:14 44:8
**Flooring** 9:19 10:1
10:12,14 11:3
103:19
**folder** 97:3
**following** 87:23
**follows** 7:1
**follow-up** 56:12
77:13 81:20
105:23 115:10
**foregoing** 127:3
**forgot** 79:11
**formally** 62:4
**former** 60:19 68:2
120:22
**forth** 29:12 122:22
**forward** 27:17
29:20
**foundation** 13:15
52:2 54:11 55:18
60:4,12 64:11
68:6 69:7 114:6
**four** 42:2 71:13
**Francisco** 2:15

1/18/08 DEPOSITION OF LISA TRACEY

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 133

**free** 9:2 25:2,4,5
42:10
**frequently** 116:14
116:18
**Friday** 128:5
**front** 23:6 44:22
55:13
**full** 49:3
**fully** 115:1
**function** 79:13
**functions** 40:20
79:9
**further** 9:3 69:14
74:2 121:19 127:4
128:11,14
**future** 52:8
**F-l-o-o-r-i-n-g**
103:20

**G**

**G** 2:12 4:12 6:1
41:12 43:19,20
97:10,11
**garble** 27:1
**garbled** 27:5
**gcapianco@pro...**
30:16
**generally** 22:16
**generated** 30:22
**gentleman** 75:21
**getting** 16:24 79:5
125:1
**Gil** 1:8 6:17 7:17
30:19 38:12 42:5
46:3 53:11 64:1
82:11
**girl** 19:9 44:22
**give** 10:6 32:1 36:1
50:14 57:8 61:15
76:22 84:9 97:2
110:17,20
**given** 17:8 18:21
20:6 23:22 24:2
25:6,11 45:22
52:12 104:17
124:17 125:14

128:9
**giving** 50:2
**go** 16:4 23:6,8 27:6
27:17 28:14,24
29:19 48:22 49:23
61:14 76:17,21
78:17 80:13,19
81:5,18,19 82:2
86:15 88:8 91:2
93:12 94:12,18
97:2 107:11
115:21,23 116:3
119:7
**goes** 16:20
**going** 12:12 19:10
20:22 21:13,22
29:23 31:6 33:22
35:24 36:5 37:24
41:8 43:15 46:6
47:4,19 50:11
53:15 56:15 58:22
59:15 61:6 66:14
66:15 67:11 70:13
72:2,18 84:10,12
90:14,17,24 96:3
100:20 106:15
113:19 126:3
**good** 7:6,14 8:18
9:5,9 11:11,24
12:7,16 18:21
33:21 43:16 76:24
77:10 108:7
110:10 111:13,17
**grasping** 113:17
**great** 23:14 104:3
106:7 109:18
**greatly** 103:6
**ground** 7:21
**group** 5:7 6:5 17:15
17:18 24:20 86:1
86:5,8,13,18
101:2 117:6 119:1
**guess** 8:4 9:1 20:4,9
21:13
**guidelines** 25:7
**guys** 12:19

**H**

**H** 4:1,13 46:7,17
47:5,6 59:19
127:1
**half** 72:3 73:24
74:22 121:11,13
**hand** 29:23 81:5
89:1 128:19
**handled** 13:13,19
40:20
**handling** 24:17
39:15
**handwriting** 97:14
97:16 100:1
**handwritten** 101:3
**happen** 9:22 21:7
21:21
**happened** 99:7
109:23
**happening** 93:17
**happens** 114:20
**harassed** 71:1
**hard** 103:13
**Hartford** 12:1
24:19 25:8,12
26:9,15 34:3,15
35:11 38:10 39:3
39:10,24 40:4,14
41:12,13 62:17
63:9 64:8 65:17
65:21,22,24 66:8
75:14 77:21 78:4
78:8 80:8,9,15
82:5,6 85:14
87:16,24 89:21
92:11,17 94:8
105:13 106:24
107:8 108:11,16
108:18,19,22
111:7,11 122:4,8
122:13
**Hartford's** 68:24
**hats** 16:11
**heading** 87:12
89:13 90:8,11
98:18 99:10

**health** 116:14
**hear** 36:19 108:8
**held** 28:19 124:13
**Hell** 121:8
**Hellen** 2:3,4 3:4
4:13,17,19,24 5:3
5:5 6:16,16 7:5
26:24 27:3,7,17
28:2,4,7,11,16,22
29:5,14,16 31:1
31:24 32:3 33:13
33:18 35:24 41:5
41:20,24 43:18
46:18 47:4 50:11
50:14,21,23 53:7
55:19 57:6,8
58:22 59:2 61:4
61:17,23 62:24
64:19 65:3 67:3,7
67:16 70:6 71:22
72:1,4,8,15,24
73:2,4 76:15,20
76:24 77:17,24
78:15,17 80:10,13
80:18,23 81:15,18
81:23 82:1,8,14
82:19,22 83:1,7
84:9,14,19,22
85:1,5 86:10,14
86:20 88:7,13,15
90:24 91:15 93:10
94:10,20 96:6,15
99:21 100:2
102:21,23 103:13
103:16 105:4,18
106:1,4,7,11
107:3,7,11,14,18
107:20 108:5,7
114:7 115:5,14
117:19 118:1,4,6
118:9,11,14,18,22
119:7,24 120:19
120:21 121:1,4,9
121:10,11,13,16
121:21 124:9,16
125:1,4,8,10,13

125:20 126:1,6,11
**Hellen's** 62:22
**help** 43:5 79:14
87:3 103:6 107:21
113:10,17
**helped** 23:13 79:8
**helpful** 118:2
**helps** 107:23
**hereto** 128:16
**hereunto** 128:18
**Hey** 12:19
**hhellen@aol.com**
2:8
**Hi** 30:19
**High** 12:15
**highest** 12:14
**hired** 13:6,7 22:19
98:21 99:1
**hires** 19:2
**history** 15:4
**Hoffman** 2:21 6:3
**holder** 92:22 93:2
93:20
**home** 15:3 16:2,3
24:22 47:8,16
48:16 69:15 76:11
**hooked** 55:10 56:9
58:14
**hookup** 56:1
**hope** 122:18
**hopefully** 28:12
**hostile** 48:23
**hour** 72:2
**hours** 79:5
**house** 49:9 51:16
55:11 59:10 69:23
71:12,16 103:5
**Howard** 2:3,4 4:13
4:17,19,24 5:3,5
6:16 29:15 50:23
67:15 104:15
105:24
**huge** 20:9
**human** 13:4 18:5
68:2
**hundred** 55:9

1/18/08 DEPOSITION OF LISA TRACEY
Page 134

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

**Huron** 47:22 67:14
**husband** 20:2
  70:10 103:24
**husband's** 49:24
  103:23

**I**
**idea** 12:8 76:24
**identification**
  27:21 29:21,22,24
  31:3,5 33:15,23
  36:4 38:3 41:7,11
  43:20 46:1,7 47:6
  47:20 50:13,18
  53:9,17 56:19
  59:5 61:1,7 62:5
  66:16 67:10,12
  70:8,14 72:20
  73:5 84:23,24
  96:7 127:19
**identified** 6:22 62:3
**identify** 87:3,5
**identifying** 47:13
**illness** 114:1
**important** 118:20
**include** 76:5 79:3
**included** 17:3
  23:18
**includes** 79:4 85:14
**including** 23:3 46:2
  56:15 77:11
**inconvenience**
  28:13
**incorporated** 11:7
  47:23
**independent** 36:15
  94:7
**indicate** 40:13 41:1
**indicating** 35:6
  45:6 102:24
**individual** 45:8
**industry** 18:22
**info** 32:13,15
**inform** 36:8 37:11
**information** 8:2
  12:10 32:13 38:20

98:18 100:6 101:2
  102:17 111:4,7,11
  123:10,11,18
**informed** 101:9
**inhouse** 10:11
**inquire** 7:15
**inquiring** 64:5
  110:18
**instance** 32:5
**instruction** 25:12
**insurance** 12:2,21
  18:22 24:20 25:8
  26:9,15 41:13
  75:14 79:21 85:14
  88:6,12,20 89:17
  91:9 93:6 95:9
  96:21 110:3
**insure** 79:21
**insured** 85:15
  91:17,18 99:10,16
  99:20
**insureds** 88:20
**insurer** 86:17
  116:14,15
**insurers** 80:16,22
**insuring** 89:22
**interacted** 16:15
**interested** 128:17
**internal** 31:16
**internet** 56:8 58:14
**interpose** 55:16
**interpretation**
  92:16
**interrupt** 14:16
  94:17
**Interruption** 71:19
**interview** 19:3,7,15
  20:4 67:23
**interviewed** 19:4
**interviewing** 19:17
  68:9,13
**intimidating** 48:24
**introduce** 27:18
  28:8 31:1 33:13
  35:24 41:5 43:18
  47:4 50:11 53:7

56:16 58:23 62:4
  67:7 70:6
**introduced** 47:1
  85:6
**investigator** 49:8
  103:4 113:2
**Investigators** 47:23
  67:14
**invite** 47:16
**invited** 48:15
**involved** 12:9 18:2
  35:19 83:21 86:7
  97:6 102:2,4
  123:18
**involvement** 81:21
  81:24
**issue** 26:5
**issued** 93:6
**issues** 29:10,11

**J**
**J** 4:17 50:19 53:8,9
**January** 1:18 6:6
  98:9 128:6,20
**Jason** 49:24 70:10
**job** 12:11 19:2,3,16
  22:12,14 54:24
  78:24 82:16 88:10
  88:18,24
**Jones** 6:6,13
**junior** 24:8

**K**
**K** 4:19 53:18 62:3,5
**Kahill** 9:14,15 10:8
  10:11,17 11:13
**keep** 50:15
**kidding** 27:6
**kind** 16:9,15,21
  44:15 111:7
**kindly** 7:6
**knew** 83:14,14
  121:15,16 124:1
**know** 7:23,24 8:3
  9:22 10:22 12:23
  14:3 15:4 16:20

18:17 20:2,8,14
  21:8 23:20 35:8,8
  40:12,24 43:7
  54:17 60:18 62:14
  68:22 69:22,22
  71:9 79:24 81:7
  82:14,16 83:5,8
  83:10,11,13 85:13
  85:21 86:12,16,17
  87:1 89:19,21
  90:1,4 93:8,15
  96:11,24 97:22
  99:15 100:1,6
  102:8,11,14 103:7
  103:10,17,18
  104:20,24 107:24
  109:8 111:3
  116:24 117:6,12
  121:17 122:9
  123:7,15 124:4,7
**knowledge** 7:15
  52:14 55:15 60:17
  82:5 109:9,22
  110:13
**known** 46:3
**K-a-h-i-l-l** 10:10

**L**
**L** 4:21 56:20 58:23
  59:5
**label** 84:18
**lacks** 13:15 52:1
  54:10 55:18 60:3
  60:11 64:10 68:5
  69:7 114:6
**language** 122:19
  123:1
**lapse** 120:8,12,14
  120:17
**large** 49:3 67:19
**late** 27:2,3 55:16
  70:3 82:14
**Law** 2:3 50:22
  67:16
**lawyer** 20:2 114:20
  114:22,24

**layoff** 20:9 83:20
  109:6,12,15,23
**Leading** 78:17
**leave** 15:14,16,18
  19:10 29:1 39:13
  95:13 98:14
  101:21
**leaving** 19:11 48:20
  83:15 96:1
**left** 15:16,21,23
  19:21 35:11,20,21
  40:5,23 54:4,8
  56:20 57:19 60:23
  75:16,22 83:20
  93:18 98:15,16
  99:7 111:15,15,15
  111:15
**legal** 6:4 10:18 91:1
  91:16 96:16
  117:21 120:1
  121:1 123:19
**letter** 4:2,8,10,13
  4:15,17,19,21,24
  5:3,5 11:14,15,16
  29:23 34:1,8,14
  34:19,21 35:1,7
  35:10 38:5 46:8
  46:13,21,24 47:21
  48:4,8 49:4,12,16
  49:21 50:18,22
  51:7,10,13,22
  52:12,19,23 53:4
  53:8,14,15,18,21
  53:23 54:1,3,8,12
  56:12 57:2,5,13
  57:15,18 58:2,3
  58:23 59:16,18
  60:15 62:2 66:18
  67:13,17,20 68:23
  69:12,19 70:7,21
  70:23 72:19,20
  73:7,9 84:6,7
**letterhead** 34:3
  38:10 46:8 47:22
  53:19 67:13 70:16
**letters** 28:1,12 29:1

1/18/08 DEPOSITION OF LISA TRACEY

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 135

38:19 40:3,14,17
54:16 55:8,12
56:14 74:6,10,18
74:19 84:5
let's 8:18 21:17
25:5,6,16 28:4
43:18 70:3,12
72:10,15,15 74:18
76:8 77:15 84:9
89:11 90:6 91:5
111:18 121:22
125:5
level 12:14
license 6:24
licenses 12:17
Lids 16:5
life 34:3 38:10
41:13,13 87:16
101:2 123:4
likable 54:15
limitation 90:9,23
91:6,13
line 42:6 51:16 56:8
64:1 108:2 127:7
lines 32:8,10 42:2
Lisa 1:16 3:3 4:6,8
4:10,13,17,19,21
4:23 6:8,20 7:8
30:3,13 32:9 33:7
34:2 38:8,13
46:12 51:2 56:24
61:10 95:5 127:2
127:16 128:5
list 26:8
listed 30:3 32:6
42:2,6 51:9,13
127:6
listing 31:23 32:8
32:18 33:2 38:12
litigation 103:14
little 8:14 12:10
22:24 26:7 61:24
67:24 72:22 90:21
94:17
live 25:2,4
living 73:12

LLP 2:11
located 19:4 40:16
location 74:23
lodging 29:3
long 14:5 41:14
45:13 54:22 72:13
112:1
longer 58:7
long-term 1:11 6:9
7:18 23:15 63:8
89:16,22 90:2
95:17 96:1 99:16
104:10 105:1
look 25:18,24 42:10
42:11 43:15 61:13
69:14,16 77:15
89:7,9,11 90:6
91:5 93:1 106:3
107:13,19 114:9
117:24 118:10
looked 42:9,20
55:23 93:19
looking 31:20 41:1
64:22 91:12 92:1
92:19 93:19 97:13
97:18 98:17 100:4
107:14 116:7
118:24 119:5
looks 33:6 41:16
107:7
lost 66:17 126:8
lot 16:21 20:3
104:8 116:20
Lothrop 56:24
lscibilia@urome...
30:9
lying 69:19
L-i-d-s 16:8

**M**

M 4:23 38:14 61:1
61:7 66:17,22
67:8,10
machine 58:9,12
mail 56:14 70:17
126:3

mailed 56:13
maintain 55:7
major 28:13 83:20
109:6
making 21:12
37:20 109:2
manager 18:6
manuals 20:6
manufactured
16:11
March 4:18,20,22
51:1,19 53:18
56:21 57:22 58:2
62:2 99:13
mark 27:22 29:8
56:19 84:7,12
96:3 100:11
marked 5:13 27:20
29:21,22,24 31:3
31:5 33:15,23
36:4 38:3 41:7,11
43:20 46:6 47:6
47:20 50:13,18
53:9,17 56:19
57:15 59:5 61:1,7
62:5 66:16,22
67:10,12 70:8,14
72:19 73:5 77:16
84:23,24 96:7
97:10 118:12
marker 118:22
Market 2:13
Marketing 45:4
Mass 6:12 9:21
Massachusetts
1:22 6:11,23 47:8
57:1 128:1,4
matches 32:16 33:6
material 76:5
maternity 15:16,18
19:10 39:13 95:13
98:14 101:21
111:22
matter 6:8 29:10
50:4 52:14 53:11
54:5,9 60:17

61:24 75:15,20
76:12
matters 10:18,21
35:19
McCracken 32:5
mean 10:23 14:16
22:2 23:2 24:1
35:7 54:15 72:4,5
74:18 90:23 91:14
91:20 109:20
113:18 119:15,21
120:23 122:6,6
126:9
meaning 96:24
means 23:2 37:16
89:16,19 92:22
117:7,12 119:6,16
123:1
Medeiros 2:22 6:4
medical 15:12 22:6
22:10 35:3 81:8
102:15,18,22
117:2,14 122:12
meetings 80:8
Melrose 2:5
mem 52:11
memo 32:16,21
33:4 108:14,16
memory 8:3 14:23
15:3 46:2 48:11
51:23 59:24
mention 21:21
28:24 58:5
mentioned 75:21
mentioning 68:15
113:24
merge 21:22 22:7
merged 22:4
merger 20:22 99:4
99:6
mergers 21:19
81:21
messages 54:4,8
57:19
met 124:2
Micale 18:11,17

21:5,18 24:5 37:3
37:5,11,19 40:24
60:21 63:22 83:24
98:2 111:1,2,3
112:17 123:14
Micale's 100:1
Michael 9:14 10:8
mid 70:2
middle 87:8 118:24
Middlesex 128:2
mind 55:6 107:20
118:13,14
mine 71:21
minute 84:20 94:19
minutes 61:12
68:14 72:9 113:16
mischaracterize
120:22,24
misspeak 54:15
misstates 13:14
39:16 41:18 56:4
63:19 64:17 69:6
mistaken 38:4
moment 30:4 33:17
43:14 66:13 67:17
70:20 82:22 90:15
108:1
money 112:4
Moran 2:11 70:16
morning 7:6 77:10
moved 20:19 22:24
multiple 113:22
Muscatello 21:3,7
21:9,10,18
M-u-s-c-a-t-e-l-l-o
21:15

**N**

N 2:1 3:1 4:24 6:1
67:12 70:7,8
name 6:3 7:7,7 10:6
14:17,20 15:7,9
15:11 18:10 19:11
19:23 21:21 22:8
22:9 23:20 30:10
30:13 31:13 33:9

1/18/08 DEPOSITION OF LISA TRACEY
Page 136

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

34:15 42:1,5
49:24 63:13,23,24
64:14 68:15 77:10
97:23 104:18
127:20
named 14:24 34:9
47:22
names 15:8 31:22
32:4
Nancy 67:13
nature 20:7
necessary 124:19
need 12:10,19
29:13 55:16 61:2
61:4 115:15 125:6
needed 11:18,20
neglected 27:18
negotiate 88:11
negotiated 79:24
negotiating 79:20
neither 128:11
never 7:13 52:19
52:23 55:11,23
88:10 107:20
122:7 124:2,2
new 112:12 119:2
119:10
Newton 19:5,6
nod 8:13
nods 73:13 76:4
Nonpayment 10:22
Nope 53:1
normal 45:14 66:7
normally 65:14
108:24
Notary 6:24 127:23
128:3,22
note 46:16 58:1,5
124:21
notes 15:2 106:3
notice 4:3,5 27:19
29:9,12 31:22
32:12 34:8 75:24
86:23
notifying 83:21
noting 125:16

number 51:9,10,12
51:13 53:20 54:16
54:18,21 55:9
58:6 66:20 78:10
78:13
numbers 27:23,24
28:13 86:23 87:1

——————
O
——————
O 5:3 6:1 70:14
73:1,5
oath 6:15 8:19 55:3
55:15
object 29:11 55:19
62:20 90:24
Objecting 93:10
objection 4:4 13:14
13:24 29:4,9,18
32:22 34:17 39:16
40:8 43:1 44:10
52:1 54:10 55:17
56:2 60:3,11
63:18 64:3,10,17
65:2 66:2 68:5
69:6,20 77:24
78:15 80:10,18,23
81:23 82:1,8,14
82:19,23 83:2,7
86:11,14,20 88:7
88:13 91:15 94:10
96:15 99:21
105:18 114:5
117:19 119:7,24
120:19
objections 13:21
obligation 8:20
obtain 111:7
obtained 19:2
obvious 29:18
obviously 29:18
occasion 71:16
111:24
occasions 71:13
occupy 44:8
occurred 107:22
occurrence 116:18

October 4:14 46:11
101:21,22,24
office 23:6 46:8
50:22 54:3,8
62:23 87:1 101:23
128:19
officer 68:3
officers 82:5
offices 2:3 45:8,12
50:23
oh 11:22 14:3 24:13
27:4 28:10,10
33:18 41:20 59:1
59:2 66:24 67:3,7
71:22 72:1,4
76:20 82:21 84:19
84:22 85:6 100:8
100:8,9 101:5
118:16
okay 7:14,21 8:7,18
8:23 9:5,9,10,20
10:5,9,17 11:5,9
11:11,22,24 12:7
12:16,19,20,23
13:4,10 14:4,12
14:14 15:23 16:3
16:9,12,14,14,23
17:6,14 18:4,8,12
18:15,17 19:1,6
19:12,15,19,22
20:1,3,5,18 21:1,4
21:7,15,17 22:1,3
22:9,12,14 23:12
23:14,19 24:4,8
24:11,17,17,22
25:1,5,11,16,16
25:20,24 26:5,6,7
26:14 27:3,16,16
28:2,16,22 29:14
29:16 30:1,5,11
30:15,18,21,24
31:4,8,10,13,19
31:22 32:8,15,20
33:8,12,20,21
34:10,22 35:1,3
35:23 36:6,17,24

37:5,19,24 38:2,7
38:15,18,24 40:24
41:4,8,10,14 42:1
42:5,8,13,14,15
42:18 43:7,10,14
43:16,17 44:2,8
45:8,11,17,22
46:23 47:3,3,7,13
47:16,19,21 48:3
48:7,8,11,14,18
48:21,23 49:7,10
49:20,22,23,24
50:2,6,10,24 51:6
51:17 52:11 53:2
53:6,10,15,16,18
53:24 54:1,14,23
55:2 56:10,15,17
56:18,23 57:11,12
57:18 58:9,15,17
58:21,21,22 59:3
59:6,9,11,15 61:5
61:8 62:12,13
63:5,11,15 65:10
65:14 66:7,12,12
66:14,15,15 67:11
67:19,22,24 68:11
68:12,15,18,21
69:4,13 70:5,12
70:13,13,20,23
71:5,11,22 72:10
72:16,23 73:6,16
73:18,22 74:2,12
74:17,20 75:4,8
75:10,11,11,18
76:8,14 77:14
81:14,17 83:2,3
84:14,19 85:6,10
85:20,24 87:2,7,8
88:17 89:6,11,14
90:7,13,14,18,19
91:5,7,11,22
92:10,19,20,21
94:4,15 96:2,19
97:9 98:17 99:24
100:8,10 101:19
101:23 102:4

103:12,22,24
105:12,20 106:4,7
106:13,14,17,23
107:18 108:7,10
108:13,20,24
109:4,8,13 110:1
110:1,8,14,21
111:3,6,10,13,16
111:18 112:7,16
112:19 113:1,9,12
113:20 114:8,14
114:17,18,22,24
115:4,10,12
116:17 118:6,9,18
119:4,5,12,19
120:6,16 121:6,14
121:22 122:1,2,6
122:16 123:4,7,12
123:14,17,21,24
124:4,8 126:11
once 49:9 59:8
open 81:4 85:23
operate 104:3
opinion 91:1,16
96:17 117:21
121:2
opposing 47:24
oral 25:11
order 12:8 89:6
96:4 110:22
organization 9:15
original 126:7
outcome 128:17
oversaw 18:7
owners 103:24

——————
P
——————
P 2:1,1 5:5 6:1
72:20 84:16,18,23
pace 45:14
packages 84:2
page 3:2 4:2 30:3
38:14 42:3 59:22
62:12 64:1 87:6,9
89:11 90:6 92:4
92:19 93:19 94:7

1/18/08 DEPOSITION OF LISA TRACEY

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 137

96:4 97:18 98:17
100:1 108:2 127:7
**pages** 1:2 41:14
87:5 97:14
**paid** 123:23
**paper** 94:14
**paragraph** 49:4
59:21 60:9 62:14
67:19 91:21
**parameters** 8:1
**Pardon** 50:15
**part** 16:24 33:3,5
36:21 44:6 79:7
87:17 88:10,16,18
91:5 101:8 119:15
**participant** 104:21
119:17
**participants** 81:3
88:21
**participate** 117:17
**participated** 7:16
93:9,16
**particular** 12:9
47:10 60:17 78:7
78:18
**parties** 87:4 128:13
128:16
**pass** 85:1 121:8
**passed** 110:22
**patience** 106:14
115:13
**pause** 82:20
**pay** 84:2
**payable** 79:10
124:1
**payables** 79:12
**payroll** 13:6,7,8
14:9,10,15 16:13
16:15,20 18:14
19:10 22:19 23:17
23:23,24 79:1,4,5
79:7,12 84:1
**penalty** 55:6
105:15
**people** 19:8 20:13
20:15 26:9 39:3

40:4,6,14 95:13
95:22,24 109:16
**percent** 55:9
**period** 15:5 72:13
81:4 101:20 109:9
112:2 120:5,8
124:17
**perjury** 55:6
105:16
**permanently** 15:21
**permission** 50:3
**person** 19:12,17
23:6,20 54:15
81:8 87:17 112:16
112:18 127:20
**personal** 7:15
52:13 60:17 109:9
110:13
**personally** 9:17
26:19 127:18
**persons** 39:23
**person's** 23:20
**perspective** 101:20
**phone** 22:21 51:23
60:1,9 71:19
73:23
**physically** 44:16,20
**piece** 36:20
**place** 1:20 48:19
51:24 126:9
**places** 31:14
**plaintiff** 1:9 2:9
6:17,22 29:19
46:19 103:16
**plaintiff's** 7:17
**plan** 1:11 5:7 6:9
6:19 77:12 81:3
81:10 86:1,19
89:13,16,18 90:2
90:4,12 91:3,18
92:1 93:21 99:11
99:17 104:10,22
117:12,17 119:3
119:10,13,17,22
120:4,17
**plans** 79:14,17,22

80:17 85:16 86:5
86:8,13 93:9,16
117:13
**playing** 23:8
**Plaza** 2:13
**please** 7:6 8:10 9:2
14:6 16:7 27:1,8
28:8 30:4 31:2
33:14,18,24 36:11
36:20 46:15 51:5
52:8 53:23 54:6
54:20 59:20,22
61:12 67:8,16
70:21 72:17,23
74:16 77:20 82:19
83:8 84:7 85:2
88:15 93:13
104:15
**point** 20:15 43:22
45:19 51:2,19
65:13 66:18
**POL** 86:24 87:6
89:12 90:6 92:19
93:1,19
**policies** 17:7,12,13
17:15,19 79:21,24
85:14 88:1,6,12
89:1,8 92:17 95:9
96:21
**policy** 17:18 64:8
80:9 82:6 87:9,18
87:19 88:20 89:7
89:22 91:9 92:12
92:22 93:2,5,20
94:8 96:14 97:7
**portion** 101:3
**position** 16:12
19:12 36:7,12
39:15,18 88:5
**positions** 13:8
16:15
**possible** 76:10
103:3
**possibly** 81:4
**Post-it** 118:20
**preceding** 127:21

**prefer** 118:8
**prepared** 62:22
**prescription**
116:21
**presence** 127:21
**present** 2:21 63:16
**presenting** 55:12
**president** 21:3 24:6
80:3 87:14,14,15
**presumably** 62:22
**pretty** 18:21 103:13
**previous** 27:9
53:21 54:5 91:18
**previously** 77:16
97:10 116:10
**pre-existing** 17:16
17:20 36:9 37:7
37:14 64:7 69:2
90:8,22 91:6,13
91:20 112:9
115:20 116:1
**pre-mark** 28:11
**price** 81:6
**printing** 128:7
**prior** 10:18 13:18
20:15 30:13 32:17
55:17 58:12 59:2
63:19 64:18 69:7
71:9 89:13,16
90:2,12 91:3,22
93:9,16
**privy** 17:8
**Pro** 4:7 31:9,20
**probably** 67:3
78:10 97:2 122:12
**problem** 64:6
**procedural** 61:24
**procedure** 74:23
**procedures** 25:7
**processing** 7:17
12:21 16:24 17:9
25:8,12 39:19
43:12 79:4
**produce** 58:21 87:4
**production** 6:23
**professional** 12:17

**program** 105:2
**programs** 24:15
**pronounce** 21:11
**property** 69:23
**proportion** 66:20
**proposed** 62:21,24
63:4
**proved** 127:18
**provide** 21:18 26:8
110:23
**provided** 96:21
**provision** 37:14
87:21 91:13
112:23 116:5
**provisions** 17:14,16
17:20 18:1 85:11
87:24 88:20 89:7
90:16,20 91:10
92:11,16 95:8
110:3,9
**Prowess** 14:24 63:7
104:18
**proximity** 44:16
45:22
**Public** 6:24 127:23
128:3,22
**purported** 103:8
**purporting** 106:21
**purpose** 7:14
**put** 66:5 84:17 87:1
97:3 101:19 118:3
**putting** 23:9 25:23
**P.C** 1:20
**p.m** 126:16

___

**Q**

**qualified** 112:9
**question** 8:24 9:3
14:2 27:8,9,14
32:24 41:17 42:8
42:13 52:9 54:20
55:17 60:8 63:24
65:6,19 66:4,9
72:16 74:15 75:8
78:19 84:10 91:23
92:8 93:14 106:19

1/18/08 DEPOSITION OF LISA TRACEY
Page 138

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

106:23 107:4,12
107:15,17,21
108:2,8 114:8,24
120:22 122:17
questioned 125:17
questioning 65:12
questions 8:11,20
12:12 35:18 68:12
75:9 76:17 77:12
78:9,9 81:15 89:1
90:17 105:24
106:12,15 111:14
115:1,19 121:12
121:14,23
quick 61:15 114:9
115:16
quickly 113:15

_____ R _____
R 1:3 2:1,21 5:8 6:1
96:5,7 127:1,1
Rafik 1:20
rarely 55:11
rate 29:19 55:21
rates 81:7
rationale 68:24
reached 12:14
read 11:14 26:24
27:4,7,9,11,14
30:4 34:22 36:20
37:1 46:14 57:11
57:12 59:20,22
62:8 67:17 70:20
70:22 72:22 73:19
87:11 89:15 90:14
90:16 97:22 101:1
108:2 127:3
reading 117:10
121:5
real 123:4
realize 8:19 81:14
realized 27:18
really 17:23 18:2
20:9,9 26:3 79:7
97:6 111:13
reason 9:5 30:21

33:8 34:13 49:10
49:13 63:15 68:24
69:18 78:22 80:22
99:19 104:24
126:7
reasonable 40:2
reasonably 75:2
recall 14:20 15:7
33:16 34:11,21
35:17 37:15,16,19
38:18 39:23 42:18
46:12 47:7 50:2
51:9 52:3,14
53:10 54:3,7,12
56:11 59:6,11
60:6,10,13,14,18
64:5,12,13,22,23
65:1 67:24 68:1,8
68:12,15 69:3,4,9
69:10,13 70:9
71:2,5,12,14
73:22 74:6,12,20
75:12,18 77:19,20
78:2,3,8,12,21
80:7 82:11 85:7
86:6,22 89:4,5
92:5,10,14 94:4,8
94:13 95:17,19
97:19 104:17,20
105:5,12 106:24
107:3,5 108:10,11
108:20,22 111:9
111:12 113:20,24
122:13,14
recalled 68:23
receipt 125:15
receivable 79:10
receivables 79:12
receive 26:21 43:12
received 25:17
52:19,23
receives 124:20
receiving 38:19
39:19 40:3 56:11
79:17
Receptionist 45:6

recognize 30:6
31:11,13 32:4
34:1,3,6 46:21
51:7 54:1 57:12
62:10 73:7 96:8
97:16,20,21 99:24
recollect 35:9 36:6
recollection 22:17
26:18 42:19 45:11
47:9 55:7 67:23
71:8 98:24 99:3
100:21 101:11,14
104:13 114:10
record 6:3 7:7
22:13 28:8,14,18
28:19,21,24 31:2
33:14 41:6 46:16
61:15,19,22 62:1
62:4 74:13,17
76:22 77:2,5
82:10 89:15 90:15
94:19 95:1,6,8
107:12 124:12,13
124:15,22 126:14
127:5 128:9
recording 6:2
125:8
records 58:18
76:11
recounts 67:22
RECROSS-EXA...
115:7
REDIRECT 106:9
reduced 29:10
128:7
reduction 101:8
reference 60:8
referred 62:2
reflect 125:23
refresh 8:3 14:23
15:3 46:2 48:11
51:22 59:24 98:24
99:3 101:11,14
refreshed 104:14
refreshes 48:13
100:21

refuse 105:8
refusing 105:11
regard 8:10 79:16
regarded 102:22
regarding 37:12
47:10 50:3 60:16
77:21 78:4 80:8
82:5 92:15 102:5
108:3
regular 70:17
Reiser 4:15,24
47:22 48:12,15,23
49:11 50:2 59:7
59:11,17 60:6,14
67:14,22 68:2,8
68:21 69:13,19
70:2,10 71:1,12
113:2,21,24
related 43:11
128:12
relating 54:21
relative 128:15
remarking 50:15
remember 14:9
15:1,10,11,13
19:1,6,11,22 20:5
20:8,20 21:1 22:2
22:9 24:21 25:14
26:1,11,12,13,14
26:17 38:16 39:12
41:3 42:23 43:6,9
44:13 47:13 49:6
49:8,8 50:9 59:8
59:14,18 63:11
68:13,18,20,21
70:1 78:2 80:20
80:21 85:9 95:24
99:6,8 105:10,11
107:9 113:6,11,12
113:19
remind 54:23
repeat 9:2 13:17
17:17 26:22 33:1
36:11 37:10 39:8
44:18 52:21 54:6
65:18 85:17

105:20 117:22
119:7 125:5
repeated 108:8
rephrase 60:8
replaced 19:13
replacement 41:1
reported 36:18
40:21
reporter 6:12,14
27:13 28:9 33:17
33:20 36:21,24
61:3,15 66:23
73:1,3 84:15,17
84:20 105:21
107:13 108:1
126:3
Reporting 6:6,13
represent 9:16
represented 10:17
representing 12:4
request 124:16
requirements
19:16
resource 68:2
resources 13:4 18:6
respect 12:4 24:17
54:24 111:21
112:22 114:23
respecting 17:16,20
39:3
respond 58:16
73:16
response 8:12 54:4
responsibility 23:4
retained 10:14
return 15:17
returned 15:19
review 25:20 48:3
51:3 52:13,15
53:23 67:17
124:18 125:16
ride 71:23 76:23
right 8:5,21,23 12:7
20:20 21:11,13,14
21:17 22:5 28:3,4
31:20 33:21 35:23

1/18/08 DEPOSITION OF LISA TRACEY  GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 139

37:24 43:10 45:5
50:7,10,16,17
51:13,22 61:5,6
64:24 67:5 68:1
73:19 84:21 95:15
96:6 97:6 99:9
101:6,7 109:4
110:12 112:3,21
114:8 115:18
121:7 122:24
**right-hand** 41:22
**role** 79:16,20 81:2
**Rolstad** 2:12 3:5
4:15 6:18,18
13:14,21 27:2,4
27:22 28:3,6,10
28:14,23 29:7,15
32:2,22 34:17
36:3,19,23 37:2
39:16 40:8,11
41:17,22 43:1
44:10,12 46:16
47:24 52:1 54:10
55:16 56:2,4 57:4
57:7,10 60:3,11
61:2,14 62:20
63:18 64:3,10,17
64:20 65:1,9,11
66:2,22 67:1 68:5
69:6,20 70:24
71:3,6,9 72:5 76:3
76:18,21 77:9,11
84:4,12,16 94:21
96:3 104:15
105:23 106:2,5,19
107:2,3,6,9,16,19
108:3 114:5 115:9
118:3,5,8,10,12
118:17,19 120:23
121:7,10,12
124:21 125:3,21
126:2,10
**Rolstad's** 107:22
**room** 76:1
**Rosenfeld** 1:20
**rules** 7:21

**Rumbo** 6:13 128:3
128:22

**S**
**S** 2:1 4:1 6:1 127:1
**Sabrina** 34:9,11
**sake** 29:3
**salutation** 30:19
**San** 2:15
**satisfactorily** 6:22
**satisfactory** 127:19
**saved** 56:10
**saw** 43:7 49:21
108:14
**saying** 55:23 60:7
62:15 65:12,16
68:24 69:1,11
91:19 95:12
108:16 113:17
114:20 120:20
**says** 30:18 31:9
32:9,12 41:18
51:14 57:18 63:6
70:17,24 87:6,9
92:22 93:2,20,23
97:22 98:21 100:4
100:14 113:18
117:11 118:24
120:3
**school** 1:21 6:12
12:15
**Scibilia** 4:6,10 30:3
32:9 33:7 38:8
**Scibilia-Tracey**
4:23 51:2 61:10
**sclerosis** 113:22
**scope** 29:9,12 95:8
96:19
**screen** 4:7 31:7,11
31:14
**seal** 128:19
**second** 13:23 28:15
38:13 51:16 59:19
67:19 92:21 97:13
97:18 98:15
**seconds** 43:16

**secretary** 87:15,16
**Section** 41:15
**Sedgwick** 2:11
70:16
**see** 8:18 11:18,20
21:17 25:5,16
28:10 29:5 30:18
32:8,15 42:1,5,9
46:23 48:1 54:12
57:15,18 58:8
61:10 62:13 67:24
72:10 76:8 83:17
87:8 89:13 90:8
92:23 93:3,21
96:20 97:4 98:10
98:19,22 99:11
100:5,10,11,15,23
103:7 104:13
106:5 111:18
116:23 118:2
121:22 123:7
125:5
**seeing** 64:23 85:7
105:10
**seen** 17:24 41:16
42:15,20 55:11
74:20
**semantic** 68:11
**seminars** 24:14
**send** 33:10 35:10
**senior** 24:5
**sense** 96:18
**sent** 23:17,19,21
33:6 70:17
**sentences** 87:11
**September** 15:19
**service** 16:18 18:13
22:23 23:7 45:7
58:7 78:11 79:8
**set** 29:12 45:2
128:18
**severance** 84:2
**shock** 55:13
**short-term** 95:14
111:22 112:1
**shoulders** 8:13

**show** 31:6 33:22
36:5 37:24 41:8
46:1,6 47:19
49:14 53:15 59:20
61:6 66:14,15
67:11 70:13 72:18
84:8 97:9
**showed** 32:17
63:12 64:13 105:4
**shown** 40:5 54:16
116:10
**shrug** 8:13
**sign** 105:8
**signature** 63:21
97:20,21,23
**signed** 34:8 38:13
98:9 127:21
**similar** 38:19
**sit** 78:12 105:12
**situation** 12:9
52:16 123:4,8
**six** 104:9
**small** 16:17,21,23
23:13 45:2 79:7
79:13
**snow** 114:19,21
**snowstorm** 114:16
**soliloquy** 55:17,20
**somebody** 81:7
88:11 110:22
112:11,15 113:18
123:6,10
**somebody's** 116:20
**sorry** 10:6 11:15
13:17 14:16 15:13
24:11 25:3 27:5
27:12,12 28:9
31:24 33:18 36:19
41:20 43:9 49:5
51:8,12,18 52:7
52:10 53:13 55:12
55:22 56:20 57:9
58:23 59:3 67:5
72:19,24 73:4,16
79:10 81:19 82:21
82:24 85:17 94:16

125:3,7,12
**sort** 23:9,10 24:14
109:5
**South** 2:5
**SOUTHERN** 1:5
**space** 44:21
**speak** 47:10 71:5
80:16 113:2
116:13
**speaking** 53:11
59:11 60:6 70:1,9
71:5 78:21 80:21
92:10,14 105:13
116:17
**speaks** 64:4 70:23
**specialist** 6:4
**specific** 75:14
91:22
**speculate** 110:14
**speculation** 32:23
34:18 40:9 43:2
55:18 63:19 69:21
83:2,8 86:15,21
93:12 94:12 96:16
99:22 117:20
120:1 121:4
**speculative** 46:17
**spell** 7:7 16:7
**spelling** 21:14
**spoke** 19:7,8 24:12
65:16
**spoken** 65:24
**sponsor** 1:11 6:9
24:14
**ss** 128:2
**SSGI** 14:24 104:18
104:21
**stage** 9:10
**stamp** 87:1
**stamped** 89:12
**staple** 33:24 59:4
**start** 12:13 25:6
125:11
**starts** 41:15 59:21
**state** 6:14 7:6 62:15
**stated** 54:7 60:15

1/18/08 DEPOSITION OF LISA TRACEY
Page 140

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

63:3 109:11
**statement** 4:12
  41:15,19 100:22
**statements** 46:17
**states** 1:4 52:12
  62:14,15 68:22,23
**stating** 29:18 60:16
  69:4
**status** 107:1
**stayed** 16:2
**staying** 16:3
**Steno** 2:22 6:5
**Steuart** 2:14
**Stewart** 4:15,24
  47:22 67:14
**stipulate** 125:13
**stipulated** 125:20
**stop** 35:5
**stopped** 71:12,16
  125:9
**store** 48:22
**street** 1:21 6:12
  9:23 10:2
**strike** 72:15,16
**subject** 32:12
**subpoena** 11:19
  27:20
**subsequent** 124:6
**substance** 11:12
**successor** 40:19
**suggest** 53:3 65:3
**Suite** 1:21 2:5
**support** 49:11
  52:18,22
**supposed** 114:19
**sure** 7:23 8:10
  12:24 14:13 18:20
  21:12,15,24 22:8
  23:1 25:21 27:1
  29:6,16 33:21
  35:13,16 40:23
  50:5 51:4 61:16
  69:24 74:13 85:18
  88:24 91:4 93:15
  94:20,21 99:18,23
  100:3 109:21

111:5 117:23
**switch** 13:8
**switched** 23:3,5
**sworn** 6:24 55:5
  128:7
**system** 25:23 31:17
  31:18,19,20
**Systems** 104:18

_____
**T**
**T** 4:1 127:1,1
**take** 14:6 21:13
  30:4 33:18 46:15
  46:18 51:5 53:23
  61:12 62:12 67:16
  70:20 72:22 79:7
  81:9 90:15 91:21
  94:21 112:5 114:9
  115:15 118:19
**taken** 6:11 7:23
  36:7,13 45:13
  61:20 69:15 77:3
  95:2 119:20
  128:14
**takes** 46:19
**talk** 89:10 92:9
  108:16 112:11
**talked** 37:20 95:22
  108:17 111:24
  124:2
**talking** 39:14 68:10
  101:17 109:12,15
  109:15
**talks** 49:4
**tape** 94:18,22
**taught** 12:20
**team** 23:8
**technically** 63:2,3
**Technologies** 15:12
  22:6,10 35:4
**telephone** 52:3
  53:12 57:22 59:12
  80:7
**tell** 9:1 21:14 33:24
  37:5 71:11 83:9
  95:12 111:6,10

**telling** 20:21 60:14
  68:1,21 69:13
  113:21
**ten** 20:13,15 43:24
  44:14,19 72:9
  95:24
**term** 96:14
**terminal** 114:2,4
**terminated** 83:22
  90:4 100:5,9
  101:7,9 109:10
**terminating** 83:17
  83:19
**termination** 100:18
  101:12,18 102:6,9
**terminations**
  101:16
**terms** 12:11 19:2
  39:14 80:9 81:11
  85:10 86:5,12,18
  88:5,12 122:21
**test** 98:5
**testified** 7:1 43:21
  71:15 75:5 78:24
  79:18 98:7 108:14
  109:4 110:2
  111:18 121:24
  122:2,17,24
**testify** 9:6 55:5
  121:22
**testifying** 105:19
**testimony** 13:15
  39:17 48:15 56:5
  58:19 63:20 64:18
  69:7 76:6 77:19
  106:16 115:18
  125:24 127:3,5
  128:9
**thank** 7:9 10:11
  12:7 24:4 25:5
  28:6 29:7,15 36:3
  37:2 47:3 48:6
  51:17 57:10 61:23
  66:12 67:4,8
  84:22 87:20 97:9
  106:7 110:1

115:13 119:21
  121:7 122:16
  124:16 125:4
**thereabouts** 47:9
**they'd** 83:22 97:1
**thing** 8:9 23:10
  29:17 31:4 50:17
  59:4 76:9 92:6
  95:20 118:9 126:7
**things** 11:8 81:6,9
  81:11 112:5
  115:20 116:24
  125:22
**think** 14:3 15:22
  20:13 21:5,10
  25:14,15 28:9
  32:5 35:5 38:3,22
  40:2 42:10 43:23
  44:7 45:17 56:14
  58:11 66:17,19
  72:11,11 75:8
  76:8,9,15 82:3
  93:17 95:23 96:4
  96:6 97:10 98:5
  103:11 109:14
  114:3,9 116:1
  117:8 118:21
  119:6 122:24
  123:1 125:22
**thinking** 13:22
**third** 89:12,13
**thought** 71:23 99:6
  103:2 123:9 125:8
**thoughts** 60:16
**three** 16:2 32:8,10
  42:24
**time** 1:19 6:7 10:7
  13:1 14:6 15:5
  20:16,21 22:14
  24:6 27:12 28:17
  28:20 32:16 33:19
  35:6 38:23 40:16
  46:15 47:14,17
  49:21 51:5,11,19
  53:10,23 57:1
  58:10,13 59:12

61:18,21 68:1
  72:13,22 74:15,18
  75:15,21 77:1,4
  78:4 79:6,8 82:3
  85:23 86:4,4
  88:19 94:23 95:3
  98:12,15 101:15
  101:20 102:18
  109:9 120:17
  124:10,14 126:13
**times** 42:19,24
  68:19 88:4 91:9
**timesheets** 79:5
**tiny** 20:13 45:15,15
  45:17 79:13
**title** 41:12 87:9
**titled** 38:12
**today** 6:6 9:7,11
  10:19 11:12 12:5
  71:6,9 75:5,16,22
  76:6 78:12 102:22
  104:17 105:4
  114:19 115:2
**told** 21:1 28:9
  37:17 58:17 96:13
  103:2 113:3
**top** 31:9 33:3 46:11
  89:13 91:5 93:2
  98:18 125:10
**touched** 81:15
**Tower** 2:14
**Tracey** 1:16 3:3 4:8
  4:13,17,19,21 6:8
  6:20 7:8,9 13:24
  29:23 30:13 31:6
  34:2 43:21 46:12
  49:24 54:14 56:24
  62:6 65:7 76:22
  77:10 85:7 95:5,7
  96:8 106:12 126:4
  127:2,16 128:5
**track** 66:17
**trained** 19:20
**training** 20:5,6
**transcript** 8:15
  65:13 124:19

1/18/08 DEPOSITION OF LISA TRACEY

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

Page 141

125:15,23 126:4,8
127:3 128:8
**transfer** 117:6
119:1 122:21
**transferring**
117:10 119:10
**transmission** 51:14
58:18
**tried** 58:5
**trouble** 65:6
**true** 74:20 75:1,4
107:18,20 108:13
116:13 117:1
123:9 125:23
127:4 128:9
**truthfully** 8:20 9:6
**try** 28:2 42:8 43:5
106:15 107:15,21
110:8
**trying** 8:2 9:1 14:3
49:22 59:17
113:17
**turn** 87:5
**twenty** 43:8
**two** 15:21 19:8,20
22:23 29:11 40:4
43:15 51:23 56:7
75:9,11 87:11
90:16,19 92:11
93:20 102:3
111:13 121:23
125:21 126:2
**type** 92:6 95:8,20
96:8 107:16 123:7
**types** 17:24
**typical** 126:9
**T-r-a-c-e-y** 7:8

**U**

**Uh-huh** 22:22 23:1
44:23 45:1,3
**Um-hmm** 8:6 13:11
20:11 22:20 32:14
38:9,11,24 42:10
45:24 46:10 48:2
67:21 70:19 91:24

104:2 109:7
112:14 123:3
**underneath** 32:17
87:11 100:22
**understand** 7:10,19
8:5,15,23 9:3 23:1
40:22 49:22 55:4
55:15 66:4 90:19
90:22 91:8,14
93:5 115:18
119:16 120:10
122:11 125:18
126:2
**understandable**
48:8
**understanding**
12:24 69:1 122:19
**UNITED** 1:4
**Unresponsive**
72:17
**unsure** 99:10
**upper** 41:22
**urgent** 57:16
**Uromed** 1:12 6:9
6:19 13:2,10,18
14:7,13,17,18
15:7,14,23 16:18
18:6,15 19:2,4
20:9,23 21:23
22:12,13 24:14,19
26:2,7,20 30:9
31:16 33:9 35:6
35:11 36:13 37:13
38:8,23 39:4,7,11
39:15 40:5,7,19
41:16 42:1,16,20
43:23 44:3 45:12
45:19 46:4 62:16
63:8 65:15 66:8
68:3 69:23 75:16
75:22 76:12 77:12
78:5,24 80:16
81:2 82:17 83:5
85:15 86:2,8 88:4
88:11,18 89:2
90:1 92:4,15 93:2

93:6,9,16 94:1,5
95:21,23 96:20,22
98:12 99:1,5
101:16 102:19
105:2 109:6,16
112:8 123:21
124:5
**Uromed's** 37:7
79:14,17,21 80:17
80:22 81:21
**use** 33:9 55:11
**uses** 53:20
**usually** 112:16
114:1
**U.S** 6:10

**V**

**v** 1:10
**vacation** 79:5
**vacations** 84:3
**vague** 34:17,20
40:11 44:12 65:2
65:4 66:2
**various** 23:3
**verbal** 8:11 25:11
**verbally** 73:16
86:18
**versus** 6:8
**vibrates** 71:20
**vice** 87:14,15
**video** 1:16 2:22 6:4
6:5 8:14
**VIDEOGRAPH...**
6:2 28:17,20
61:16,18,21 77:1
77:4 94:16,23
95:3 108:6 124:10
124:14 125:7,11
126:13
**visit** 48:12
**visited** 59:6,12
**visiting** 68:9
**visits** 70:10
**Vista** 2:6
**voice** 57:19
**voicemail** 54:4,8

**VOLUME** 1:1

**W**

**wait** 84:20 88:15
**waiting** 76:1 112:2
**waive** 87:17
**waived** 69:2 119:11
120:7
**waiver** 120:18
**walk** 45:12
**want** 8:14 9:1 30:4
51:3 54:23 61:24
62:3 67:23 74:13
74:17 76:16 85:3
97:9 104:13
**wanted** 81:8,20
**wasn't** 72:16 88:24
109:14 116:21
120:8
**way** 14:11 22:13
34:20 40:15 48:23
107:11,15 124:5
**week** 15:21 16:19
22:24 53:13 57:20
73:23 74:9,22
102:3
**weeks** 19:20
**welcome** 28:7
**welfare** 80:17
85:16 104:21
**went** 16:5 95:13
101:21 106:19
112:15
**weren't** 23:5 102:4
116:4
**Weymouth** 16:6
**we'll** 12:13,23
22:12 26:5 41:5
**we're** 8:1,2 9:1,9
31:20 38:4 54:22
58:22 66:18 94:17
94:18 115:10
116:7 120:20
**we've** 45:23 47:1
61:24 68:19
**WHEREOF**

128:18
**witness** 3:2 6:21
11:16 13:15 27:11
39:17 56:4 59:1
63:19 64:18 66:24
67:5 69:7 71:21
71:23 72:2,7
73:13 76:4,19
82:21,24 84:8
85:2,3 88:17
103:15,17 118:16
121:15 125:19
128:18
**word** 92:21 107:9
**work** 9:16 10:11
13:12,18 16:4,5
44:21 111:19
124:5
**worked** 10:5 11:5
13:10 16:1,17
18:20,22 45:19
89:2
**workforce** 101:8
**working** 6:4 40:6
42:16 94:5 109:16
123:22
**wouldn't** 9:22
58:16 66:5 93:18
97:1 111:12
112:12
**write** 10:7 65:14
**writing** 66:6 86:13
87:14,19
**written** 25:6,7
34:14 49:12 65:20
81:10 89:7 96:13
96:21 100:15,22
**wrong** 29:5 77:20
111:20
**wrote** 40:14,16
69:19 107:5

**X**

**X** 3:1 4:1

**Y**

1/18/08 DEPOSITION OF LISA TRACEY
Page 142

GIL CAPIANCO V. LONG-TERM DISABILITY PLAN OF SPONSOR UROMED CORP., ET AL.

**yeah** 11:4 13:23
23:11,22 26:23
44:19 50:20 61:17
76:24 100:2
115:14 118:1,22
125:1,12
**year** 47:8 63:6 81:7
**years** 16:2
**yep** 92:2 117:4
119:4

**0**

**004** 93:1,19
**006** 92:19
**01** 101:21,22,24
**03-CV-562** 1:6
**08** 89:12

**1**

**1** 1:2 28:5 41:15
64:1 93:23 94:1,9
94:24
**1-800** 78:13
**10** 4:20 56:24
**10th** 53:18 58:2
62:2
**10/18/01** 101:9
**10/31/01** 100:19
101:10
**10:19** 28:17
**10:20** 28:20
**105** 3:4
**11** 4:9 34:2 35:1
90:6
**11/01/2013** 128:23
**11:06** 61:18
**11:11** 61:21
**11:33** 77:1
**11:35** 77:4
**11:58** 94:23
**114** 3:5
**12th** 64:15
**12:01** 95:3
**12:30** 124:10
**12:34** 124:14
**12:35** 126:13,16

**120** 3:4
**128** 1:2
**13** 4:14 46:11
**15** 124:17 125:14
**16** 4:22 56:21 57:22
98:22
**16th** 49:5
**18** 1:18 4:11 6:6
38:5 128:6
**19** 5:2 67:15 108:2

**2**

**2** 62:12 95:4 124:12
**2000** 93:23 94:2,9
98:22
**2001** 15:16,20,21
15:22,23 62:16
63:7 64:15 69:5
99:13
**2002** 4:9,11 34:2
35:1 38:5 98:10
**2003** 4:14 46:11
47:8
**2004** 4:16,18,20,22
5:2,4,6 47:23 49:5
51:1,20,24 53:19
54:22 56:21 57:23
59:17,21 60:10
62:3 67:15 70:3
70:15 72:21
**2008** 1:18 6:7
127:17 128:6,20
**21st** 51:24 59:21
128:19
**26th** 60:10
**27** 99:13
**28** 4:3,5 5:4,6
**28th** 70:15
**29** 4:16 47:23
**29th** 59:17 72:21

**3**

**3** 62:14
**30** 4:6
**32** 4:7
**35** 4:9

**361** 2:5
**380** 2:5

**4**

**4/12/2001** 32:9
**40** 4:11
**401(k)** 81:9 117:14
**410** 1:21
**415** 2:16
**42** 4:12
**44** 1:21 6:12
**46** 4:14
**49** 4:16 87:6

**5**

**5** 4:18
**5th** 51:1
**508-586-7205**
57:23
**508-897-0831**
51:10,15
**52** 4:18
**58** 4:22

**6**

**61** 4:20
**627-3435** 2:16
**66** 4:23
**69** 5:2

**7**

**7** 3:4
**7:35** 32:9
**707** 10:2
**72** 5:4
**76** 3:5 108:2
**760** 2:7

**8**

**8th** 2:14 98:9
**800** 78:10
**83** 5:6,7

**9**

**9:56** 1:19
**9:57** 6:7
**92081** 2:6

**94105** 2:15
**942-7848** 2:7
**95** 5:8